## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No.:_____ |
| | ) | |
| v. | ) | |
| | ) | |
| BRANDEIS UNIVERSITY, | ) | |
| | ) | |
| Defendant | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff, John Doe ("**Plaintiff**"),[1] by and through his undersigned attorney, files this Complaint, and in support alleges as follows:

### Nature of Action

1.     This case arises out of actions taken by Defendant Brandeis University ("**Brandeis**") concerning false allegations of sexual misconduct made against Plaintiff, in February 2020, by another Brandeis student ("**Accuser**").

2.     Brandeis failed to provide a meaningful process for Plaintiff to defend himself from false allegations of sexual misconduct; refused to explore the Accuser's character for truthfulness after it received information that the Accuser had made false accusations against other Brandeis students that were not supported in fact; proceeded with the process at Brandeis internally despite the Accuser being particularly well-known in the Brandeis community and having pre-existing relationships with Brandeis's Office of Equal Opportunity and Title IX staff and

---

[1] Contemporaneously with this Complaint, Plaintiff has filed a Motion to Proceed Under Pseudonym.

administration; applied the 2019-20 Student Handbook's policies and procedures regarding Title IX when the conduct occurred in December 2018, and while Brandeis was simultaneously significantly altering Brandeis's Title IX policies and procedures to come into compliance with anticipated Title IX Final Rules, effective before Plaintiff was disciplined; failed to utilize policies and procedures that afforded the Plaintiff basic fundamental fairness; and neglected to apply the policies and procedures to Plaintiff and the Accuser equally, when Brandeis received evidence that both students were equally intoxicated and that both initiated parts of their sexual encounter.

## Parties

3.     Plaintiff John Doe is a resident of the Commonwealth of Massachusetts. Plaintiff was enrolled as a full-time student from the Spring 2018 academic term to the Fall 2020 academic term at Brandeis University.

4.     Plaintiff was suspended from Brandeis University on September 16, 2020, for the period from September 16, 2020 through May 23, 2021, as described in Brandeis's Notice of Final Outcome, transmitted electronically to Plaintiff. Brandeis's Decision-Making Panel determined that Plaintiff was responsible for four violations of the Brandeis Student Handbook and imposed two sanctions, including (1) the previously described suspension and (2) an ineligibility to participate in leadership roles at Brandeis or represent Brandeis in any official capacity, upon return to Brandeis after his suspension.

5.     Plaintiff and his family are of Asian heritage, and experienced implicit bias and racism as a motivating factor in Brandeis's conduct and actions, in that Brandeis

has a history of complaints against fraternity members that are Caucasian with substantial financial resources being dismissed or "swept under the rug." A conviction against a student of Asian heritage, that is not a fraternity member, helps the school correct its longstanding reputation for failing to protect victims of sexual violence from privileged Brandeis students.

6.    Furthermore, Plaintiff's parents themselves experienced bias, when Brandeis administration responded to their request for an urgent meeting, and incorrectly assumed that of the two signatures in the electronic communication, the one without a doctor title was the Plaintiff's mother. In-fact, Plaintiff's mother is a surgeon and was the parent whose signature was inclusive of her doctor title and is not less qualified than her doctor spouse. Brandeis assumed that the Plaintiff's mother was his father in the signature simply on the basis that as an Asian woman Plaintiff's mother must have been the lesser qualified parent.

7.    Defendant Brandeis University ("**Brandeis**") is a corporation organized and existing under and by virtue of a special charter granted by the Commonwealth of Massachusetts, together with its schools, departments and offices.

8.    Defendant Brandeis is a private institute of higher education, located at 415 South Street, Waltham, MA 02453.

9.    At all relevant times, Brandeis acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of Brandeis's business, mission, and/or affairs.

**<u>Jurisdiction and Venue</u>**

10.     This Court has original jurisdiction under Title IX of the Education Act Amendments of 1972 (20 U.S.C. § 1681), and jurisdiction over related state claims under the principles of ancillary and/or pendent jurisdiction (28 U.S.C. § 1367).

11.     Venue in the District of Massachusetts is proper because Defendant is located here and a substantial part of the events and transactions causing the claims occurred here. (28 U.S.C. § 1391(b)).

## Statement of Facts

### Brandeis

12.     Brandeis was founded in 1948, is located on a 235-acre campus in the suburbs of Boston, and has a current enrollment of approximately 5,800 students across its undergraduate and graduate areas of study.

13.     Brandeis is a residential university where 78% of its students live on campus for all four years of higher education.

14.     Residence halls are supervised by area coordinators with the assistance of upper-class students who serve as community advisors, and the university community living staff.

### Brandeis's Climate of Sexual Misconduct

15.     Historically, Brandeis has repeatedly been accused of mistreating sexual assault victims, not protecting students, and taking no action to identify and punish perpetrators of sexual misconduct on its campus.

16.      In 2014, Brandeis received national attention after it was widely reported that the United States Department of Education ("**DOE**") filed a federal investigation regarding Brandeis's handling of sexual assault complaints.

17.      In 2014, Brandeis students established "SpeakOut! Brandeis" an online community and student-led initiative to promote awareness because of the significant prevalence of sexual assault on Brandeis's campus.

18.      In 2014, *Brandeis Students Against Sexual Violence* was founded by a group of anonymous student activists, and the student group compiled a letter and petition to Brandeis to address the pervasive issues of sexual violence on campus and organized various demonstrations in order to create spaces for survivors to be heard.

19.      In 2015, Brandeis conducted its first *Campus Climate Survey* and the responses reflected disturbing and deeply troubling findings regarding sexual harassment and sexual misconduct at Brandeis.

20.      Then Interim President of Brandeis, Lisa Lynch, called the results "deeply troubling," and the Brandeis Hoot Editorial Board noted "[t]he results are scary, but probably not surprising to activists on campus who have tried to talk about sexual assault and increase awareness for years."

21.      In 2015, Brandeis had its first recorded expulsion from Brandeis for a violation of the sexual misconduct code.

22.      In 2015, Brandeis opened its Rape Crisis Center for survivors of sexual violence as a dedicated resource for information and support on campus.

23.    In 2016, Brandeis received national publicity when the United States District Court for the District of Massachusetts issued its decision on Brandeis's motion to dismiss a lawsuit brought by a student against Brandeis after Brandeis had found him to have sexually assaulted his ex-boyfriend multiple times over their 21-month long romantic relationship.

24.    The comprehensive decision by the District of Massachusetts unequivocally informed Brandeis that their Title IX policies and procedures violated basic notions of fairness; including failure to provide a thorough account of the charges to the student; no right to counsel; no right to confront the accuser; no right to examine witnesses; no right to examine evidence or witness statements; impairment of the right to present evidence or witness statements; no access to the Special Examiner's report; no separation of investigation, prosecution, and adjudication functions; no right to effective appeal; and a lowered burden of proof to "preponderance of the evidence."

25.    The District of Massachusetts further determined that there was reason to believe the Special Examiner decided the students guilt based on unfair generalizations, stereotypes, and logical fallacies.

26.    In October 2018, Brandeis students were critical of Brandeis because sexual assault charges were not being reflected on the transcripts of students found responsible, rather Brandeis was maintaining the disciplinary records in a separate disciplinary file.

27.     At this time, a Brandeis survivor that had went through Brandeis's Title IX process was critical that Brandeis was wary of legal battles and poor publicity and that stated that Brandeis purposefully drags out Title IX Investigations.

28.     Also, in October 2018, the Brandeis student group *Brandeis Believe Survivors* held a sit-in against sexual violence, with pamphlets and signs stating "Brandeis We Feel Your Silence."

29.     *Brandeis Believe Survivors* was critical that Brandeis was perpetuating silence in allyship during this political climate around the issue of sexual violence.

30.     In January 2019, Brandeis joined with 54 other Massachusetts colleges and universities to submit comments to the DOE critical of the DOE's proposed Title IX regulations, according to a Brandeis community-wide letter from Brandeis President Ron Liebowitz.

31.     The Association of Independent Colleges and Universities in Massachusetts's ("**AICUM**") comments were critical of the DOE's proposed rules, including for example, that the DOE proposed the requirement of live hearings with cross-examination by advisors, mandated dismissal of the complaint if the conduct alleged does not constitute sexual harassment as defined by the DOE, and required that Title IX Coordinators are not to have any conflicts of interest or bias for or against complainants or respondents generally or individually.

32.     In March 2019 Brandeis conducted its second *Campus Climate Survey,* which responses again demonstrated that many of the results remained stubbornly and disappointingly consistent with those from the first campuswide climate survey at Brandeis, conducted in 2015.

33.     In March 2019 Brandeis created the Office of Equal Opportunity ("**OEO**"), responsible for addressing all issues of discrimination, harassment and sexual violence for students, staff, and faculty at Brandeis, to be headed by inaugural Director Sonia Jurado, Esq. ("**Attorney Jurado**")

34.     In November 2019 several Brandeis Greek life organizations ("**GLOs**") participated in *These Letters Believe Survivors*, an event to raise awareness of sexual assault on campus.

35.     From November 18 to November 19, 2019, the Brandeis Board of Trustees held a retreat to discuss among other things the negative results of the second *Campus Climate Survey*.

36.     During the retreat, the Trustees also discussed improving the Title IX complaint process.

37.     In November 2019, the results of the second *Campus Climate Survey* were released by Brandeis.

38.     Of the total number of students that responded to the second *Campus Climate Survey*, 179 undergraduate respondents reported being sexually assaulted, and 48 students reported being raped since becoming a student at Brandeis.

39.     In May 2020, the DOE released its Final Rule under Title IX of the Education Amendments of 1972, the Final regulations were published in the Federal Register and the Final Rule carried the force and effect of law as of August 14, 2020.

40.     Effective August 14, 2020, Brandeis implemented policies and procedures regarding Title IX to come into compliance with the DOE's final regulations.

41.     In August 2020, Brandeis held a Community Forum to provide overviews of the changes to the policy and to answer questions from the Brandeis community about new policies and procedures.

42.     As of October 2020, the DOE, Office of Civil Rights lists two current investigations of Brandeis regarding Title IX (sex discrimination).

### Brandeis Student Handbook

43.     Brandeis's policies on sexual misconduct have been repeatedly restructured during Plaintiff's education at Brandeis.

44.     At the time of Plaintiff's matriculation, in the Spring 2018 semester, Brandeis's Rights and Responsibilities ("**Student Handbook**") outlined the standards of personal conduct for the University community. **Exhibit A** (Brandeis University, *Rights and Responsibilities 2017-2018*).

45.     Then, the Student Handbook was inclusive of a *Special Examiner's Process* (Section 22), a formal adjudicatory process for allegations of sexual misconduct or gender-based violence or harassment. **Exhibit A**, at 6, 51-62.

46.     Brandeis's Student Handbook, in Plaintiff's following year at Brandeis, was also inclusive of the *Special Examiner's Process* (Section 22). See **Exhibit B**, at 6, 52-62 (Brandeis University, *Rights and Responsibilities 2018-2019*).

47.     Brandeis's Student Handbook, in Plaintiff's next year at Brandeis, departed from the *Special Examiner's Process* (there is no Section 22), and rather described a *OEO Resolution Process* (Section 3) to be used when a member of the Brandeis community is alleged to have engaged in discrimination, harassment or sexual

9

misconduct. See **Exhibit C**, at 12 (Brandeis University, *Rights and Responsibilities 2019-2020*).

48.     The Student Handbook described that the OEO Resolution Process could be found in the Policy Against Discrimination, Harassment and Sexual Misconduct. **Exhibit D** Brandeis University, Policy Against Discrimination, Harassment and Sexual Misconduct (Revised Sept. 2019).

49.     Unlike prior Student Handbooks, the *OEO Resolution Process* is not described specifically in the Student Handbook, rather the Student Handbook repeatedly refers person(s) to the OEO website for relevant information about the *OEO Resolution Process*.

50.     Brandeis's Student Handbook, in Plaintiff's most recent academic year at Brandeis, significantly departed from the *OEO Resolution Process*, and set forth the *OEO Formal Complaint Process* and the *Title IX Grievance Process*, to address when there are allegations that members of the Brandeis community engaged in discrimination, harassment, or sexual violence. **Exhibit E**, at 13-18 (Brandeis University, *Rights and Responsibilities 2020-2021*).

51.     The details of the *OEO Formal Complaint Process* and/or *Title IX Grievance Process* are not detailed specifically in the Student Handbook, rather repeatedly throughout the Student Handbook refers person(s) to the OEO website for relevant information.

52.     Effective August 14, 2020, Brandeis set forth new policies and procedures regarding Title IX including the revised *Policy Against Discrimination Harassment, & Sexual Violence*, the *OEO Formal Complaint Process* and the

*Title IX Grievance Process*. **Exhibit F** Brandeis University, *Policy Against Discrimination, Harassment, & Sexual Violence* (Effec. Aug. 14, 2020).

53.     Violations of this Policy are subject to adjudication through either the *Formal Complaint Process* or the *Title IX Grievance Process* which Brandeis set forth simultaneously with its *Policy Against Discrimination Harassment, & Sexual Violence*. **Exhibit G** Brandeis University, *Title IX Grievance Process* (Effec. Aug. 14, 2020); **Exhibit H** Brandeis University, *OEO Formal Complaint Process* (Effec. Aug. 14, 2020).

54.     The *Title IX Grievance Process* provides for a <u>significantly</u> different process to complainants and respondents than the 2019-20 Student Handbook Brandeis elected to use in its adjudication of the Accuser's complaint.

55.     The *OEO Formal Complaint Process* also provides for a different process to complainants and respondents than the 2019-20 Student Handbook that Brandeis elected to use in its adjudication of the Accuser's complaint.

56.     The newly implemented *Title IX Grievance Process* includes jurisdictional requirements to be eligible for the *Title IX Grievance Process*, including that the conduct occurred after August 13, 2020; the conduct must have occurred in the United States; the conduct must have occurred in a Brandeis University program or activity; the complainant must be participating in or attempting to participate in the educational program or activity of Brandeis. **Exhibit G** Brandeis University, *Title IX Grievance Process* (Eff. Aug. 14, 2020).

57.     The jurisdictional requirement that the conduct must have occurred after August 13, 2020, departs from Brandeis prior implementation of Title IX policies and procedures based on the date of the complaint, not the date of the conduct.

58.     The *Title IX Grievance Process* further requires that the conduct alleged fall within the definitions of Title IX Sexual Harassment/Violence.  **Exhibit G** Brandeis University, *Title IX Grievance Process* (Eff. Aug. 14, 2020).

59.     Though both the Plaintiff and Accuser had both consumed alcohol before their sexual encounter, Brandeis proceeded as if Plaintiff was automatically and solely responsible for their sexual encounter.

60.     The investigation by Brandeis was biased in favor of the Accuser and the Plaintiff felt that the Plaintiff was presumed to be guilty from the beginning of the process.

61.     The *Title IX Grievance Process* provides for pre-hearing conferences, that gives an opportunity to both complainant and respondent to review the information the Decision-Making Panel considers to be relevant and which will be discussed at the hearing.  **Exhibit G** Brandeis University, *Title IX Grievance Process* (Eff. Aug. 14, 2020).

62.     Plaintiff was not afforded an opportunity to submit relevant evidence and did not have an opportunity to object to evidence that was not authenticated.

63.     The *Title IX Grievance Process* pre-hearing conference permits both the complainant and respondent to present additional information for consideration during the pre-hearing conference if the party wishes it to be included at the hearing, allows the parties to agree that witnesses information can be either obtained from the Investigative Report, in gathered information, or through

questioning of the Investigator at the hearing, and provides the option to submit questions they would like to pose to a party or witness during the hearing. **Exhibit G** Brandeis University, *Title IX Grievance Process* (Eff. Aug. 14, 2020).

64.     The *Title IX Grievance Process* requires a live hearing for the resolution of a complaint, and states that "[t]o fully participate in the hearing, the Respondent and Complainant *must* each have a support person/advisor." **Exhibit G** Brandeis University, *Title IX Grievance Process* (Eff. Aug. 14, 2020) (emphasis in original).

65.     Plaintiff was not afforded a pre-trial conference or a live hearing, and was not required to use a support person/advisor.

66.     The *Title IX Grievance Process* further provides that if a party does not have a support person/advisor, that Brandeis will provide one of the University's choice, at no expense to the party. **Exhibit G** Brandeis University, *Title IX Grievance Process* (Eff. Aug. 14, 2020).

67.     Plaintiff was not encouraged to obtain a support person/advisor, despite Brandeis being aware of Plaintiff's mental health issues.

68.     The *Title IX Grievance Process* provides each party with a cross-examination opportunity, and specifically states that the support person/advisor is the sole person that has the ability to question another party or witness during the hearing. **Exhibit G** Brandeis University, *Title IX Grievance Process* (Eff. Aug. 14, 2020).

69.     Plaintiff was not provided an opportunity to cross-examine the Accuser or any witnesses, and was not provided any ability to challenge or confirm the authenticity of evidence that had been submitted in the process.

70.     The *Title IX Grievance Process* allows the Decision-Making Panel to deem what information is relevant and admissible in the Grievance Process Hearing, and specifically notes that information about incidents that may show a pattern of behavior may be relevant as determined by the Chair.   **Exhibit G** Brandeis University, *Title IX Grievance Process* (Eff. Aug. 14, 2020).

71.     Plaintiff's evidence that the Accuser had exhibited a pattern of behavior wherein the Accuser wrongfully accused other Brandeis students of misconduct that was not supported in fact was deemed irrelevant by the Investigator at Brandeis, and thereafter not investigated by Brandeis or included in the Investigative Report.

72.     Specifically, the Plaintiff reported to the Brandeis Investigator that there were two other students that experienced the same or similar situation, where the Accuser alleged events occurred that had not actually occurred, and this evidence had a direct bearing on the Accuser's credibility.

73.     The *Title IX Grievance Process* sets forth the opportunity for either party to object to the inclusion of any witness at the Hearing. **Exhibit G** Brandeis University, *Title IX Grievance Process* (Eff. Aug. 14, 2020).

74.     Plaintiff was not provided the opportunity to object to the inclusion of any witnesses.

75.     The *Title IX Grievance Process* requires that Hearings will be recorded, either as an audio or video recording (or both) at the discretion of the Director of the OEO. **Exhibit G** Brandeis University, *Title IX Grievance Process* (Eff. Aug. 14, 2020).

76.     Plaintiff was not provided a hearing and Plaintiff is uncertain whether the three (3) virtual meetings he participated in with the Investigator were recorded by Brandeis.

77.     The *Title IX Grievance Process* also affords the respondent more extensive appellate rights.

78.     The *Title IX Grievance Process* states there are three grounds for appeal, procedural error, availability of new information, and bias. **Exhibit G** Brandeis University, *Title IX Grievance Process* (Eff. Aug. 14, 2020).

79.     Plaintiff's appellate rights were limited to procedural error and new information, and Plaintiff was not permitted to present evidence that there were conflicts of interest due to the Accuser being a well-known student within the Brandeis community.

80.     Furthermore, and equally important, the Plaintiff was not permitted to present evidence that the Accuser's credibility was questionable due to her conduct as a prominent student leader who had been publicly reprimanded, and evidence that the Accuser had close connections and relationships with Brandeis staff and administration, including the OEO and Title IX staff and administration.

### Relationship Between Plaintiff and Accuser

81.     Prior to December 2018, Plaintiff and the Accuser were friends and the Accuser requested the Plaintiff set the Accuser up with one of his friends (the "**Friend**").

82.     The Friend and the Accuser dated for a short period of time and the Friend ended the relationship with the Accuser.

83.     The Accuser was displeased with this and again asked the Plaintiff to intercede and set up the Accuser with his Friend again. This ultimately was unsuccessful as the Friend was not interested in a relationship with the Accuser.

84.     In December 2018 the Plaintiff and the Accuser were hanging out with two other Brandeis students, who had all gotten together to watch a movie. The four students were consuming alcohol, and some of them were smoking marijuana, including the Accuser.

85.     Plaintiff consumed alcoholic beverages and felt tipsy, as the night drew to a close.

86.     The Accuser asked the Plaintiff to walk the Accuser back to her on-campus residence. The Plaintiff and the Accuser walked first to the Plaintiff's room, and then to the Accuser's room.

87.     During the walk, the Plaintiff and the Accuser talked about oral sex techniques that the Plaintiff had used during prior relationships, discussed that the Accuser's relationship with the Friend did not work out, and the Accuser stated that the Accuser was still interested in the Plaintiff's friend and didn't want to mess up that relationship.

88.     Upon arrival to the Accuser's room, the Accuser asked the Plaintiff to come into her room and keep her company, and the Plaintiff entered the Accuser's room.

89.     The Plaintiff and the Accuser talked for about twenty to thirty minutes while the Accuser got ready for bed, including the Accuser changing clothes in the same room as the Plaintiff.

90.     Next, the Plaintiff and the Accuser sat on the Accuser's bed together, and the Accuser got up and turned off the light, and then both laid down together on her bed.

91.     The Plaintiff started to get ready to leave when the Accuser asked Plaintiff "do you find me attractive?"

92.     The Plaintiff answered "no" and then the Accuser asked a second time, "do you find me attractive?" The Plaintiff then answered "yes" and said "I'm not going to try to do anything."

93.     The Friend had recently ended his relationship with the Accuser and the Plaintiff did not want any awkward situations amongst their friend group, or with his Friend in the future.

94.     Then, the Accuser kissed the Plaintiff, and the Plaintiff asked if that was really ok. The Accuser answered "yes."

95.     The Accuser then unbuttoned two buttons on Plaintiff's shirt; and the Plaintiff continued and removed his shirt.

96.     The Plaintiff asked the Accuser "are you sure" and went to take off the Accuser's shirt. The Accuser nodded and said "yes," and the Plaintiff took off the Accuser's shirt.

97.     The Plaintiff and the Accuser continued kissing, and touching each other above the waist.

98.     The Accuser then held the Plaintiff's hand and said "I think you promised to do something for me," and pulled the Plaintiff's hand to the Accuser's waist. The Plaintiff again asked if this was ok. The Accuser answered "yes."

99.     The Plaintiff understood the Accuser's statement to be a reference to the conversation they had while walking, which included the Plaintiff describing oral sex techniques that he had used during prior relationships.

100.    The Accuser had underwear on, and at that point the Plaintiff and the Accuser together took the Accuser's underwear off. The Plaintiff again asked, "is this okay?" The Accuser confirmed by saying "yes."

101.    The Plaintiff used his hands to touch the Accuser externally on the vagina, and then internally in her vagina.

102.    The Plaintiff was laying on top of the Accuser, when the Accuser said "give me something to bite." And, the Plaintiff leaned a shoulder toward the Accuser, who bit the Plaintiff's shoulder leaving a half-oval bite mark on his collar bone.

103.    The Accuser pushed the Plaintiff's head downward toward the Accuser's waist and the Plaintiff said "are you sure?" The Accuser continued to push Plaintiff's head downward toward the Accuser's waste and replied "yes."

104.    The Plaintiff performed oral sex on the Accuser for ten to fifteen minutes, and then the Accuser said "I'm going to come" and climaxed.

105.    After the Accuser climaxed, the Accuser touched the Plaintiff's hand and said "wait, slow down."

106.    The Plaintiff moved his face near the Accuser's face, and asked if everything was okay, and the Accuser responded "I can't believe I'm the girl who hooks up with a guy's best friend after they break up."

107.    The Plaintiff replied "it was okay" but both the Plaintiff and the Accuser were agitated and upset. The Accuser stated "I can't believe I just did this. We

shouldn't have done that." The Plaintiff apologized to the Accuser because of her prior relationship with his Friend, and then he left the Accuser's room and went back to his room.

### After the Incident

108.   The Plaintiff and the Accuser spoke about their sexual encounter in the days after, and the Accuser stated that she was upset because she turned out to be the person that hangs out with their ex's best friend.

109.   The Accuser then told the Plaintiff that the Plaintiff had taken advantage of her, and did not have her consent and that "it wasn't okay."

110.   The Accuser asked the Plaintiff that if anyone asked about what had happened between the two of them, that the Plaintiff would admit the Plaintiff performed oral sex without the Accused's consent.

111.   Upon information and belief, the Accuser was solely concerned with her reputation and purposefully manipulated the Plaintiff so she could protect her own reputation in the student community.

112.   During the Plaintiff and the Accuser's conversation, the Plaintiff reminded the Accuser that she had initiated parts of the interactions between them, and that he had repeatedly asked her if it was okay as they engaged in sexual activity.

113.   The Accuser consistently cut the Plaintiff off from expressing the Plaintiff's experience during the sexual encounter, blamed the Plaintiff for taking advantage of the Accuser, and repeatedly insisted the Plaintiff was not being a very good friend.

114.    Though the Accuser initiated portions of the sexual encounter and both the Plaintiff and the Accuser had been drinking (and the Accuser had used marijuana), the Accuser placed all the fault on the Plaintiff for the Plaintiff and the Accuser's sexual encounter.

115.    The Accuser's statements caused immediate anguish and confusion to the Plaintiff.

### The Accuser's Slanderous Conduct

116.    In January 2019, the Plaintiff was participating in rush week, and when the Accuser learned that the Plaintiff received an invitation to join a Greek letter organization ("**GLO**"), the Accuser intervened to tell the GLO presidents that the Plaintiff sexually assaulted her.

117.    The Accuser asked the GLO presidents not to accept the Plaintiff into their respective GLOs, and relayed to them her version of events that she expressed to the Plaintiff in the days after the sexual encounter.

118.    GLO leaders contacted the Plaintiff to discuss what occurred and invited Plaintiff to a special meeting, where he was pulled aside and told by the GLO leaders that he could not join their GLO.

119.    Plaintiff was severely and negatively affected by the Accuser slandering him and telling other persons the Accuser's version of their sexual encounter.

### Accuser's Pattern of Manipulation and Wrongful Accusations

120.    After Accuser destroyed Plaintiff's opportunity to join any GLO, the Plaintiff spoke with other Brandeis students about their sexual encounter, and described that he had been confused and full of anguish because he definitely recalled

having the Accuser's consent, and that the Accuser initiated parts of the interactions when they engaged in sexual activity.

121.    Through these conversations, the Plaintiff realized that the Accuser had been gaslighting the Plaintiff, and Plaintiff was suffering from extreme emotional abuse where-in Plaintiff was questioning his own thoughts and memories.

122.    The Plaintiff also learned from other Brandeis students that the Accuser had done this to other persons at Brandeis (accusations of wrongful conduct that were not supported in fact) and the Brandeis students familiar with the Accuser advised the Plaintiff to just accept responsibility, let the Accuser say whatever, and move on.

123.    The Plaintiff also learned that the Accuser had been "blacklisted" from GLO events for wrongfully accusing other Brandeis students of inappropriate conduct.

124.    Additionally, the Plaintiff was informed that the Accuser had a reputation for manipulating other students, and negatively affecting their mental health, leaving them worse off than they were before they knew her.

125.    The Plaintiff took the advice, accepted responsibility repeatedly to the Accuser, and tried to move on with the Plaintiff's life.

126.    The Plaintiff and the Accuser did not communicate again after February 8, 2019.

### *The Plaintiffs Mental Health*

127.    The Plaintiff was immediately affected from the actions of the Accuser, and his realization that the Accuser tried to manipulate his recollection of their sexual encounter.

128.    The Plaintiff began to suffer from mental health issues, including immediately suffering from panic attacks if the Accuser was nearby.

129.     Plaintiff went to great lengths to avoid the Accuser, would "hide" from the
         Accuser if the Plaintiff knew the Accuser was nearby, and generally Plaintiff
         would take any action Plaintiff could to avoid any proximity with the Accuser.

130.     For example, the Plaintiff and the Accuser attended an event that required hard-
         to-come-by tickets for entrance. When the Plaintiff became aware the Accuser
         was present, the Plaintiff hid for two hours so the Accuser would not see the
         Plaintiff and he missed the entire event.

131.     Due to the sexual encounter with the Accuser and her conduct after the sexual
         encounter, the Plaintiff suffered from substance abuse issues, and mental health
         issues, including panic attacks, anxiety, suicidal ideation, and nightmares.

132.     The Plaintiff also was fearful for his safety because after the Accuser slandered
         him, the Plaintiff was directly threatened by another Brandeis student.

### The Accuser's Connections and Reputation at Brandeis

133.     In the Accuser's early experiences at Brandeis, the student community knew her
         from her well-known Instagram account.

134.     In the Fall of 2017, the Accuser joined a Brandeis student organization as events
         coordinator that supports women's empowerment and gender equality, and she
         worked with fifty to sixty different clubs, and over fifty different Brandeis
         professors on campus.

135.     The Accuser then held the position of President in that student organization, and
         in that capacity, the Accuser held a self-defense workshop, an event that featured
         fifty-three professors across every department on campus, and presented an open

panel with the Dean of Arts and Sciences, and multiple heads of departments and influential Brandeis professors.

136.    In the Fall of 2018, the Accuser joined another student organization and became one of the co-chairs of one of its committees.

137.    In her role as co-chair, the Accuser worked with the Student Sexuality Information Service and the Health Center to distribute condoms in all freshman dorm bathrooms, worked with the Brandeis Counseling Center outreach project and scheduled meetings with administrators, met with the Dean of Arts and Sciences and other members of administration to advocate for accessibility on campus, met with the Health Center to discuss online portals and potential sexually transmitted disease clinics, and invited members of the Student Sexuality Information Service, the Prevention, Advocacy & Resource Center, the Health Center, the Brandeis Counseling Center and other organizations on campus to discuss initiatives.

138.    During this time, the Accuser served as the primary liaison with Brandeis administration, for specific accessibility initiatives.

139.    In January 2019, the Accuser was elected to another prominent leadership role at Brandeis that she maintained for four months, until April 2019, and was the face of that student organization.

140.    In this position, the Accuser served as a liaison between the student organization and higher up academic administration, dining services, and residential life, and was responsible for sending weekly emails to the student body.

141.    The Accuser then was elected to another prominent leadership role at Brandeis that the Accuser maintained for one year and six months, from April 2019 to September 2020.

142.    In this role the Accuser established relationships with faculty, staff, and administration at Brandeis, and served as an advisor to upper administration in weekly and bi-weekly meetings with the President, Trustees, Provost, Vice Presidents, and Deans at Brandeis.

143.    In this role the Accuser advocated for survivors with the Brandeis Title IX office, and established reforms in the procedures and policies that shortened the time for investigations while helping build trust with the Brandeis community.

144.    During her tenure in this role the accuser was the subject of a complaint by other students that alleged she had violated student group rules and failed to deal professionally with other student leaders and failed to effectively communicate with students.

145.    The complaint against the Accuser was subject to a public hearing, and it was determined that the Accuser had overstepped her authority multiple times and that she had unfairly and unjustly spoken about another student behind their back.

146.    It was also specifically determined that the Accuser had misrepresented the truth and had attempted to engineer a tactical move by making a decision but having another student take credit for it.

147.    In November 2019, the Accuser was required by the student organization to issue a public apology and the Accuser's apology referred to her misrepresentation of

the truth, tactical moves, and abuse of authority as "institutional problems" and a "breakdown of communication."

148.     The Accuser's apology was the subject of further complaints by Brandeis students that were disappointed with the choice of her language.

149.     Upon information and belief, the Accuser was exceptionally concerned with her reputation within the Brandeis community and this public ridicule bore on her filing a complaint, a full fourteen months after the sexual encounter between the Plaintiff and the Accuser.

### *Brandeis's Adjudication of the Accuser's Complaint*

150.     On February 3, 2020 the Accuser reported to the Brandeis OEO that in December 2018 she was sexually assaulted by the Plaintiff, and she elected to proceed under the "Formal Resolution Process" described in the *Policy Against Discrimination, Harassment and Sexual Misconduct*. **Exhibit F**, at 14-22.

151.     On February 26, 2020, at 5:43PM, the Plaintiff received an email from Attorney Jurado that stated as follows:

> I am the Director of the Office of Equal Opportunity at Brandeis. My office is responsible for addressing issues of discrimination, harassment and sexual misconduct within our community for students, staff and faculty. Some concerns have recently been brought to my attention, and I was hoping we could find a time to meet to discuss this matter. From looking at your class schedule, it seems like you are available to meet at 1:00 p.m. on Thursday (2/27). Please confirm you will be available to meet at that time.

152.     From the outset, Brandeis failed to adhere to the Student Handbook and breached their obligations to Plaintiff.

153.     The Student Handbook states that "[a]fter the complaint has been initiated, the responding party will receive a written Notice of Complaint outlining the allegations raised and providing information about the Formal Resolution Process. The Responding party will then have the opportunity to meet with the Office of Equal Opportunity to review the Notice of Complaint and discuss the Formal Resolution Process." **Exhibit F**, at 16.

154.     Plaintiff did not receive the written Notice of Complaint prior to Attorney Jurado scheduling a time to meet with him and Brandeis failed to inform Plaintiff that it was his option to meet with Attorney Jurado.

155.     In-fact, Plaintiff was under the impression from Attorney Jurado's communication that he was required to meet with her and at that point he was not aware he was under investigation by the OEO.

156.     On February 27, 2020, Plaintiff—under the impression that he was required to comply with Attorney Jurado's request to meet, and not aware that he was under investigation by the OEO—met with Attorney Jurado for about thirty minutes over the telephone.

157.     During this meeting Attorney Jurado informed Plaintiff of the identity of the Accuser, that the accuser had initiated a Formal Complaint against him, and that Attorney Jurado had appointed Attorney Amy Condon to investigate the matter.

158.     After being told the identity of the Accuser and that a complaint was initiated against him, the Plaintiff informed Attorney Jurado that his sexual encounter with the Accuser was consensual, and that the Plaintiff has suffered from significant mental health issues since his sexual encounter with the Accuser.

159.     Specifically, Plaintiff described to Attorney Jurado that he suffers panic attacks if

he is in physical proximity to the Accuser, that he was suffering from suicidal

ideation and self-harm, and that he simply cannot and will not be in the Accused's

presence for any reason.

160.     On the same day the Plaintiff received, via electronic communication, a document

titled "Notice of Complaint," which stated as follows:

> A report has been received by Brandeis University which alleges
> that you may have violated the University's *Policy Against
> Discrimination, Harassment and Sexual Misconduct*. The name of
> the individual who brought those concerns to our attention, and
> who is the Initiating Party in this matter, was shared with you
> during our telephone meeting on February 27, 2020. It has been
> alleged during the fall semester of 2018, while in Skyline, you
> engaged in kissing and oral sex with the Initiating Party without
> her consent, and after she said no. These allegations suggest that
> your behavior may constitute Non-Consensual Sexual Contact
> (Section III, A, 3, a, 1) and/or Non-Consensual Sexual Intercourse
> (Section III, A, 3, a, 3) in violation of the *Policy Against
> Discrimination, Harassment and Sexual Misconduct*. A copy of
> this policy has been shared with you via email.

161.     The allegations outlined in the Notice of Complaint are vague and lack adequate

detail to place Plaintiff on sufficient notice of the allegations against him.

162.     Furthermore, the allegations outlined in the Notice of Complaint do not coincide

with Brandeis's Investigative Report or Brandeis's Notice of Final Outcome,

which is yet another breach by Brandeis of its obligations in the Student

Handbook.

163.     The Student Handbook states that "[i]f additional policy violations are identified

during the course of the process (as discussed below), responding party will be

notified of those issues in writing through an Amended Notice of Complaint."

**Exhibit F**, at 16.

164.     The Notice of Complaint alleged (1) non-consensual kissing and (2) non-consensual oral sex by the Plaintiff (**Exhibit I**, *Redacted* Notice of Complaint); but Brandeis's Investigative Report stated that the "Issues to be Decided" were (1a) if Plaintiff had consent to kiss the Accuser; (1b) if not did Plaintiff engage in Non-Consensual Sexual Contact; (2a) if Plaintiff had consent to perform oral sex on the Accuser; (2b) if not did Plaintiff engage in Non-Consensual Sexual Contact, (3a) did Plaintiff touch the Accuser's breasts and vagina; (3b) if so if it was consensual; (3c) if it was not consensual did Plaintiff engage in Non-Consensual Sexual Contact with the Accuser; (4a) did Plaintiff penetrate the Accuser's vagina; (4b) if so was it consensual; and (4b) if it was not consensual did it constitute Non-Consensual Sexual Intercourse (**Exhibit J**, *Redacted* Investigative Report).

165.     Brandeis's Notice of Final Outcome corresponds with Attorney Condon's Investigative Report, and the Decision-Making Panel found Plaintiff responsible for four (4) violations of the Student Handbook. **Exhibit K**, *Redacted* Notice of Final Outcome.

166.     Plaintiff never received an "Amended Notice of Complaint" and the allegations in the "Notice of Complaint," were incredibly vague, never referenced these additional policy violations which Attorney Condon included in her Investigative Report, and which Brandeis included in its discipline and sanctions of Plaintiff.

167.     The Notice of Complaint further stated:

> As the Director of the Office of Equal Opportunity, I have assigned Amy Condon [] to act as the Investigator in this matter. The Investigator will begin a full factual investigation into these allegations. As the Responding Party, you have the right to identify

any documents or witnesses you believe may have information relevant to the allegations that have been raised. Please provide that information to the Investigator as soon as possible. You also have the option to submit a written response to the allegations in this letter. Please note that any information you share with the Investigator may be shared with the Initiating Party. As part of the process, the Investigation will also include an opportunity for you and the Investigator to speak in detail regarding these allegations and to provide your viewpoint. You will also have the opportunity to submit any questions you would like to have posed to the Initiating Party.

168.   Plaintiff took these representations at face value and trusted Brandeis to conduct a full factual investigation of the allegations. Plaintiff genuinely understood that Attorney Condon would investigate the information he provided in the process.

169.   However, at the outset, Brandeis unfairly limited the scope of the investigation, by refusing to explore the Accuser's character for truthfulness after Plaintiff provided information to Attorney Condon that the Accuser made false accusations against other Brandeis students that were not supported in fact.

170.   This arbitrary and subjective refusal by Brandeis to examine information that had a direct connection to the credibility of the Accuser was a miscarriage of justice and had a substantial effect on the fairness of the proceeding.

171.   The refusal was particularly cruel where Brandeis made "Credibility Assessments" and stated as follows:

1. The Investigator finds [the Accuser] to be generally credible. Her statements to the Investigator have been generally consistent with the documents and the statements of other witnesses in this case.

2. The Investigator finds [Plaintiff] to be generally credible, [Plaintiff] admitted that his statements to the Investigator conflict with statements he made after the incident to [the Accuser] verbally and in writing in the January 2019 text messages to [the Accuser].

172.    In-fact, the Investigative Report notes that Witness One said the Accuser said that "they were hooking up, everything was a blur," and that only recently had the Accuser told Witness One that the Accuser said "no" during the Plaintiff and the Accuser's walk to the Accuser's dorm room the night of their sexual encounter.

173.    This information was not included in Attorney Condon's credibility assessments of the Accuser, or Witness One, and directly reflects inconsistencies in statements by the Accuser.

174.    The Investigative Report also makes a note that Witness One said the Plaintiff told Witness One what happened on three occasions in December 2018, and that the Accuser had invited the Plaintiff over, the Accuser kissed the Plaintiff first, and that though the Accuser said she didn't want to do anything that night, the Plaintiff understood she changed her mind.

175.    This information was not included in Attorney Condon's credibility assessments of the Accuser, or Witness One, and directly reflects inconsistencies in the statements of the Accuser.

176.    Both Plaintiff and the Accuser provided the names of witnesses, and electronic communications. However, the Investigator interviewed only the Plaintiff, the Accuser, Witness One (a Brandeis student) and Witness Two (a Brandeis student).

177.    Brandeis interviewed the Plaintiff three separate times, by Zoom due to the Brandeis campus closing in response to the emergent Coronavirus, and during those interviews he described text messages that reflected communications that established the Accuser had a character for untruthfulness, and specifically that

the Accuser had falsely accused other students at Brandeis of improper conduct which was not supported in fact.

178.    Brandeis did not investigate this information, or include it in its Investigative Report, denying Plaintiff the right to enter evidence and witnesses which substantially affected the fairness of the proceeding.

179.    Plaintiff sent Brandeis screenshots of text message conversations, and Brandeis elected not to interview the person identified in the messages, investigate the information, or include any reference to the information in its Investigative Report.

180.    During his interviews, Plaintiff repeatedly informed Attorney Condon that he was suffering from significant mental health issues and described in detail the full-extent of issues he was facing since his sexual encounter with the Accuser.

181.    Plaintiff told Attorney Condon that because of his sexual encounter with the Accuser he had been struggling for months with substance abuse issues, and mental health issues, including for example, that he suffered from anxiety, panic attacks, nightmares, and suicidal ideation.

182.    Brandeis proceeded with the process even though Brandeis was aware that Plaintiff was unable to meaningfully participate in the Title IX process, and ultimately defend himself, because he was incapacitated due to his mental health issues.

183.    Plaintiff also informed Attorney Condon that he had been threatened by another Brandeis student because the Accuser slandered his name in the Brandeis student community.

184.    The Plaintiff explained to Attorney Condon why in the immediate aftermath of the sexual encounter the Plaintiff agreed with the Accuser's recollection of their sexual encounter, but Attorney Condon completely disregarded his explanation and the Investigative Report did not reflect Plaintiff's statements.

### Brandeis's Discipline and Sanctions of the Plaintiff

185.    On September 16, 2020, Plaintiff was informed by Monique Gnanaratnam, Associate Dean of Student Life ("**Dean Gnanaratnam**") that the Decision-Making Panel at Brandeis found Plaintiff responsible for four (4) separate violations of the 2019-20 Student Handbook, including: Non-Consensual Sexual Contact, for kissing the Accuser; Non-Consensual Sexual Intercourse, for performing oral sex on the Accuser; Non-Consensual Sexual Contact, for touching the Accuser's breasts and vagina; and Non-Consensual Sexual Intercourse, for penetrating the Accuser's vagina with his fingers.

186.    The Plaintiff was informed that the Plaintiff was suspended from Brandeis immediately, and through Commencement (May 23, 2021), and that during this time Plaintiff was not allowed to access Brandeis's campus or Brandeis sponsored events (virtual or in-person), and could consider returning to Brandeis to complete his degree after May 23, 2021, but upon return Plaintiff would be ineligible to hold any office or leadership role, or represent the university in any official capacity.

187.    Additionally, the Plaintiff was informed that a no contact order was put in place, and no further action was required on Plaintiff's part.

188.    Plaintiff had five (5) days to submit an appeal in writing to the OEO, and unless Plaintiff appealed the outcome Brandeis would consider the complaint final and the Formal Resolution Process would be permanently closed.

189.    Plaintiff was informed there were only two grounds for appeal (1) Procedural Error or (2) New Evidence.

190.    Upon information and belief, the Accuser did not receive any discipline for the Accuser's participation in the sexual encounter or the initiation of sexual activities during the Plaintiff and the Accuser's sexual encounter.

191.    The Plaintiff submitted an Appeal to Attorney Jurado, however, Attorney Jurado informed him that his Appeal was incomplete and he needed to provide additional information.

192.    The Plaintiff rewrote his Appeal paperwork and re-submitted it to Attorney Jurado.

193.    After that the Plaintiff requested an extension of the Appeal period, because Plaintiff retained legal counsel in order to prepare the information contained herein as part of his Appeal.

194.    Brandeis rejected Plaintiff's request, and Plaintiff's Appeal is currently pending.

## Statement of Claims

## COUNT I
### (Breach of Contract)

195.    Plaintiff restates and realleges each of the foregoing paragraphs as if fully restated herein.

196.    At all relevant times, a valid and enforceable contract existed between Brandeis and Plaintiff, through Brandeis's Student Handbook.

197.     Brandeis was contractually obligated to conduct its investigation and discipline in accordance with the Student Handbook when it adjudicates allegations of violation of student conduct standards.

198.     Brandeis materially breached its contract with Plaintiff by failing to comply with its obligations, standards, policies, and procedures set forth in the Student Handbook.

199.     As a direct and proximate consequence of Brandeis's material breaches, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed.

200.     Plaintiff has suffered significant damages, including but not limited to, damage to Plaintiff's physical well-being, emotional and psychological damages, damage to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

201.     Furthermore, the Plaintiff has suffered significant disruption to his academic career and future career prospects, because Brandeis suspended Plaintiff for the 2020-2021 academic year delaying his education. At this time, Plaintiff will not be eligible to submit applications for graduate programs as planned, and his graduate school prospects are substantially damaged.

202.     Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT II**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

203.    Plaintiff restates and realleges each of the foregoing paragraphs as if fully restated herein.

204.    In all Massachusetts contracts there is an implied covenant of good faith and fair dealing that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

205.    At all relevant times, a valid and enforceable contract existed between Brandeis and Plaintiff, through Brandeis's Student Handbook.

206.    Brandeis violated the covenant of good faith and fair dealing implied in the contract between Plaintiff and Brandeis by subjecting Plaintiff to an unfair, arbitrary process, and denying him the fruit of his contract with Brandeis.

207.    Brandeis willfully and knowingly breached the implied covenant of good faith and fair dealing by failing to ensure that Brandeis's investigation was fair, adequate, and prompt.

208.    Brandeis willfully and knowingly breached the implied covenant of good faith and fair dealing by causing unreasonable delay in Brandeis's investigation of the Accuser's allegations.

209.    Brandeis willfully and knowingly breached the implied covenant of good faith and fair dealing by proceeding with the investigation, Title IX process, and discipline/sanctions against Plaintiff, while Brandeis simultaneously updated its policies and procedures to the *Title IX Grievance Process*, inclusive of a hearing, cross-examination, and other mechanisms to ensure due process and fundamental fairness to Brandeis's Title IX process.

210.     Brandeis willfully and knowingly breached the implied covenant of good faith and fair dealing by updating their applicable Student Handbook and the policies and procedures regarding Title IX, and thereafter refusing to apply any of the updated policies and procedures to Plaintiff's pending case.

211.     Brandeis willfully and knowingly breached the implied covenant of good faith and fair dealing by failing to ensure an impartial investigation and determination, though Brandeis was aware of the Accuser's well-known status at Brandeis and the Accuser's close connections and regular interaction with Brandeis's senior administration and staff, including staff and administration that work with Title IX issues at Brandeis.

212.     As a direct, proximate, and foreseeable consequence of Brandeis's breaches, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. Plaintiff has suffered significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

213.     Furthermore, the Plaintiff has suffered significant disruption to his academic career and future career prospects, because Brandeis suspended Plaintiff for the 2020-2021 academic year delaying his education. At this time, Plaintiff will not be eligible to submit applications for graduate programs as planned, and his graduate school prospects are substantially damaged.

214.    As a result, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT III
### (Negligence)

215.    Plaintiff restates and realleges each of the foregoing paragraphs as if fully restated herein.

216.    Brandeis owed Plaintiff a duty of care, including without limitation, the duty of reasonable care in selecting and supervising competent, trained, and unbiased staff and administration to be involved in the disciplinary process.

217.    Brandeis breached its duty of care because staff and administration were personally familiar with the Accuser, thereby critically affecting Brandeis's investigation, and Brandeis's ability to fairly, adequately, and promptly investigate the allegations made against Plaintiff.

218.    Brandeis breached its duty of care by intentionally, recklessly, and/or negligently failing to conduct conflict checks on all persons involved in Brandeis's disciplinary process to assure the process involved unbiased participants.

219.    As a direct, proximate, and foreseeable consequence of Brandeis's conduct, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. Plaintiff has sustained damages, including but not limited to, damages to his physical well-being, severe emotional distress damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

220.     Furthermore, the Plaintiff has suffered significant disruption to his academic career and future career prospects, because Brandeis suspended Plaintiff for the 2020-2021 academic year delaying his education. At this time, Plaintiff will not be eligible to submit applications for graduate programs as planned, and his graduate school prospects are substantially damaged.

221.     As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT IV**
**(20 U.S.C. § 1681)**
**(Title IX)**

222.     Plaintiff restates and realleges each of the foregoing paragraphs as if fully restated herein.

223.     Title IX of the Education Amendments of 1972 provides Plaintiff a right to not be subjected to university discipline where sex is a motivating factor in the decision to enforce the Student Handbook and to impose sanctions.

224.     Brandeis violated Plaintiff's rights when it failed to apply "equitable" procedures to Plaintiff and selectively enforced the Student Handbook against the Plaintiff, in spite of evidence that the allegations against Plaintiff were not credible, and in spite of evidence that the Accuser had recently changed her story to make Plaintiff appear worse.

225.     Brandeis violated Plaintiff's rights when it declined to even consider or investigate whether the Accuser violated the Student Handbook, despite evidence that both Plaintiff and Accuser had consumed alcohol prior to engaging in sexual activity, thereby affecting each of their abilities to recall and provide accurate

information of the circumstances which occurred between them in December 2018.

226.     Brandeis violated Plaintiff's rights when it decided to hold only the Plaintiff accountable for the sexual activity, because Brandeis was motivated by a pro-female, anti-male bias due to pressures at Brandeis and nationwide to "believe survivors."

227.     Brandeis violated Plaintiff's rights when it refused to investigate the Accuser's character for truthfulness, after Plaintiff provided evidence demonstrating that the Accuser had wrongfully and inaccurately accused other Brandeis students of misconduct that was not supported in fact, on the basis of Plaintiff's gender and on the basis of the Accuser's status at Brandeis.

228.     To date, Brandeis has not remediated its discriminatory actions against the Plaintiff.

229.     As a result of Brandeis's actions and omissions, the Plaintiff has suffered multiple damages as described herein.

## COUNT V
### (Injunctive Relief)

230.     Plaintiff restates and realleges each of the foregoing paragraphs as if fully restated herein.

231.     As set forth herein, Plaintiff is likely to prevail on his claims against Brandeis.

232.     Brandeis has violated its contractual obligations and Plaintiff's rights under Federal law.

233.     Plaintiff's educational and career opportunities have been severely damaged. Without appropriate redress, Brandeis will continue to label Plaintiff as a student

that engaged in Non-Consensual Sexual Contact and Non-Consensual Sexual Intercourse.

234.     The investigation Brandeis conducted was fundamentally flawed. The evidence undercuts Brandeis's finding that Plaintiff engaged in Non-Consensual Sexual Contact and Non-Consensual Sexual Intercourse by a preponderance of the evidence, and requires, as a matter of equity, that Brandeis be ordered to remove any and all notations from Plaintiff's educational and disciplinary records, that Brandeis restore Plaintiff to his prior status and permit Plaintiff to return to Brandeis and complete his studies and receive his degree, and that Brandeis take all appropriate action to correct any statements published by Brandeis stating or implying that Plaintiff committed sexual misconduct.

235.     Plaintiff requests this Court issue a permanent injunction: (a) reversing the findings and sanction against Plaintiff made by Brandeis; (b) order Brandeis to expunge Plaintiff's disciplinary record and remove it from his education record at Brandeis; (c) order Brandeis to provide Plaintiff with a Dean's Certification that shall be made available to third parties (such as medical or law school admissions officers, and prospective and current employers) certifying that the findings and sanction have been reversed and expunged from Plaintiff's education record; and (d) order Brandeis to restore Plaintiff's reputation to person(s) aware of the disciplinary process and sanctioning of Plaintiff.

**Prayer for Relief**

**WHEREFORE**, Plaintiff John Doe respectfully requests that the Court grant him the following relief:

1. Entered the requested permanent injunction against Defendant Brandeis;

2. After trial, enter judgment for the Plaintiff on each Count of the Complaint and award him damages in an amount to be determined at trial, including attorney's fees, costs and interest; and

3. Grant such other relief as the Court deems just and equitable.

**JURY DEMAND**

Plaintiff John Doe hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

JOHN DOE,

By his attorney,

Dated: December 4, 2020

/s/ George J. Leontire
George J. Leontire (BBO # 294270)
LEONTIRE & ASSOCIATES, P.C.
PO Box 4328
Westport, MA 02790
(855) 223-9080
george@leontirelaw.com