UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN DOE,

          Plaintiff

    v.

BRANDEIS UNIVERSITY,

          Defendant

No. 1:20-cv-12162-AK

**LEAVE TO FILE GRANTED ON
MARCH 31, 2022, DKT. NO. 43**

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

### RELEVANT FACTS

The plaintiff, John Doe, enrolled at Brandeis in the spring of 2018.  Statement of Material Facts ("Facts") ¶ 2.  On December 7 or 14, 2018, Doe and several other students, including "Jane Roe,"[1] were socializing in a Brandeis residence hall.  *Id.* ¶ 45.  Doe consumed about six drinks containing vodka that evening.  *Id.* ¶ 46.  Roe consumed approximately two glasses of wine and three or four shots of vodka.  *Id*. ¶ 47.

Doe walked Roe back to her room.  *Id.* ¶ 48.  They stopped at Doe's room on the way.  *Id.* Doe invited Roe into his room and asked if she wanted to sleep there, but Roe declined and said that she did not want to "do anything."  *Id.* ¶ 49.

After they arrived at Roe's room, Doe asked if he could come in, and Roe agreed.  *Id.* ¶ 50. They eventually laid down together on Roe's bed.  *Id.* ¶ 51.  It is undisputed that Doe kissed Roe and touched her breasts and vagina, penetrated her digitally, and performed oral sex on her.  *Id.* ¶ 52.  Roe says she did not give consent to any of the sexual activity and said "no."  *Id.* ¶ 53.  Doe says Roe initiated or otherwise expressed consent to all of the activity.  *Id.* ¶ 54.

Immediately after the encounter, Roe was upset and Doe apologized.  *Id.* ¶ 55.  According

---

[1] The Complaint refers to this student as the "Accuser."  Brandeis will refer to her as "Jane Roe."

to Doe, he apologized because he believed Roe was upset that she "hooked up" with Doe shortly after being in a relationship with Doe's friend. *Id.* ¶ 56.

Doe and Roe spoke in person a day or two after the encounter. *Id.* ¶ 57. Roe accused Doe of taking advantage of her and asserted that Doe performed oral sex without her consent. *Id.* ¶ 58. Doe claims he tried to bring up the fact that he asked her "if it was okay" during the sexual activity, but Roe cut him off and told him he was not being a good friend. *Id.* ¶ 59. According to Doe, Roe convinced him the incident occurred as she alleged, his memory was "overwritten," and he went along with what Roe said. *Id.* ¶ 60.

Doe apologized to Roe and offered to turn himself in to the university's Title IX office. *Id.* ¶ 61. Roe told him that she was not going to report him. *Id.* ¶ 62. According to Roe, they agreed that if anyone asked what happened, Doe would admit that he performed oral sex without her consent. *Id.* ¶ 63. Doe does not recall discussing what he would say if someone asked what happened. *Id.* ¶ 64.

In January 2019, Roe learned that Doe was attempting to join a fraternity. *Id.* ¶ 65. Roe told the fraternity president about her experience with Doe and urged him not to accept Doe into the fraternity. *Id.* ¶ 66. Fraternity leaders contacted Doe to discuss the matter. *Id.* ¶ 67. Roe learned about that conversation and understood that Doe portrayed their encounter as a "drunk hookup." *Id.* ¶ 68.

On January 27 and 28, 2019, Doe and Roe exchanged text messages in which Roe chastised Doe for portraying the encounter in that way. *Id.* ¶ 69. Doe responded that he told the fraternity president "what you told me" and that "I *thought that while it was happening* it was a drunk hookup [but] I do not think that [now]." *Id.* ¶ 70. After Roe reacted negatively to this text, Doe said, "I just called him again and … told him specifically that it was much worse than a

2

drunken hookup and I told him how I'd understood you didn't want to do anything with anyone." *Id.* ¶ 71.  Roe told Doe to "just own up to it." *Id.* ¶ 72.  Doe responded, "Look I know what I did was super fucked up okay. … I was never trying to hide or downplay how bad it was – not just on the phone call with [the fraternity president], but with everyone I've had a conversation about it with. … I told [the fraternity leaders] that it was wrong, and that I apologized." *Id.*  Later in their text exchange, Doe again told Roe, "I told [the fraternity leaders] how [you] said you didn't want to do anything. … I know what I did and I know it was wrong." *Id.* ¶ 73.

On January 28, 2019, Doe exchanged texts with a fraternity leader, in which Doe said, "I fucked up pretty bad, and when you do something wrong there are consequences." *Id.* ¶ 74.

On January 30, 2019, Doe exchanged messages over Facebook with a friend, "Student A," in which they discussed Roe and her accusations against Doe. *Id.* ¶ 75.  Among those messages, Student A said, "Here's the thing[,] she's tricky"; Doe said, "I can't believe I went along with the stuff she said[,] like I straight up got gaslit"; and Student A said, "It'll be fine – just keep your head down and you'll be good ….  She's done this with other guys – just accept responsibility, let her say whatever, and move on." *Id.* ¶ 76.

On February 8, 2019, Doe said in a text to Roe, "I didn't lie or cover shit up.  I know damn well what I did, and I carry the guilt with me every day." *Id.* ¶ 77.

In December 2019, Roe met with Sonia Jurado, the Director of Brandeis's Office of Equal Opportunity (OEO) and Title IX Coordinator. *Id.* ¶ 78.  Roe told Jurado that a male student had sexually assaulted her and asked about the formal resolution process for addressing a complaint if she decided to bring one. *Id.*  Roe eventually made a formal complaint on February 3, 2020. *Id.* ¶ 79.

At the time, Roe was the Brandeis Student Union President. *Id.* ¶ 5.  In that capacity, Roe

had met with Jurado on one or two occasions to discuss matters related to disability access on campus and training on Title IX issues for the Student Union leadership.  *Id.* ¶ 80.  Roe also met occasionally with other Brandeis officials including the President.  *Id.* ¶ 81.

Pursuant to the Policy, an investigation was conducted by Amy Condon, an experienced, trained investigator in OEO and Deputy Title IX Coordinator.  *Id.* ¶ 82.  Condon conducted an initial interview of Roe in mid-February, 2020.  *Id.* ¶ 85.  Jurado then prepared a formal Notice of investigation and arranged to speak with Doe on February 27, 2020.  *Id.* ¶¶ 90-91.

In that conversation, Jurado informed Doe that Roe had filed a formal complaint against him, told him the nature of the complaint, explained the formal resolution process, and offered to answer any questions Doe had.  *Id.* ¶ 92.  Jurado then sent Doe an email with a formal Notice of Complaint and a link to the Brandeis Policy Against Discrimination, Harassment, and Sexual Assault ("the Policy"), pursuant to which the matter would be addressed.  *Id.* ¶ 93.  Jurado invited Doe to come to her with any questions about the process or for help with support resources.  *Id.* ¶ 94.  She also provided information about both the Brandeis Counseling Center and confidential support available through the Ombuds office.  *Id.*

The Notice said Roe alleged that Doe "engaged in kissing and oral sex with her without her consent, after she said no.  These allegations suggest your behavior may constitute Non-Consensual Sexual Contact … and/or Non-Consensual Sexual Intercourse" in violation of the Policy.  *Id.* ¶ 95.  The Notice informed Doe that the complaint would be addressed under the process outlined in the Policy, which the Notice summarized.  *Id.* ¶ 96.  The Notice informed Doe that he had the right to an advisor/support person throughout the process and invited him to bring forward any request for disability accommodations that he might need during the process.  *Id.* ¶ 98.  Doe elected to go through the process without an advisor and he never requested any

accommodations. *Id*. ¶ 99.

Condon interviewed Doe three times, during which he gave a full account of what transpired in the encounter with Roe. *Id.* ¶¶102, 104.  In doing so, Doe volunteered that in addition to kissing and performing oral sex on Roe, which the Notice specifically referenced, he touched Roe's breasts and vagina and digitally penetrated her vagina. *Id.* ¶ 106.

Doe told Condon that when he met with Roe a day or two after their encounter, and for some time thereafter, he accepted her version of events, but starting in March 2019 his "memory of the incident came back" and he realized Roe had convinced him that he did not have consent. *Id.* ¶ 107.  Doe told Condon that initially he was so upset about the encounter that he engaged in self-harming behavior and was suicidal. *Id.* ¶ 108.  He told Condon that happened about a year earlier and he assured Condon that he no longer was suicidal or engaged in self-harming behavior. *Id.* ¶ 109.  Condon nevertheless provided Doe with information about mental health resources and reached out to the Brandeis Care Team. *Id.* ¶ 110.  According to Doe, he spoke with the counseling center twice but did not have the time and energy to fully talk about his mental health concerns. *Id.* ¶ 111.  At no point during the investigation did Doe indicate that he currently was in need of any supports or accommodations, or that he was unable to fully participate in the investigation of Roe's complaint. *Id.* ¶ 112.

In addition to interviewing Doe, Condon invited him several times to identify any witnesses and provide any documents or other evidence that might be relevant to the investigation. *Id.* ¶ 113.  Doe identified Witness 2, who Condon interviewed, and two other witnesses. *Id.* ¶ 114.  One of them was Student A, the student with whom Doe exchanged the January 30, 2019 Facebook messages referenced above. *Id*.  Condon tried several times to interview Student A, but after initially agreeing to speak with Condon, he stopped responding.

*Id.* ¶ 115.

Condon ultimately determined that she had no need to interview Student A, because it did not appear he had any new information to offer.  *Id.* ¶ 116.  Doe had told Condon about the Facebook messages with Student A, although at the time Doe did not have copies of them.  *Id.* ¶ 117.  Doe told Condon (incorrectly, as it turns out) that he exchanged the Facebook messages with Student A in March 2019.  *Id.* ¶ 117.  Doe told Condon the messages would reflect Doe's realization that the events did not happen as Roe said.  *Id.*  Condon determined that she did not need to interview Student A about this because Doe had provided other text messages with the same information – i.e., that by March 2019, he was claiming to have realized that the incident did not occur as Roe said.  *Id.* ¶ 118.

Doe also told Condon that Student A told him Roe had "done this with three other guys." *Id.* ¶ 119.  Doe showed Condon text messages in which another student said he had "some bad experiences" with Roe and "heard a lot of stuff" about her.  *Id.* ¶ 120.  Condon determined that these allegations were entirely vague; they did not amount to allegations that Roe had falsely accused other students of sexual misconduct, much less allegations from anyone claiming to have first-hand knowledge of that.  *Id.* ¶ 121.  As a result, she did not include the information in her report, nor did she make further attempts to interview Student A or the other student about this.  *Id.* ¶ 122.  In fact, there is no evidence that Roe ever falsely accused any other student of sexual misconduct.

The second witness Doe identified, "Student B," was a friend of Doe, with whom Roe had a brief, prior relationship.  *Id.* at 123.  However, Doe also indicated that the information Student B could provide was the same as that of another witness, whom Condon already had interviewed.  *Id.* ¶ 124.  As a result, Condon did not interview Student B.  *Id.* ¶ 125.

6

Condon prepared an investigative report, which summarized her interviews of Doe, Roe, and two other witnesses, and which summarized and attached copies of relevant text messages. *Id*. ¶ 126.  The report identified four issues for the Decision-Making Panel to decide:  whether Doe (1) kissed Roe without consent; (2) performed oral sex on Roe without consent; (3) touched Roe's breasts and vagina without consent; and/or (4) digitally penetrated Roe's vagina without consent. *Id.* ¶ 128.

In her report, Condon noted that she found Roe generally to be credible. *Id.* ¶ 133. Condon noted that she also found Doe generally to be credible, but she noted that his statements to her about the encounter conflicted with his several admissions of wrongdoing to Roe both verbally and in text messages. *Id.* ¶ 134.

In accordance with the Policy, Condon notified Doe and Roe that the report and exhibits were available for their review and comment. *Id.* ¶ 129.  Doe acknowledged reviewing the report but submitted no comments. *Id.* ¶ 130.[2]  Roe did offer comments on the report. *Id.* ¶ 131. Condon made a few changes to the report based on Roe's comments and informed Doe of those changes. *Id.* ¶ 132.

In accordance with the Policy, the report was submitted to a three-person Decision-Making Panel, which Jurado selected from a pool of trained faculty and staff. *Id.* ¶ 141.  The panelists were one female faculty member and two male administrators. *Id.* ¶ 142.  Jurado screened the panelists for potential conflicts and gave Doe the opportunity to identify any

---

[2] At about this time, Brandeis's Committee on Academic Standing called on Doe to address concerns about his poor academic performance.  *Id*. ¶ 135.  Doe told the Committee that he was sexually assaulted by a male athlete on campus in February 2020, which caused his mental health to deteriorate. *Id*. ¶ 136.  The Committee reported this alleged assault to Jurado, who reached out to Doe. *Id*. ¶ 137.  She offered to meet with Doe to review his options, including whether to pursue a formal complaint and/or a no-contact order for his alleged assailant. *Id*. ¶ 138.  Doe thanked Jurado for reaching out, but said he did not want to take any action and assured her that as a result of therapy and support from his friends, he had "moved past" the incident." *Id*. ¶ 139.  Doe admitted in his deposition in this case that this purported assault never occurred. *Id*. ¶ 140.

possible conflicts, but he did not identify any.  *Id.* ¶ 144.  None of the Panel members knew Roe or was aware she was the President of the Student Union.  *Id.* ¶ 145.

The Panel reviewed the investigative report and its exhibits and met to deliberate by videoconference.  *Id.* ¶ 147.  Jurado was present to open the meeting, but then left the joint session before any deliberations occurred.  *Id.* ¶ 148.  She was available for any questions the Panel had about matters of policy, in which case she would join the session only to address those questions and then leave before deliberations resumed.  *Id.*

Applying the preponderance of evidence standard, as the Policy requires, the Panel found by a 2-1 majority that Doe violated the sexual misconduct policy on all four questions.  *Id.* ¶ 150. The female faculty member was the dissenting vote; she found the accounts of Doe and Roe to be equally credible.  *Id.* ¶ 151.

The Panel sent Jurado a draft of their findings.  *Id.* ¶ 152.  Jurado asked them to clarify some language in their reasoning and suggested some other edits.  *Id.* ¶ 153.  In doing so, she stressed that the decision was theirs and that the final version of the findings should express their views.  *Id.*  The Panel did not accept some of Jurado's proposed edits and clarified how they viewed the inconsistencies in Doe's account.  *Id.* ¶ 154.  Based on this feedback, Jurado suggested some further, revised language and asked the Panel if it was accurate.  *Id.* ¶ 155.  The Panel approved the revised language.  *Id.* ¶ 156.

As the final version reflects, the Panel noted the inconsistencies in Doe's statements about the encounter and a majority of the Panel found that Doe's account was less credible than Roe's. *Id.* ¶ 157.  The Panel noted that in the few days after the encounter, Doe agreed that everything happened as Roe described and that he agreed to tell others the conduct was non-consensual.  *Id.* ¶ 158.  The Panel also noted there was no dispute that when Roe declined to enter Doe's room,

she told him that she did not want anything to happen that night.  *Id.* ¶ 159.

In accordance with the Policy, Doe's sanctions were determined by the Dean of Students Office.  *Id.* ¶ 33, 163.  Doe was suspended for two academic terms, until May 23, 2021, after which he was ineligible to hold any leadership roles or to represent Brandeis in any official capacity.  *Id.* at 163.  Monique Gnanaratnam, then Associate Dean of Students, communicated the findings and sanctions to Doe and informed him of his right to appeal.  *Id.* at 169.

Doe submitted an appeal, which Jurado helped him to clarify and restate in order to comply with the Policy.  *Id.* ¶ 170.  The revised appeal asserted two grounds.  *Id.* ¶ 171.

First, Doe claimed procedural error, arguing that the case was not completed in a timely manner and that Condon's report failed to accurately reflect the testimony of one witness, who said that Roe changed her story over time to "villainize [Doe] more."  *Id.* ¶ 172.  Jurado exercised her authority under the Policy to reject the claim of procedural error.  *Id.* ¶ 173.  As she informed Doe, the Policy does not require that investigations be completed within any particular timeframe and Doe's complaint about how the investigator summarized a witness's testimony was not a procedural issue.  *Id.* ¶ 173.

Second, Doe appealed on the ground of new evidence, citing the Facebook messages he exchanged with Student A on January 30, 2019 – copies of which he now provided for the first time.  *Id.* ¶ 174.  Doe argued these messages showed that his story was consistent, that Roe "gaslighted" him, and that he only went along with Roe's version of events "for fear of retaliation or confrontation."  *Id.* ¶ 175.  Jurado referred this aspect of Doe's appeal to a three-person University Appeals Board.  *Id.* ¶ 182.  In accordance with the Policy, Jurado shared Doe's appeal with Roe, who submitted a written response.  *Id.* ¶¶ 179-80.

The Board comprised three administrators – two female and one male.  *Id.* ¶ 182.  Jurado

screened the Board members for potential conflicts and invited Doe to identify any potential conflicts, to which Doe responded that he had no objections.  *Id.* ¶¶ 184-86.  The Board reviewed the Policy, the final investigative report and exhibits, the outcome letter, and the appeals submissions of Doe and Roe and met to deliberate.  *Id.* ¶ 187.  Jurado was not present during the deliberations, but was available for questions.  *Id.* ¶ 188.

The Board found that Doe failed to state the basis of an appeal on the ground of new evidence.  *Id.* ¶ 190.  The Board found that the Facebook messages would not have changed the outcome because they did not "correct the inconsistencies" in Doe's statements, which the Decision-Making Panel cited as the basis for its findings of responsibility.  *Id.* ¶ 191.  The Facebook messages showed that Doe disagreed with Roe's version of events in late January 2019 – earlier than March 2019, as Doe told Condon in his interviews – but the messages still were inconsistent with the inculpatory statements Doe made to Roe, both before and after the Facebook exchange with Student A.  *Id.* ¶ 191.

The Board provided Jurado with its decision.  *Id.* ¶ 195.  Jurado offered clarifying edits, with which the Board members all agreed.  *Id.* ¶ 196.  The decision was then incorporated into a letter to Doe, informing him that his appeal was denied.  *Id.* ¶ 197.  Doe served his suspension and returned to Brandeis.  *Id.* ¶ 198.

## ARGUMENT

## I.   THE CONTRACT CLAIMS IN COUNTS I AND II

Doe's complaint alleges in Count I that Brandeis breached its contractual obligations to him, as set forth in the Student Handbook, Compl. ¶ 198, and alleges in Count II that Brandeis violated the implied covenant of good faith and fair dealing by subjecting him to an unfair, arbitrary, and biased process.  *Id*. ¶¶ 206-11.

Brandeis is a private institution.  Facts, ¶ 1.  As a result, two tests are relevant to Doe's contract claims:  whether Brandeis followed its procedures as it reasonably would expect Doe to understand them and whether the procedures were conducted with "basic fairness."  *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019) (*BC II*) (citing *Schaer v. Brandeis Univ.*, 432 Mass. 474, 478 (2000); *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 724 (1st Cir. 1983)).  If these tests are met, the outcome is not subject to judicial challenge.  *Id.* at 535 (courts must give deference to the decisions of private academic institutions in student discipline proceedings).

Any procedural argument is waived if Doe did not raise the issue during the conduct process.  *See Berkowitz v.  Pres. & Fellows of Harvard Coll.*, 789 Mass. App. Ct. 262, 275 (2003) (professor's failure to include a procedural argument in the pre-suit university grievance process barred this aspect of his contract claims); *see also Tigrett v. Rector & Visitors of Univ. of Va.*, 97 F. Supp. 2d 752, 762 (W.D. Va. 2000) (student's bias argument waived by failure to raise it in his disciplinary hearing); *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 694 (M.D. Tenn. 2018) (student's failure to raise issue during university appeal waived his contract claim).

### A.   There is No Genuine Dispute that Brandeis Followed its Procedures as it Reasonably Would Expect Doe to Understand Them.

#### 1.   Notice of the charges

Doe complains that Brandeis failed to follow its procedures because it failed to send him the written Notice of Complaint before Jurado met with him and failed to inform him that meeting with Jurado was optional, not required.  Compl. ¶¶ 154-56.  Doe waived these procedural arguments by not raising them at any point during the conduct process.  They are without merit in any event.  The point of the Handbook's notice provisions is to ensure that Doe had notice of the allegations against him, the process that would be followed in addressing those allegations, and his rights and options during that process.  That is undisputedly what happened.

11

Doe admitted at his deposition that Jurado handed him the written Notice at their meeting.  Facts ¶ 91.  Doe does not allege – much less have any evidence to support – that he was harmed by the fact that he got the written Notice contemporaneously with, rather than before, his meeting with Jurado, or that he was harmed by meeting with her.

Doe complains that the written Notice was vague and failed to give him sufficient notice of the allegations against him.  Compl. ¶ 161.  Doe waived this procedural argument by not raising it at any point in the conduct process.  It is without merit in any event, for several reasons.

The Notice informed Doe that Roe alleged he kissed her and engaged in oral sex without her consent  and that the allegations suggested his behavior during their encounter may have involved  "Non-Consensual Sexual Contact … and/or Non-Consensual Sexual Intercourse" in violation of the Policy.  *Id.* ¶ 95.  Doe understood from his numerous conversations with Condon that the question at issue was whether any or all of the sexual encounter that occurred that evening happened without Roe's consent, and he was careful to describe everything about the sexual encounter that might shed light on whether there was consent to the activity.  *Id.* ¶ 105.  In doing so, Doe volunteered that in addition to kissing and performing oral sex on Roe, which the Notice specifically referenced, he touched Roe's breasts and vagina and digitally penetrated her vagina.  *Id.* ¶ 106.  In addition, Doe was provided the written investigation report, in which the allegations were fully laid out in detail, prior to any hearing or finding of responsibility. *Id.* ¶¶ 126-30.  The fact that Doe was fully apprised of the allegations against him is confirmed by his lack of comments on the report and the fact that he made no notice argument in his appeal.  *Id.* ¶ 130, 172.

Doe complains that the investigative report and final outcome went beyond the Notice – by addressing not only kissing and oral sex, but also the touching of Roe's breasts and vagina

and digital penetration – but he was not provided with an amended Notice.  Compl. ¶¶ 161-66.

Doe waived this argument by not raising it any point in the conduct process.  It is without merit

in any event.  As discussed above, it is beyond dispute that Doe was apprised of the full range of

allegations against him.  The findings also did not go beyond the alleged Policy violations in any

event, in two respects.  First, Doe reads the Notice too narrowly in suggesting that it was limited

only to kissing and oral sex.  The Notice references these specific allegations, but goes on to say

that "these allegations suggest his behavior" – i.e., his behavior during the encounter – "may

constitute Non-Consensual Sexual Contact … or Non-Consensual Sexual Intercourse" in

violation of the Policy.  *Id.* ¶ 95.  Second, all of the findings against Doe involved those

provisions of the Policy.  Tab 40.  An amended Notice was required only if different Policy

violations were at issue.

Moreover, the fact that Brandeis did not provide Doe an amended Notice is of no

consequence.  Notably missing from Doe's "notice" argument is any claim that there was some

evidence he otherwise would have offered, or some argument he otherwise would have made in

his defense, which could have changed the outcome.  Absent such a showing of actual prejudice,

his "notice" argument involves at most a "minor error" or "technical violation," which fails to

support a breach of contract claim.  *See Doe v. Stonehill College, Inc.*, No. CV 20-10468-LTS,

2021 WL 706228, at *13 (D. Mass. Feb. 23, 2021); *Doe v. Brown Univ.*, 210 F. Supp. 3d at 331.

Doe's "notice" argument also fails because the "additional" charges were not necessary

to the sanctions that were imposed.  Doe was found responsible for non-consensual kissing and

oral sex, as alleged in the Notice, and those findings alone would have resulted in the same

sanctions.  Facts ¶ 164.  *See Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1242 (10th Cir.

2001) (where plaintiff was found responsible for the noticed violation, which alone was grounds

for expulsion, additional violations were of no consequence); *Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 428 (7th Cir. 1997) (where student was sanctioned on basis of noticed charge, reference to other violations did not violate due process).

### 2.     Scope of the investigation

Doe complains that Brandeis "unfairly limited the scope of the investigation" because Condon "refus[ed] to explore [Roe's] character for truthfulness" after Doe provided information that Roe "made false accusations against other Brandeis students"; Condon failed to include in her credibility assessments information about "inconsistencies" in Roe's statements; and Condon declined to interview witnesses with potentially relevant information – a reference to Student A. Compl. ¶¶ 169-79.  These procedural arguments all are waived because Doe failed to raise them at any point in the conduct process.  They all are without merit in any event.

Doe's argument that Condon failed to investigate Roe's "character for truthfulness" by not interviewing witnesses Doe identified is without merit for several reasons.  The Policy does not guarantee that every witness named will be interviewed.  *Id.* ¶ 22.  *See Doe v. W. New Engl. Univ.*, 228 F. Supp. 3d at 179 (no breach where university did not secure the appearance of every witness named).  In fact, the Policy provides that "character witnesses are not considered relevant to this process."  Facts ¶ 22.  *See also Haidak v. Univ. of Mass-Amherst*, 933 F.3d 56 (1st Cir. 2019) (due process in a student conduct proceeding does not require consideration of extrinsic evidence of other alleged conduct offered to attack character for truthfulness). Moreover, as discussed above, Condon attempted to interview Student A, but he would not respond after numerous attempts, and Doe offered no evidence that either Student A or any other witness had first-hand knowledge of other complaints of sexual assault by Roe, much less

knowledge that any such complaints were false.  *Id.* ¶ 115, 119-21.[3]  Condon accordingly exercised her discretion under the Policy not to pursue information she believed was not relevant.  *Id.* ¶ 22, 122.[4]

Doe's claim that Condon failed to note Roe's "inconsistencies" in her credibility assessment also is without merit.  Compl. ¶ 172-73.  Doe points to the fact that Witness 1 said Roe initially told her that "everything was a blur" in relation to her encounter with Doe, but Roe "recently" told Witness 1 that she said "no" during the walk to Roe's residence.  *Id.*  Plainly, there is no inconsistency in these statements.  Moreover, Doe, himself admitted that Roe said she didn't want to "do anything" during the walk to her dorm.  Facts ¶¶ 49, 71, 73.  Doe also alleges that Witness 1 said Roe told her that she "kissed [Doe] first."  Compl. ¶ 174.  Doe misreads the investigator's report; Witness 1 said that *Doe* told her that Roe kissed him first.  Tab 32 at 9.

### B.     There is No Genuine Dispute that the Process was Conducted with Basic Fairness.

Doe's claims for breach of the implied covenant of good faith and fair dealing implicate a university's obligation to conduct disciplinary proceedings with "basic fairness."  Compl. ¶¶ 2, 170, 178, 209.  It is well-settled that "[a] private university need not comply with federal due process to meet the basic fairness requirement in disciplining students."  *BC II*, 942 F.3d at 534. Basic fairness means only "some minimum level of fair play," including notice of the charges, a meaningful opportunity to defend oneself, and a decision that is not arbitrary or capricious or made in bad faith.  *See Doe v. Stonehill Coll., Inc.*, 2021 WL 706228, at *13-14 (citing *Doe v.*

---

[3] It is unclear whether these allegations in the Complaint are meant to include Roe's alleged untruthfulness in a matter involving her actions as President of the Student Union.  Compl. ¶ 80.  If so, any such "character" evidence was irrelevant to the allegations against Doe.  The issue also is waived, as Doe never presented this information to Condon or at any other point in the conduct process.  Facts ¶¶ 199-02.

[4] Nor does Doe offer any such evidence now.  He has not deposed Student A, or any other fact witness, in an attempted to adduce the supposed evidence that he claims Condon should have pursued.

*Brandeis Univ.*, 177 F. Supp. 3d. 561, 572, 601 (D. Mass. 2016); *Coveney v. Pres. & Trs. of the Coll. of the Holy Cross*, 388 Mass. 16, 19-20 (1983)).  The process here easily meets that test.

### 1.    Notice and an opportunity to defend

As discussed above, Doe received ample notice of the alleged Policy violations for which he ultimately was found responsible.  In addition, it is beyond dispute that he had a full and fair opportunity to defend himself.  Doe had multiple opportunities to present his side of the story, including in multiple interviews with the investigator; he was invited to provide supporting evidence, to identify witnesses with relevant information, and to suggest questions to be asked of the initiating party; he had the opportunity to review and respond in writing to the investigative report, which summarized the relevant evidence and appended copies of relevant exhibits, although he elected not to do so; and he had the opportunity to appeal on the basis of procedural error or new evidence.  *Id.* ¶¶ 97, 102-05, 113, 129-30, 170-71.  Such a process easily meets the test of basic fairness.  *See, e.g., Schaer*, 432 Mass. at 481 (basic fairness afforded even though accused student not allowed to provide input during investigation and university considered statements that would have been excluded in court proceedings); *Coveney*, 388 Mass. at 19-20 (basic fairness afforded where student had opportunity to make statements before a dean and the president, notwithstanding that witnesses were not "actively" questioned); *Driscoll v. Bd. of Trs. of Milton Acad.*, 70 Mass. App. Ct. 285, 287, 295 (2007) (basic fairness afforded where accused student could explain his behavior and provide a written statement, notwithstanding inability to seek advice of counsel).

There is no merit to Doe's argument that he was denied a fair process because he was not afforded the procedural safeguards, which now are available to students under the revised Policy that Brandeis adopted pursuant to Department of Education (DOE) regulations effective in

August 2020, including the right to a live hearing at which he could cross-examine witnesses. Compl. ¶¶ 209-10.  As an initial matter, this is a procedural argument, which Doe waived by not raising at any point in the conduct process.  The argument fails in any event because – consistent with the DOE regulations – the new Policy does not apply to conduct that occurred before August 14, 2020.  Facts ¶ 44.  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30028 (May 19, 2020), codified at 34 C.F.R pt. 106; *see also* Part 1: Questions and Answers Regarding the Department's Title IX Regulations, U.S. Dept. of Education, January 15, 2021 at p. 2, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-part1-20210115.pdf.

It is well-settled that the covenant of good faith and fair dealing, applicable to student conduct proceedings through the concept of "basic fairness," does not require a private university to provide formal, evidentiary hearings with the opportunity for cross-examination.  *BC II*, 942 F.3d at 529-31; *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 88 (1st Cir. 2018) (*BC I*).  Nor does the implied covenant afford students the right to any procedures in addition to or different from those that the handbook expressly provides.  *See BC II*, 942 at 534 n.6 (quoting *BC I*, 892 F.3d at 88) (where a college's procedures contain an explicit promise of fairness, any implied promise of basic fairness "becomes superfluous and the court's [determination whether] the proceedings were 'conducted with basic fairness'… focuses on assuring compliance with the express contractual promise" – whether the university substantially complied with its stated policies); *BC I*, 892 F.3d at 80-82, 82-83, 88-89 (rejecting arguments that a university should have done things differently because they were arguments for procedures other than those the university adopted); *Sonoiki v. Harvard Univ.*, No. 19-CV-12172, 2020 WL 3416516, at *13 (D. Mass. June 22, 2020) (student's disagreement with the university's policies and procedures "does not give rise

to a breach of contract claim").

### 2. The decision was not arbitrary and capricious.

"A decision is arbitrary and capricious when it lacks any rational explanation that reasonable persons might support." *City of Cambridge v. Civil Serv. Comm'n*, 43 Mass. App. Ct. 300, 303 (1997). Where there are any "reasonable grounds" to support the finding of a university's disciplinary board, it "will not be subject to successful challenge in the courts." *Cloud*, 720 F.2d at 724 (quoting *Coveney*, 388 Mass. at 19).

The Panel's finding that Doe engaged in sexual conduct with Roe without her consent was supported by "reasonable grounds." As discussed above, it was undisputed that Roe told Doe she did not want to "do anything" that night and that Doe made several inculpatory statements to both Roe and others, both verbally and in text messages, and apologized to Roe multiple times. *Id.* ¶¶ 49, 55, 61, 69-77. In addition, Roe asserted that Doe never asked for consent, she said "no" when he kissed her, she bit him in an effort to get him off her, and she disassociated from the experience and started crying, and a majority of the panel members found Roe's account of these events to be more credible than Doe's. *Id.* ¶ 53, 157.

Nor is there any merit to Doe's argument that the decision was arbitrary and unfair because the investigator "disregarded" his explanation as to why he originally agreed with Roe's account of what happened. Compl. ¶ 184. Condon did not "disregard" Doe's explanation; she specifically addressed in her report Doe's claim that he initially believed Roe's version of what took place only because Roe convinced him of her version, with the result that his memory was "overwritten" until he later recovered it as a result of speaking with others. Facts ¶ 60, 107. In assessing Doe's credibility in light of the change in his story, the Panel had ample grounds to reject Doe's claim that his memory was "overwritten" by Roe, and to credit Roe's account over Doe's inconsistent account.

Whether a different decision-maker might have found Doe's claims to be credible is "not a relevant line of inquiry." *Doe v. Williams Coll.*, 530 F. Supp. 3d 92, 99 (D. Mass. 2021). It is not the Court's role to weigh the evidence or to assess the credibility of the parties to a school disciplinary hearing. *Id; Doe v. Phillips Exeter Acad.*, 2016 WL 6651310, at *2; *Doe v. W. New Engl. Univ.*, 228 F. Supp. 3d 154, 180 (D. Mass. 2017); *Doe v. Brown Univ.*, 210 F. Supp. 3d at 313; *Schaer*, 432 Mass. at 479 n.9. Because the Panel's decision has a "rational basis," it is not "arbitrary and capricious" and not subject to challenge in this Court. *Cloud*, 720 F.2d at 724.

### 3. There is no evidence the decision was the product of bias or made in bad faith.

Doe claims that Brandeis "fail[ed] to ensure an impartial investigation and determination," despite being "aware of [Roe's] well-known status at Brandeis and her close connections and regular interaction with Brandeis's senior administration and staff, including [those] that work with Title IX issues at Brandeis." Compl. ¶ 211. Doe, however, has adduced no evidence to support this claim, much less evidence which creates a genuine dispute of fact sufficient to defeat summary judgment. University administrators are presumed to act without bias – a presumption that must be overcome with specific evidence in the record, such as "personal animosity, illegal prejudice, or a personal or financial stake in the outcome," not "speculation" nor "tenuous inferences." *BC II*, 892 F.3d at 84 (citations omitted). Doe has adduced no such evidence.

Condon, the investigator, began working at Brandeis in February 2020, around the time Roe filed her formal complaint. Facts ¶¶ 79, 83. Condon had no interactions with Roe other than in the course of the investigation. *Id.* ¶¶ 84, 86. Condon became aware at some point that Roe was the Student Union President, but that did not influence her investigation. *Id.* ¶ 87.

Jurado, as discussed above, had a couple of interactions with Roe in her capacity at

Student Union President, but these brief contacts did not give rise to a "close connection" between them and are not any evidence of bias or partiality.  "In the intimate setting of a college or university, prior contact between the participants is likely and does not per se indicate bias or partiality."  *Gorman v. Univ. of R. I.*, 837 F.2d 7, 15 (1st Cir. 1988); *accord Doe v. W. New Engl. Univ.*, 228 F. Supp. 3d at 184; *Bleiler v. Coll. of Holy Cross*, No. CIV.A. 11-11541-DJC, 2013 WL 4714340, at *13 (D. Mass. Aug. 26, 2013).  Moreover, Jurado was not a decision-maker in Doe's case and there is no evidence that she exerted any influence on the outcome; in fact, the evidence is that the Decision-Making Panel made its findings based entirely on its own review and consideration of the record before it.  *Id.* ¶¶ 14-50.

Doe adduced no evidence of "close connections" between Roe and any members of the Decision-Making Panel or the Appeals Board.  Moreover, as discussed above, all of these individuals were screened for conflicts and affirmed they had none, and Doe was invited to identify any conflicts of interest, which he did not raise.  *Id.* ¶¶ 144-46.  By not raising this issue at the time, or in his appeal, it was waived.  *See Tigrett*, 97 F. Supp. 2d at 762 (student who was given the opportunity but failed to raise any claim of bias at disciplinary hearing waived the argument).  Nor has Doe adduced any evidence that Roe's purportedly "close connections" with other Brandeis administrators had any impact on his case.  There is no evidence that any Brandeis administrators had any communications with the investigator or any of the decision-makers or sought to influence them.

### 4.      Doe's remaining "fairness" claims also lack merit

Doe alleges the process was unfair because he was not required or encouraged to have a support person, despite Brandeis's awareness of his "mental health issues," which rendered him "unable meaningfully to participate" in the conduct process.  Compl. ¶¶ 180-82.  This claim fails

for multiple reasons.  First, basic fairness does not require that a student be afforded an advisor for a disciplinary hearing.  *See Doe v. Williams Coll.*, 530 F. Supp. 3d at 120.  Second, as discussed above, Doe was informed of his right to have an advisor/support person assist him throughout the process, but he declined to do so.  *Id.* ¶¶ 98-99.  Third, the undisputed evidence does not support Doe's claim that his "mental health issues" rendered him "unable meaningfully to participate" in the process.  In fact, the evidence is all to the contrary.  As discussed above, Doe was invited to request any disability accommodations he might need, but never requested any, *id.*, and when he disclosed to Condon that he experienced significant mental health issues ***one year before***, he assured her that was no longer the case.  *Id.* ¶¶ 108-09.

## II.     THE NEGLIGENCE CLAIM IN COUNT III

Doe alleges in Count III of his complaint that Brandeis  breached a duty to exercise reasonable care in selecting, supervising and training its employees by "failing to conduct conflict checks on all persons involved in [its] disciplinary process to assure" they were "unbiased," and that he was denied a fair investigation because "staff and administration were personally familiar with [Roe]."  Compl. ¶¶ 217-18.  This claim fails on two grounds.

First, it is well-settled in Massachusetts that where, as here, a university's discipline procedures are part of a contract between the university and its students, the university does not owe students an independent duty of care sounding in negligence.  *BC I*, 892 F.3d at 93; *Doe v. Williams Coll.*, 530 F. Supp. 3d at 123; *Doe v. Stonehill Coll., Inc.*, 2021 WL 706228, at *14.

Second, assuming the law of negligence could apply, an employer is liable for negligent retention or training of an employee only if the plaintiff can show the employer knew or should have known of "problems with an employee that indicated his unfitness, but fail[ed] to take further action."  *Helfman v. Northeastern Univ.*, 485 Mass. 308, 326 (Mass. 2020) (quoting *Foster v. The Loft, Inc.*, 26 Mass. App. Ct. 289, 291 (1988)).  As discussed above, Doe has

21

adduced no evidence that anyone involved in his case was "unfit" for their role as a result of any "personal familiarity" with Roe.

Third, a claim for negligent training or supervision fails where the plaintiff, as in this case, did not suffer a physical injury or the threat of a physical injury. *See Doe v. Senechal*, 66 Mass. App. Ct. 68, 76 (2006).

Fourth, in the absence of personal injury or property damage, a negligence claim also is barred by the economic loss doctrine. *Patriarca v. Ctr. For Living & Working, Inc.*, No. 99689-B, 1999 WL 791888, at *5, n.6 (Mass. Super. Sept. 8, 1999) (doctrine applied to negligent supervision and retention claim); *see also Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 469 (2009); *FMR Corp. v. Boston Edison Co.*, 415 Mass. 393, 395 (1993); *R.L. Whipple Co. v. Pondview Excavation Corp.*, 71 Mass. App. Ct. 871, 873 (2008).

## III.   THE TITLE IX CLAIMS IN COUNT IV

Doe alleges in Count IV that Brandeis discriminated against him on the basis of sex in violation of Title IX.  He offers several theories, all of which fail as a matter of law.

### A.   Selective Enforcement

Doe alleges that Brandeis "selectively enforced the Student Handbook" when it "declined to even consider or investigate whether [Roe] violated the Handbook" and "decided to hold only [Doe] responsible for the sexual activity."  Compl. ¶¶ 224-26.  This claim fails for the obvious reason that Doe never claimed that Roe "violated the Handbook" by engaging in the sexual activity.  His argument always was, and it remains, that all of the sexual activity was mutually consented to.  He never claimed, and does not claim now, that Roe engaged in any sexual conduct without his consent.  Simply put, there never was any reason for Brandeis to seek to "enforce the Student Handbook" against Roe or "hold her accountable" for the sexual activity.

A student claiming selective enforcement of disciplinary policies in violation of Title IX

must show that the decision to initiate a disciplinary proceeding and/or the severity of the penalty was affected by the student's gender. *Haidak,* 933 F.3d at 74 (citing *Yusuf,* 35 F.3d at 715); *BC I,* 892 F.3d at 90; *Doe v. Amherst Coll.,* 238 F. Supp. 3d 195, 222 (D. Mass. 2017). To meet that burden, a male student must show that a female student in circumstances "sufficiently similar" to his – i.e., one accused of sexual misconduct – was treated more favorably than he was treated ***and*** must demonstrate that gender bias was a motivating factor in that discrepancy. *Haidak,* 933 F.3d at 74; *Yusuf,* 35 F.3d at 715; *see also Doe v. St. Joseph's Univ.,* 832 F. App'x at 774; *Mallory v. Ohio Univ.,* 76 F. App'x 634, 641 (6th Cir. 2003). Doe's selective enforcement claim thus fails for the simple reason that he has identified no such comparator, much less adduced any evidence that gender bias caused the disparate treatment.

### B.    Erroneous Outcome

Doe also alleges that Brandeis discriminated against him on the basis of gender by "failing to apply 'equitable' procedures to him, failing properly to consider and weigh all certain evidence, and "refus[ing] to investigate [Roe's] character for truthfulness." Compl. ¶¶ 224-27. Although not described as such, this aspect of Doe's Title IX claim is one the First Circuit and other courts refer to as an "erroneous outcome" claim. *E.g.*, *BC II*, 892 F.3d at 91 (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).

To succeed on an erroneous outcome claim, Doe first must offer evidence that would "cast some articulable doubt on the accuracy of the outcome" of the investigation. *Id.* Such doubt may be shown, for example, by "particular evidentiary weaknesses" in the case or "particular procedural flaws affecting the proof." *Doe v. Harvard Univ.*, 462 F. Supp. 3d 51, 60 (D. Mass. 2020) (quoting *Yusuf*, 35 F.3d at 715). If Doe provides sufficient evidence of a flawed outcome, he then must demonstrate that gender bias was the cause of that outcome. *BC I*, 892 F. 3d at 91.

He "cannot merely rest on superficial assertions of discrimination, but must establish that 'particular circumstances suggest[] that gender bias'" caused the outcome, *id.* (quoting *Yusuf*, 35 F.3d at 715), such as statements by decision-makers or other "pertinent university officials, or patterns of decision-making that … tend to show the influence of gender." *Yusuf*, 35 F.3d at 715. Moreover, Doe must demonstrate that gender bias is the "but for" cause of the outcome, not merely a "motivating factor." *Sheppard v. Visitors of Va. St. Univ.*, 993 F.3d 230, 236-37 & n.7 (4th Cir. 2021).[5]

Doe cannot demonstrated any "articulable doubt" in the outcome of his case. The fact that Doe disagrees with the investigator's assessment of the evidence or the Panel's decision does not establish articulable doubt. *See Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015); *see also Doe v. Colgate Univ.*, 760 F. App'x 22, 33 (2d Cir. 2019). In Title IX cases such as this one, "it is not within the purview of a district court to second-guess a university's credibility determinations and overall evaluation of the evidence." *Doe v. Vassar Coll.*, No. 19-CV-9601, 2019 WL 6222918, at *8 (S.D.N.Y. Nov. 21, 2019); *see also Doe v. Williams Coll.*, 530 F. Supp. at 99. As discussed above, there was ample evidence upon which the Panel could decide it was more likely than not that Doe acted without Roe's consent. As a result, summary judgment for Brandeis is warranted. *See Doe v. Williams Coll.*, 530 F. Supp. 3d at 115-16.

Moreover, even assuming for the sake of argument there was a genuine dispute about the existence of articulable doubt, Doe has adduced no evidence that gender bias caused the outcome

---

[5] While the First Circuit has used the term "motivating factor" in student Title IX cases, it did so because the parties cited that language in *Yusuf*, without addressing whether "motivating factor" or "but for" is the correct standard. *See BC I*, 892 F.3d at 90 & n.12; *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 74 & n.11 (1st Cir. 2019). *Yusuf* borrowed the "motivating factor" language from the Civil Rights Act of 1991, which applies to Title VII, not Title IX. *See Sheppard*, 993 F.3d at 236-37 & n.7 (citing *Yusuf*, 35 F.3d at 715). Title IX requires "but for" causation. *Id.* (citing *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1739 (2020); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351-52 (2013); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, (2009); *Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 184 (2005)). Even if a "motivating factor" analysis is applied, Brandeis is entitled to summary judgment in any event.

in his case.  He has adduced no evidence of any statements by the decision-makers in his case, or

other university officials, which suggest gender bias.  Nor has he adduced any evidence of any

pattern of decision-making at Brandeis which suggests gender bias.

Doe claims that "Brandeis was motivated by a pro-female, anti-male bias due to pressures

at Brandeis and nationwide to 'believe survivors.'"  Compl. ¶ 226.  But "survivors" of sexual

assault is a gender neutral term.  *BC I*, 892 F.3d at 92.  The person who alleges sexual assault can

be either female or male, as demonstrated by the facts of this case.  As discussed above, Doe

alleged at one point that he had been the victim of sexual assault, in response to which Brandeis

officials reacted just as they do when the reporting party is female – promptly reporting the

allegation to Jurado, who reached out to offer Doe exactly the same support and options that

were made available to Roe.  *See supra* note 2.  Moreover, assuming for the sake of argument

that Brandeis actually has a bias to "believe survivors" – a claim for which Doe has no evidence

– any alleged bias in favor of survivors or complainants is not evidence of gender discrimination.

*Doe v. Lincoln-Sudbury Reg'l Sch. Comm.*, No. CV 20-11564, 2021 WL 3847985, at *12 (D.

Mass. Aug. 27, 2021); *Doe v. Harvard Univ.*, 462 F. Supp. 3d at 62; *Doe v. Univ. of Mass.-

Amherst*, No. 14-30143-MGM, 2015 WL 4306521, at *8 (D. Mass. July 14, 2015); *Bleiler v.

Coll. of Holy Cross*, 2013 WL 4714340, at *12.

Nor is there any merit to Doe's conclusory allegation that Brandeis was "motivated" by

"pressures at Brandeis and nationwide" in relation to handling of campus sexual assault

allegations.  Compl. ¶¶ 15-38, 226.  As the First Circuit and numerous other courts have made

clear, evidence of "pressure" on a university to properly address issues of sexual misconduct

does not, without more, support a claim of gender bias.  *Doe v. St. Joseph's Univ.*, 832 F. App'x

770, 774 (3d Cir. 2020); *BC I*, 892 F.3d at 92; *Doe v. Univ. of Denver*, 952 F.3d 1182, 1192

(10th Cir. 2020); *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018); *Rossley v. Drake Univ.*, 979 F.3d 1184, 1196 (8th Cir. 2020); *Doe v. Colgate Univ.*, 760 F. App'x at 30; *Doe v. Trs. of Dartmouth Coll.*, No. 21-cv-085-JD, 2021 WL 2857518, at *5 (D.N.H. July 8, 2021).  There is no evidence that any decision-maker in Doe's case perceived any such "pressure," much less that any such "pressure" caused a different outcome in this case because of Doe's gender.  *See Haidak*, 933 F.3d at 75 (affirming summary judgment on Title IX claim absent evidence "the decision maker in this case brought to bear any bias on the basis of sex").  Simply put, Doe's speculative, conclusory allegations about "pressure" are not evidence of gender bias and are insufficient to defeat summary judgment. *See Theidon v. Harvard Univ.*, 948 F.3d 477, 502 (1st Cir. 2020); *Doe v. Williams Coll.*, 530 F. Supp. 3d at 116; *Bleiler*, 2013 WL 4714340, at *13.

## IV.    THE INJUNCTIVE RELIEF CLAIM IN COUNT V

Doe's claim for injunctive relief fails because the legal claims on which it is based all fail, for the reasons set forth above.

### CONCLUSION

The Court should enter summary judgment for Brandeis on all counts.

BRANDEIS UNIVERSITY,

/s/Elizabeth H. Kelly
Daryl J. Lapp (BBO No. 554980)
   daryl.lapp@lockelord.com
Elizabeth H. Kelly (BBO No. 672277)
   liz.kelly@lockelord.com
LOCKE LORD LLP
111 Huntington Avenue
Boston, MA  02199
April 4, 2022                        617.230.0100

**Certificate of Service**

I certify that on April 4, 2022, this document was filed and served through the Electronic Case Filing System.

/s/ Elizabeth H. Kelly
Elizabeth H. Kelly

112745312v.2