## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )   **Civil Action No.: 1:20-cv-12162** |
| | ) |
| BRANDEIS UNIVERSITY, | ) |
| | ) |
| Defendant | ) |
| | ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

George J. Leontire, BBO # 294270
LEONTIRE & ASSOCIATES, P.C.
P.O. Box 4328
Westport, MA 02790
(855) 223-9080
george@leontirelaw.com

*Counsel for Plaintiff*

April 4, 2022

# TABLE OF CONTENTS

Page(s)

Introduction ................................................................................................................ 1

Standard of Review ..................................................................................................... 1

Key Background Facts ................................................................................................. 2

Argument ................................................................................................................... 11

   I.    John Doe is Entitled to Summary Judgment on his Breach of Contract Claim (Count I) . 11

      A.   Applicable Law ............................................................................................... 11

   II.   John Doe is Entitled to Summary Judgment on his Breach of the Implied Covenant of Good Faith and Fair Dealing Claim (Count II) ........................................................ 17

      A.   Applicable Law ............................................................................................... 17

   III.   John Doe is Entitled to Summary Judgment on his Claim that Brandeis University Breach its Duty to Select and Supervise Competent, Trained, and Unbiased Staff and Administration to Participate in the Disciplinary Process (Count III) .................................... 19

      A.   Applicable Law ............................................................................................... 19

   IV.   John Doe is Entitled to Summary Judgment on his Claim Under Title IX (Count IV) 20

      A.   Applicable Law ............................................................................................... 20

Conclusion ................................................................................................................ 22

# TABLE OF AUTHORITIES

**Federal Cases**

*Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418 (1st Cir. 2014)...............................2

*Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166 (1st Cir. 2003) ...............................................................2

*Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979)..............................................................................20

*Cherkaoui v. City of Quincy*, 877 F.3d 14 (1st Cir. 2017) .............................................................2

*Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721 (1st Cir. 1983) .............................................................11

*Dinu v. President and Fellows of Harvard College*, 56 F.Supp.2d. 129 (D. Mass. 1999) ...........11

*Doe v. Amherst Coll.*, 238 F. Supp. 3d 195 (D. Mass. 2017) ........................................................21

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D. Mass. 2016) .........................................11, 12, 19

*Doe v. Stonehill College, Inc.*, No. 20-CV-10468-LTS, 2021 WL 706228 (D. Mass. Feb. 23,
      2021) (slip opinion).......................................................................................................17, 19

*Doe v. Trs. of Boston Coll.*, 892 F.3d 67 (1st Cir. 2018)....................................................2, 17, 21

*Doe v. Trs. of Boston Coll.*, 942 F.3d 527 (1st Cir. 2019) .............................................................11

*Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238 (D. Vt. 1994)..................................................11

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) ......................................................20

*Havlik v. Johnson & Wales*, 509 F.3d 25 (1st Cir. 2007) ..............................................................11

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) ..................................................20

*Kelley v. LaForce*, 288 F.3d 1 (1st Cir. 2002) ................................................................................2

*Mangla v. Brown Univ.*, 135 F.3d 80 (1st Cir. 1998) ....................................................................11

*Sánchez v. Alvarado*, 101 F.3d 223 (1st Cir. 1996) ........................................................................2

*Sonoiki v. Harvard Univ.*, No. 19-CV-12172, 2020 WL 3416516 (D. Mass. June 22, 2020) (slip
      opinion) ................................................................................................................................17

*Walker v. President & Fellows of Harv. Coll.*, 840 F.3d 57 (1st Cir. 2016) ................................11

*Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2nd Cir. 1994)..............................................................21

**State Cases**

*Coombes v. Florio*, 450 Mass. 182, 877 N.E.2d 567 (2007) .........................................................19

*Coveney v. President & Trs. of the Coll. of the Holy Cross*, 288 Mass. 16, 445 N.E.2d 136 (1983)
      ................................................................................................................................................12

*Driscoll v. Board of Trs. of Milton Acad.*, 70 Mass. App. Ct. 285, 873 N.E.2d 1177 (2007) ......12

*Foster v. Loft, Inc.*, 26 Mass. App. Ct. 289, 526 N.E.2d 1309 (1988)..........................................19

*Roe No. 1 v. Children's Hop. Medical Center*, 469 Mass. 710, 16 N.E.3d 1044 (2014) ............. 19

*Roe v. Northeastern Univ.*, No. 16-CV-03335, 2019 WL 1141291 (Mass. Sup. Ct. Mar. 8, 2019)
  (not reported) .................................................................................................................. 19

*Schaer v. Brandeis Univ.*, 432 Mass. 474, 735 N.E.2d 373 (2000) ........................................ 11, 12

**Federal Statutes**

20 U.S.C. § 1681 ................................................................................................................................ 7

**Federal Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................................... 1

**INTRODUCTION**

John Doe ("Doe" or "Plaintiff") brought this action because Brandeis University ("Brandeis") breached its express and implied contract with him (Count I); violated the covenant of good faith and fair dealing (Count II); breached its duty to Doe to select and supervise competent, trained, and unbiased staff and administration to be involved in the disciplinary process (Count III); and violated Title IX of the Education Amendments of 1972 ("Title IX") (Count IV).

Brandeis should have known that Doe had a reasonable expectation that Brandeis would follow the procedures outlined in its Sexual Misconduct Policy and fulfill its obligation to provide a process that was fair and impartial. Moreover, Doe was entitled to a fair determination of the facts, which required a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion. Brandeis should have known there were problems with Brandeis's Office of Equal Opportunity ("OEO") and Brandeis's Title IX staff and administration that indicated their unfitness to oversee Doe's case, and Brandeis should have taken further action. Brandeis's action casts doubt on the accuracy of the disciplinary proceeding outcome and gender bias was a motivating factor behind Brandeis's erroneous finding. The severity of Brandeis's decision to initiate the proceedings and sanction Doe was affected by Doe's gender.

Plaintiff incorporates by reference Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment, which attaches Exhibits 1 through 73.

**STANDARD OF REVIEW**

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law.'"

*Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law'" and disputes are genuine when a reasonable jury considering the evidence "'could resolve the point in favor of the non-moving party.'" *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23-4 (1st Cir. 2017) (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). This standard applies where the parties have filed cross-motions for summary judgment. *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 79 (1st Cir. 2018).

When ruling on a motion for summary judgment, the court must construe "the record evidence in the light most favorable to the nonmoving party." *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). The court must draw all reasonable inferences in favor of the non-moving party, but must avoid making unreasonable inferences or crediting "bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Cherkaoui*, 877 F.3d at 23 (internal quotations omitted). "[I]f there is a genuine dispute of material fact, that dispute would 'need [] to be resolved by a trier of fact.'" *Doe v. Trs. of Bos. Coll.*, 893 F.3d at 79 (quoting *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002)).

## KEY BACKGROUND FACTS

On February 3, 2020, at 9:25PM, Jane Roe ("Roe") initiated her complaint by emailing Sonia Jurado ("Jurado"), Director of the Office of Equal Opportunity ("OEO"). P's Statement of Facts ¶ 1 (hereinafter "SOF"). On February 13, 2020, Jurado and Amy Condon, OEO Staff ("Condon") met with Roe. SOF ¶ 6. During the meeting, Roe told Jurado and Condon that she was previously sexually assaulted by a graduate student, her professor reported the sexual assault and that the OEO told her that the investigation would take too long, a year and a half, and the graduate student would have graduated by then, there was no reason to move the case forward,

and the graduate student was only kicked out of her class and Roe was given a no contact order. SOF ¶¶ 7-9. After Roe felt like she shut down and did not want that to happen this time. SOF ¶ 11.

During the meeting, Roe reported the alleged sexual assault by Doe, and told Jurado and Condon that Roe was aware Doe told others Roe was "gaslighting" him, that Doe did not do anything, and that Doe thought it was a drunk hookup that Doe regretted later. SOF ¶ 10. Roe told Jurado and Condon that Doe left with Roe to walk with her home, after hanging out with friends, and Doe allegedly assaulted Roe in her room. SOF ¶ 12. Roe alleged that Doe kissed her and performed oral sex on her. SOF ¶ 14.

On February 27, 2020, Jurado met with Doe, and thereafter emailed Doe copies of the Notice of Complaint and Non-Retaliation Acknowledgement including links to the Policy Against Discrimination, Harassment and Sexual Misconduct, Formal Resolution Process Flowchart, and Rights and Responsibilities ("Sexual Misconduct Policy"), and informed Doe that Jurado assigned Condon as the investigator. SOF ¶ 18.

Condon began her investigation and in March 2020, she conducted interviews of Witness 1 and Witness 2 and received text messages from Witness 2 by email.  SOF ¶ 21. Witness 1 told Condon that Doe told Witness 2 and Student B, he felt "gaslighted"; apologized for something he did not do; may have had mixed signals from Roe being friendly with him; may have given him mixed messages; they reconciled and Roe was ok; when it happened, Doe thought he had consent; Doe thought Roe forgave him, and that Doe felt like it went back and forth and it was hard for him. SOF ¶ 25. Witness 1 told Condon that when Roe talked about it initially – different – than when Roe told Witness 1 about it this semester; that now Roe is saying that Roe told Doe no all along the way, that Roe purposefully stayed out of Roe's room; that Roe did not want Doe

3

to walk Roe back to Roe's room; and she did not mean anything suggestive by it. SOF ¶ 26. Witness 1 told Condon that Roe initially said she was drunk, but then Roe said she wasn't, and that Witness 1 did not recall Roe being that drunk. SOF ¶ 27.

Witness 2 told Condon that Roe told him that Doe described to him, Witness 2, that it was a "drunken hook up" because they both drank that night; and that right after the incident Doe was more withdrawn, quiet, and that Witness 2 saw a lot less of him around campus than he would. SOF ¶¶ 29-30. Witness 2 sent Condon an email, with text messages attached, and noted "I think these were about Doe texting Roe. When we did talk I think Doe talked about how Roe telling other people about it made him feel ostracized." SOF ¶ 31.

In April 2020, Condon conducted interviews of Doe twice and planned to interview Student A though they did not appear for their scheduled interview, and Condon received text messages from Doe by email. SOF ¶ 36. Doe expressed to Condon that he had consent from Roe at all times, that Roe had bitten him, and that after they hooked up Roe was upset and said "I can't believe I'm the girl that hooks up with a guy's best friend after they break up." SOF ¶¶ 38-45. Doe told Condon that he spoke with Roe soon after tried to express that she initiated it and repeatedly asked if it was ok, and Roe shut him down and blamed Doe for taking advantage of her. SOF ¶¶ 46-47.

Doe told Condon that eventually he believed she was right because she adamantly insisted and whenever Doe tried to bring up the fact that he asked and she initiated, Roe told him it didn't matter, she was right. SOF ¶ 47. Doe told Condon that he believed her so much so he started self-harming, punching walls until his knuckles bled and pulling his thumbs out of his sockets, and he was really upset with himself, felt guilty, and thought he was a terrible person. SOF ¶ 48. Doe told Condon that during break after this occurred, he had suicidal ideation and

then started drinking heavily to avoid talking or thinking about it. SOF ¶ 49. Doe told Condon

that after January he put a lot of effort into making sure he did not see her on campus, that

whenever he saw her on campus he would get a panic attack, that there were a bunch of instances

where Roe was present and so Doe just walked out. SOF ¶ 51. Doe told Condon that Student A

told Doe that Roe has done this with other people; that Student A said Roe did this with three

other guys; and that Student A told Doe that he was being gaslighted. SOF ¶ 52.

     In May 2020, Condon conducted interviews of Roe and Doe. SOF ¶ 58. In June 2020,

Condon stated to Doe that she was in the process of writing the report and would keep Doe

updated on progress. SOF ¶ 62. In July 2020, Condon conducted another interview with Roe to

show Roe unredacted text messages Doe had provided that would be attached to the Investigative

Report SOF ¶ 64. Throughout the investigation, Jurado and Condon discussed the status

investigation of Roe v. Doe, including witnesses, documents, and planned interviews. SOF ¶¶ 32,

57.

     On July 1, 2020, Condon finalized the Investigative Report and transmitted it to Jurado.

SOF ¶ 67. Jurado edited the Investigative Report, via the "Track Changes" feature with edits and

comments. SOF ¶ 68. On July 30, 2020, Condon transmitted the investigative report and its

attachments to Doe and Roe under separate transmission.  SOF ¶ 82. Roe provided comments to

the investigative report and forwarded them to Jurado 14 minutes after receiving them. SOF ¶ 84.

On August 10, 2020, Condon transmitted to Jurado the final report. SOF ¶ 88.

     On August 12, the Roe v. Doe matter went to the Decision-Making Panel, including

members: Corey Bright ("Bright"), Jody Hoffer Gittell ("Hoffer-Gittell"), and Eli Jacobson

("Jacobson") SOF ¶¶ 90, 93. Jacobson said the panel consulted with Jurado many times,

countless times, at least seven times, and that the panel consulted on the topics of understanding

consent and incapacity and the panel was too look for inconsistencies, in stories between two individuals and could utilize that in their determination if we would find someone less credible based on inconsistencies. SOF ¶¶ 95-96. Jacobson and Hoffer-Gittell, felt that credibility of the witnesses and individuals was important. SOF ¶¶ 97, 100.  Jacobson stated that Doe's text messages taking responsibility weighed significantly on the panel's decision and agreed that if there was evidence that existed as to why he made those admissions, he would have liked to know. SOF ¶ 98. Hoffer-Gittell found Roe and Doe equally credible and did not find Doe to be responsible and recalled that the other panel members found Roe responsible because he was less credible due to inconsistency. SOF ¶ 100.

Jacobson, Bright, and Hoffer-Gittell drafted a document that was then edited by Jurado, which described each panel member's vote with regard to their determination, and Hoffer-Gittell was split 50/50 because both parties were equally credible. SOF ¶¶ 101-102. Jurado made revisions to the panel's findings and added "Doe agreed that everything happened the way that Roe described it when they spoke a few days later, and Doe agreed that he would admit that it was non-consensual if anyone asked" to each of the four questions. SOF ¶ 102. Then, Jurado made additional revisions, in this occasion outright stating "[i]n reviewing these again, I think there is one more finding that needs to be added." SOF ¶ 104. And then for the third time, Jurado again made an additional revision, this time suggesting an alternative sentence to the second revision she had suggested, and added "[t]he panel found the inconsistencies in Doe's statements about the incident made his account less credible than Roe's account." SOF ¶ 108.

On August 24, 2020, at 4:03PM, Jurado transmitted to Alex Rossett ("Rossett") Assistant Dean of Student Rights & Community Standards, the finding of the Decision-Making Panel, and then was involved throughout the sanctioning process speaking to Rossett, Monique

Gnanaratnam ("Gnanaratnam") Associate Dean of Students, Jamele Adams ("Adams") Dean of Students, Stephanie Grimes ("Grimes") Assistant Dean of Students and Lu Ling "Raymond" Ou ("Ou"). SOF ¶¶ 111-144. Sanctioning is the responsibility of DOSO, the Dean of Students Office, though Jurado was involved in suggestions levels of sanctions, discussing other cases to see how they fell on the spectrum, drafting letters, attending meetings, and giving feedback on how DOSO should function including who should handle these cases. *Id*. Gnanaratnam was the lead, but Rossett, Ou and Jurado remained involved throughout the sanctioning decision process, and the group used Doe as a means to get the process settled. *Id*. During the process Jurado told Ou that Roe v. Doe was a case where a finding of no responsibility would have been appropriate too (very close) and that probation was given to another student for sexual touching – a form of sexual assault. SOF ¶¶ 132-133. Jurado also edited Doe's notice of final outcome SOF ¶ 143.

On September 16, 2020, Brandeis sent a Notice of Final Outcome, and sanctioned him including: suspension from Brandeis from September 16, 2020 to commencement on May 23, 2021, restricted him from holding any leadership role or representing Brandeis in any capacity, and put a no contact order in place between Roe and Doe. SOF ¶¶ 145-146. On September 19, 2020, Doe asked Gnanaratnam several questions on a variety of topics including: whether his email counted as an appeal or if there was a specific form, whether he could review the case investigation, including all submitted evidence by both parties, whether the deadline to retrieve the rest of his materials could be moved to a later time (1:00 to 2:30), whether a witness statement is counted as evidence under the Sexual Misconduct Policy, and whether he could file an appeal on both procedural error and new evidence grounds, given the fairly clear misrepresentation of his statements. SOF ¶ 147. On September 21, 2020, Jurado replied to Doe's email, attached the appeal form that needed to be completed and informed him that after he

submitted his form then Jurado could discuss Doe's appeal in more detail; but did not answer the several questions he had posed to Gnanaratnam. SOF ¶ 148.

On September 25, 2020, at 6:25PM, Doe submitted his appeal under Procedural Error and New Evidence to Jurado. SOF ¶ 159. Doe stated under Procedural Error that the case was not completed in a timely manner and that there was mishandling of the Investigative Report, including specifically that it failed to record that Witness 1 informed Condon that Roe's story changed over time to villainize Doe and Roe's story changed over time to make Doe look worse; and had the panel seen that it was in line with his explanation that Roe gaslighted him it would have made him more credible and the panel ruled against him because he appeared less credible. SOF ¶ 160. Doe's attached New Evidence, text messages between Doe and Student A (who was not interviewed). SOF ¶ 161.

On October 2, 2020, Jurado dismissed Doe's appeal alleging procedural error, and told Doe that though the policy describes a goal for the completion of the process, there is no required timeframe, and so the length of time the resolution took is not procedural error, and that the characterization of evidence from a witness in the investigation is not a proper basis for appeal. 168. Doe asked Jurado how the failure to include very pertinent witness testimony is not procedural error and told Jurado that it seemed to him not only was the characterization of evidence mishandled but evidence itself was misplaced. SOF ¶ 169. Jurado told Doe that statements by the witness he referenced were included and Doe's concerns of how the statements were characterized is a factual dispute and not a basis for appeal. SOF ¶ 171. Jurado also told Doe that he did not request access to the report, (172) but Doe had asked Gnanaratnam to review the whole case investigation (147). On October 13, 2020, Jurado told Condon she suspected that Condon would have to speak with Student A as part of the appeal. SOF ¶ 176.

Julia Mani ("Mani"), Associate Director of Academic Advising, Michael Matt ("Matt"), Assistant Athletic Director for Internal Operations and Jenny Abdou ("Abdou") served on the University Appeals Board ("UAB"). SOF ¶¶ 181- 186. A potential member was removed due to actual interactions with Roe. SOF ¶ 185. On October 19, 2020, Jurado transmitted to Mani, Matt, and Abdou, the appeal documents, available through Box, the Sexual Misconduct Policy, and information about the appeal. SOF ¶ 187. Mani said the panel had questions why Student A, was not a witness in the initial report and Jurado responded that Student A did not respond to any outreach. SOF ¶ 190. Mani stated that credibility was important, and that the reason why Doe's statements conflicted would be information that would be helpful to know. SOF ¶ 191. Matt stated that credibility was a major issue between the two parties and agreed that the investigator qualified Doe's general credibility by stating Doe admitted that his statements to the investigator conflict with statements he made after the incident to Roe verbally and in writing in January 2019 text messages. SOF ¶ 195.

On October 23, 2020, at 11:30AM, after the UAB panel's deliberations were complete the panel sent Jurado their drafted statement regarding the outcome of their deliberations and they left the first sentence blank for the standard sentence to be added to their decision. SOF ¶¶ 198.  Jurado made revisions to the panel's findings, noted in "red" and Jurado's revisions substantively changed the panel's finding. SOF ¶¶ 199-200. Then, on October 27, 2020, Jurado created notice of outcome of appeal letter she created for Roe v. Doe, that notated "DOSO REP SIGNS" at the signature line and it included the UAB findings that Jurado had revised. SOF ¶¶201-202.  On October 29, 2020, Gnanaratnam sent Doe the notice of outcome of appeal and it included the UAB findings that Jurado had revised. SOF ¶¶ 207-208.

9

During the pendency of the Roe v. Doe, Condon and Jurado received information from a mandated reporter that Doe had been sexually assaulted in February, 2020, but agreed to wait until Doe was done with his review of the investigative report before discussing it, to keep the two things separate. SOF ¶¶ 209-218. In Contrast, Roe testified that she had filed a complaint with OEO, not related to Title IX prior to filing the complaint against Doe, and during the investigation Condon updated Roe regarding the other matter. SOF ¶¶ 219-220.

Roe was a student well known at Brandeis because she ran for and was elected as president of the student union. SOF ¶ 221. Prior to the investigation, Roe met with the provost and told her Title IX on this campus needs to be fixed and brought her a list of complaints from the students. SOF ¶ 222. In November, 2019, Roe also met with the President of Brandeis, Ron Liebowitz, and informed him that students were having concerns about Title IX, including for example that it was unclear if an off-campus incident involving Brandeis students would fall under Brandeis's Title IX in the new regulations. SOF ¶ 223.

Before she made her complaint against Doe, Roe met with her chief of staff, Jurado and Ou to discuss the new federal Title IX regulations, what they meant, and brought a list of student questions that were compiled which Jurado and Ou answered. SOF ¶¶ 228-230 At the end of the meeting they discussed what the new Title IX regulations (including sexual harassment and sexual assault) looked like and how Brandeis would implement those changes. SOF ¶ 232.

Roe had biweekly meetings with the provost, monthly meetings with the president, weekly meetings with the vice provost of student affairs, monthly meetings with the director of career services, and monthly meetings with the director of finance. SOF ¶ 224. During meetings with Ou, Roe discussed how students felt about the OEO because it was relatively new and there was concern among students around Title IX, especially because new federal regulations were

coming into place and that most of their conversations discussed figuring out how to communicate what OEO actually did for the student body. SOF ¶¶ 225–226.

After Roe testified met in November with Ou and Jurado, Roe and Jurado had communications regarding student concerns and student complaints. SOF ¶ 234. Roe also had exchanged emails with Jurado, such as Roe forwarding to Jurado three or four anonymous emails she received from students that had expressed concerns and Jurado emailed Roe and other student leaders on campus to get feedback on events and initiatives. SOF ¶ 235.

## ARGUMENT

I.   **John Doe is Entitled to Summary Judgment on his Breach of Contract Claim (Count I)**
     **A.  Applicable Law**

In Massachusetts, student-college relationships are contractual in nature and the terms of that contractual relationship can be derived from student policy manuals. *See e.g., Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 593 (D. Mass. 2016) (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998)); *Havlik v. Johnson & Wales*, 509 F.3d 25, 34 (1st Cir. 2007); *Dinu v. President and Fellows of Harvard College*, 56 F.Supp.2d. 129, 130 (D. Mass. 1999); *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 242 (D. Vt.1994). There are two tests relevant to Doe's breach of contract claim pursuant to Massachusetts breach of contract law: (1) reasonable expectations and (2) basic fairness. *Doe v. Trs. of Boston Coll.*, 942 F.3d 527, 533 (1st Cir. 2019).

The first test looks at the terms of the contract between the college and student and asks "whether the reasonable expectations of the parties have been met." *Schaer v. Brandeis Univ.*, 432 Mass. 474, 735 N.E.2d 373, 378 (2000); *Walker v. President & Fellows of Harv. Coll.*, 840 F.3d 57, 61 (1st Cir. 2016); *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 724 (1st Cir. 1983). The

reasonable expectation standard asks what meaning the party making the manifestation under the contract, the university, should reasonably expect the other party, the student, to give it. *Schaer*, 735 N.E.2d at 378.

The second test is whether the procedures followed were "conducted with basic fairness." *Id* at 380; *Driscoll v. Board of Trs. of Milton Acad.*, 70 Mass. App. Ct. 285, 873 N.E.2d 1177 (2007) (considering whether a school's decision was arbitrary and capricious under the umbrella of "basic fairness."). The inquiry is "uncertain and elastic" but requires the court to assess whether Brandeis provided "some minimum level of fair play" to the student during the disciplinary process. *Doe v. Brandeis*, 177 F. Supp. 3d at 572 ("In addition to reviewing the allegations of breach of contract, '[w]e . . . examine the hearing to ensure it was conducted with basic fairness'"); *see also Coveney v. President & Trs. of the Coll. of the Holy Cross*, 288 Mass. 16, 445 N.E.2d 136, 138-139 (1983) ("A private university, college, or school may not arbitrarily or capriciously dismiss a student." (citation omitted)). "Put simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion." *Doe v. Brandeis*, 177 F.Supp. at 567.

The relevant contracts at issue are Brandeis's "Rights and Responsibilities 2019-2020" and Brandeis's Sexual Misconduct Policy" which is incorporated by reference in the Student Handbook. *See* Ex. 1, Ex. 2. Brandeis's Sexual Misconduct Policy applies to all students and to conduct occurring on-campus. Ex. 2. The Office of Equal Opportunity ("OEO") maintained the Sexual Misconduct Policy on its website, and questions or concerns about the policy are directed to Jurado, Director of the OEO. *Id.* In its Sexual Misconduct Policy, Brandeis reserved the right to make changes to the policy as needed (*see* Ex. 2 at BRU0002546) and indeed exercised that right when it published a revised Sexual Misconduct Policy, and instituted the Formal Complaint

Process and Title IX Grievance Process policies, effective August 14, 2020, a mere three days after Condon, the Investigator of OEO, transmitted the August 10, 2020 Investigative Report related to Roe and Doe[1].

Violations of the Sexual Misconduct Policy are subject to disciplinary action through the informal or formal resolution processes, and depending on the nature of the violation, disciplinary sanctions for violations of the policy can include: denial of privileges, disciplinary warning, disciplinary probation, suspension and dismissal for students. Ex. 2 (BRU0002545-2546, BRU0002556-2566). Here, the relevant resolution process is the formal resolution process, which is first initiated by an individual providing a written or verbal statement to the OEO outlining the details of the incident(s), any witnesses that may have information, and any documents that might be available. Ex 2 (BRU0002559). Once the complaint is initiated, "the responding party will receive a written Notice of Complaint outlining the allegations raised and providing information about the Formal Resolution Process. Ex. 2 (BRU0002560). The process then proceeds to "Investigation," then "Investigative Report and Review," then "Determination of Responsibility and Assignment of Sanctions," and then "Appeals." Ex. 2 (BRU0002560-2566).

Under the Sexual Misconduct Policy, the Director appoints an investigator, whose responsibility is to gather information regarding the allegations. The investigator prepares a report summarizing and analyzing the relevant facts obtained through the investigation, draws

---

[1] Brandeis's 2020-2021 Rights and Responsibilities, which incorporates its revised Sexual Misconduct Policy, and its new Formal Complaint Process and Title IX Grievance Process policies, were effective August 14, 2020, and only applied to conduct which occurred after August 13, 2020. The most recent version of Brandeis's policies applicable to the current academic year, 2021-2022, can be located on Brandeis's publicly available website. https://www.brandeis.edu/equal-opportunity/policies/index.html

conclusions on the credibility of the parties and the witnesses and gives the parties an opportunity to independently review the investigative report. Once the investigation is closed, the investigator submits the investigative report and supporting documentation to a decision-making panel of three persons. The decision-making panel makes a finding and issue a written decision of their findings to the Director of the OEO. If the responding party is found responsible for violating Brandeis policy the matter is referred to the Dean of Students office, who is responsible for assigning the appropriate sanctions or remedies.

Brandeis has a contractual obligation to substantially follow its conduct policies and procedures, as it would reasonably expect a student to understand them; to conduct its procedures with "basic fairness," and to reach a decision that has rational basis, in other words one that is not arbitrary or capricious.

Here, Brandeis failed to meet this standard because Jurado guided and communicated with the investigator throughout the whole investigation, edited the investigative report before it was sent to Roe or Doe, edited the Decision-Making Panel's decision after they finished their deliberations, revised the UAB panel's decision after they finished deliberations, and was involved extensively in the sanctions process including: suggestions on levels of sanctions (both generally and regarding Doe), discussing other cases to see how they fell on the spectrum, drafting letters, attending meetings, and giving feedback on how DOSO should function including who should handle these cases.

The Sexual Misconduct Policy provides specific instances where the Director has discretion to take certain actions, such as to appoint an investigator, but nowhere in the Sexual Misconduct Policy does it inform students that the Director of OEO will intervene in this way in every step of the Formal Resolution Process. For example, the Sexual Misconduct Policy states

that the Investigator submits the Investigative Report to the Decision-Making Panel – that clearly did not happen in Roe v. Doe. Such intervention undermines the point of the investigator model, which is designed with different individuals conducting separate tasks to maintain independence, impartiality, and fairness.

Here, Brandeis failed to meet this standard because the administrative officials, including for example Jurado and Ou, interacted with Roe before and during the Formal Resolution Process. Jurado knew Roe prior to her filing her complaint, because they had met several times, including specifically for the purpose of discussing Brandeis Title IX policies and procedures. Prior to Ou questioning if the sanctions against Doe were too lenient, Ou too had met with Roe specifically for the purpose of discussing Brandeis Title IX policies and procedures. This meeting occurred before Jurado went outside the lines of the Sexual Misconduct Policy and remained involved throughout the Formal Resolution Process of Roe v. Doe. It defies logic that Jurado exercised her discretion to remove a potential UAB panel member because they knew Roe and had worked with Roe the prior summer; but did not recuse herself from any participation because she too had interacted with Roe. This is especially shocking where Jurado revision the UAB panel decision, after editing the Decision-Making Panels decision, and editing the Investigative Report. Despite that clear understanding of the obligation to protect from bias and conflict of interest, Brandeis administrative officials failed to meet that obligation.

Sexual Misconduct Policy provides that "[t]hrough this Resolution Process, [Brandeis] strives to provide a resolution process that is prompt, equitable, fair, thorough, and impartial towards all parties and witnesses involved" and that students involved in the "Resolution Process" have the right to: "[p]articipate in a Resolution Process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard." (*see* Ex. 2 (BRU0002557,

BRU0002567). "Fair" is not defined in the Sexual Misconduct Policy, however, the Merriam Webster online dictionary defines "fair" as "marked by impartiality and honesty: free from self interest or favoritism. *See* "Fair," *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.meriam-webster.com/dictionary/fair (accessed 30 Mar. 2022). Moreover, "impartial" is not defined in the Sexual Misconduct Policy, however, the Merriam Wesbter online dictionary defines "impartial" as "not partial or biased: treating or affecting all equally."

The failure of Brandeis is especially shocking whereas here it was Jurado that added: the language "Doe agreed that everything happened the way that Roe described when they spoke a few days later. And Doe agreed that he would admit that it was non-consensual if anyone asked." See **Ex. 31**. Certainly, the members of the panel agreed to accept the language, but the panel was split, one member did not find Doe responsible because the credibility assessments of Roe and Doe were both generally credible. This specific language had an effect on the UAB panel members in that Matt stated credibility was a major issue between the two parties and agreed that the investigator qualified Doe's general credibility and Matt stated he would have wanted to know why Doe's statements (such as accepting responsibility) were conflicted.

Brandeis has a contractual obligation to substantially follow its conduct policies and procedures, as it would reasonably expect a student to understand them; to conduct its procedures with "basic fairness," and to reach a decision that has rational basis, in other words one that is not arbitrary or capricious. *See e.g.*, *Doe v. Trs. of Boston Coll.*, 892 F.3d at 88 (obligation of fundamental fairness in student conduct proceedings is defined by the parties' contractual relationship). Here, Brandeis failed to substantially follow its conduct policies and procedures, failed to provide John Doe with "basic fairness" and reached a decision that was arbitrary and capricious.

This Court should grant Plaintiff's Motion for Summary Judgment because a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion.

## II.    John Doe is Entitled to Summary Judgment on his Breach of the Implied Covenant of Good Faith and Fair Dealing Claim (Count II)
### A.  Applicable Law

"The implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law, applied in the context of school disciplinary proceedings, creates an independent duty to provide basic fairness." *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 87-88 (1st Cir. 2018). The inquiry, as recently noted by other sessions of this Court, is "essentially identical to the analysis under the breach of contract claim and the standard applied to the basic fairness of the proceedings." *See e.g., Doe v. Stonehill College, Inc.*, No. 20-CV-10468-LTS, 2021 WL 706228, at 14 (D. Mass. Feb. 23, 2021) (slip opinion); *Sonoiki v. Harvard Univ.*, No. 19-CV-12172, 2020 WL 3416516, at *15 (D. Mass. June 22, 2020) (slip opinion).

As described in Section I, Brandeis has a contractual obligation to substantially follow its conduct policies and procedures, as it would reasonably expect a student to understand them; to conduct its procedures with "basic fairness."

Brandeis failed to meet this standard because Jurado guided and communicated with the investigator throughout the whole investigation, edited the investigative report before it was sent to Roe or Doe, edited the Decision-Making Panel's decision after they finished their deliberations, revised the UAB panel's decision after they finished deliberations, and was involved extensively in the sanctions process including: suggestions on levels of sanctions (both generally and regarding Doe), discussing other cases to see how they fell on the spectrum,

17

drafting letters, attending meetings, and giving feedback on how DOSO should function including who should handle these cases.

Moreover, Brandeis failed to meet this standard because the administrative officials, including for example Jurado and Ou, knew Roe and had repeatedly interacted with her both before and during the Formal Resolution Process. Prior to Ou questioning if the sanctions against Doe were too lenient, Ou too had met with Roe specifically for the purpose of discussing Brandeis Title IX policies and procedures, and in fact for about a year they met on a biweekly basis. That meeting where they discussed Title IX occurred before Jurado went outside the lines of the Sexual Misconduct Policy and remained involved throughout the Formal Resolution Process of Roe v. Doe. Jurado also knew Roe prior to her filing her complaint, because they met several times, including specifically for the purpose of discussing Brandeis Title IX policies and procedures. It defies logic that Jurado exercised her discretion to remove a potential UAB panel member because they knew Roe and had worked with Roe the prior summer; but did not recuse herself from any participation because she too had interacted with Roe. This is especially shocking where Jurado revision the UAB panel decision, after editing the Decision-Making Panels decision, and editing the Investigative Report. Despite that clear understanding of the obligation to protect from bias and conflict of interest, Brandeis administrative officials failed to meet that obligation.

The inquiry here is essentially identical to the analysis under the breach of contract claim, in Section I. For these reasons, and those described above, and as laid out in extensive detail in Plaintiff's Statement of Material Fact, this Court should grant Plaintiff's Motion for Summary Judgment.

III.   **John Doe is Entitled to Summary Judgment on his Claim that Brandeis University Breach its Duty to Select and Supervise Competent, Trained, and Unbiased Staff and Administration to Participate in the Disciplinary Process (Count III)**
   A.   **Applicable Law**

Under Massachusetts law, negligent supervision "occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d at 613 (quoting *Foster v. Loft, Inc.*, 26 Mass. App. Ct. 289, 526 N.E.2d 1309, 1310-11 (1988)). Negligent retention falls under the umbrella of negligent supervision, though at times the case law describes negligent retention and negligent supervision as two separate torts. *Doe v. Brandeis*, 177 F. Supp. 3d at 613. "In such circumstances, employers are responsible for exercising reasonable care to ensure that their employees do not cause foreseeable harm to a foreseeable class of plaintiffs." *Roe No. 1 v. Children's Hop. Medical Center*, 469 Mass. 710, 16 N.E.3d 1044, 1048 (2014) (quoting *Coombes v. Florio*, 450 Mass. 182, 877 N.E.2d 567, 570 (2007).

To establish Doe's negligent retention and supervision claim, Doe must demonstrate facts that show Brandeis should have known there were problems with Brandeis's Office of Equal Opportunity and Title IX staff and administration indicating their unfitness to oversee Doe's case, but failed to take further action. *Doe v. Stonehill College, Inc.*, No. 20-CV-10468-LTS, 2021 WL 706228, at 14 (D. Mass. Feb. 23, 2021) (slip opinion) (citing *Doe v. Brandeis Univ.*, 177 F. Supp. 3d at 614). *See also Roe v. Northeastern Univ.*, No. 16-CV-03335, 2019 WL 1141291 at *11 (Mass. Sup. Ct. Mar. 8, 2019) (not reported) (applying *Doe v. Brandeis Univ* on Defendant's motion for summary judgment).

Here, there is uncontroverted evidence that senior administration officials at Brandeis were all aware of the ongoing investigation of the complaint Roe made against Doe. The President was aware of problems with Title IX, the Provost was aware of these problems, and the Vice Provost was also aware of the problems. In fact, while the Roe v. Doe investigation was being undertaking Brandies senior administration officials were working diligently to refine and adapt their process and procedures pertaining to Title IX. The Plaintiff's Statement of Facts describes in great detail the multiple communications between the senior administration officials and Jurado, especially during the sanctions phase of the process. In fact, the Court upon review will understand that Brandeis was using the sanctioning of Doe as the "floor" for sexual assault cases at Brandeis. Moreover, there new policies were effective within three days of Doe's investigative report, and Jurado specifically desired for that panel to meet prior to those policies and procedures becoming effective.

The Court should grant Plaintiff's Motion for summary judgment on Count III and review in close detail the Plaintiff's Statement of Material Facts and Exhibits.

## IV.   John Doe is Entitled to Summary Judgment on his Claim Under Title IX (Count IV)
### A.  Applicable Law

Title IX provides that "[n]o person in the United States shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This provision is enforceable "through an implied private right of action." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998) (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979)). Prohibited discrimination occurs under Title IX when an individual is "subjected to deferential treatment . . . on the basis of sex." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

Under Title IX, separate lines of cases have established the right to damages from a school, including when a student can establish differential treatment on the basis of sex, or deliberate indifference to allegations of sexual harassment. *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 221 (D. Mass. 2017). Under differential treatment, there are two categories of claims, including claims that bias in the disciplinary process led to an erroneous outcome and selective enforcement. *Id* at 222.

To succeed on an erroneous outcome claim, Doe must show facts sufficient to cast doubt on the accuracy of the outcome of the disciplinary proceedings and that gender bias was a motivating factor behind the erroneous finding. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2nd Cir. 1994). To succeed on a selective enforcement claim, Doe must show that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 222 (D. Mass. 2017) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2nd Cir. 1994)); *see also Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 90 (1st Cir. 2018) (following the *Yusuf* framework).

As described in the Plaintiff's Statement of Material Facts and Sections I, II, and III above, Doe has established there are many facts that cast doubt on the outcome of the disciplinary proceedings. Here, gender played a role because when Jurado and OEO were told by a mandated reporter that Doe was sexually assaulted they waited to contact him to keep the processes separate, whereas compared to Roe they allowed those processes to proceed simultaneously and even updated Roe in the midst of the Roe v. Doe investigation regarding the other complaint. Put simply Doe was not treated the same or similarly as Roe by Brandeis college. The severity of Doe's punishment had more to do with Brandeis wanting to set a

specific floor for sexual assault than the situation and merits of his case, which Jurado acknowledge was a very close call.

The Court should grant Plaintiff's Motion for Summary Judgment.

## CONCLUSION

Pursuant to Fed. R. Civ. P. 56, Plaintiff John Doe, respectfully moves for summary judgment, because he is entitled to judgment as a matter of law to his claims that Brandeis University breached its express and implied contract with Plaintiff (Count I); violated the covenant of good faith and fair dealing (Count II); breached its duty to Plaintiff to select and supervise competent, trained, and unbiased staff and administration to be involved in the disciplinary process (Count III); and violated Title IX of the Education Amendments of 1972 ("Title IX") (Count IV).

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) as follows, on April 4, 2022:

Daryl J. Lapp
Elizabeth H. Kelly
Locke Lord LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0174
Daryl.Lapp@lockelord.com
Liz.Kelly@lockelord.com

                            /s/ George J. Leontire
                            George J. Leontire, Esq.