**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |
| JOHN DOE,                              ) | |
|                                        ) | |
|              Plaintiff                 ) | |
|                                        ) | |
| v.                                     )   **Civil Action No.: 1:20-cv-12162** |
|                                        ) | |
| BRANDEIS UNIVERSITY,                   ) | |
|                                        ) | |
|              Defendant                 ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |


**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**


George J. Leontire, BBO # 294270
LEONTIRE & ASSOCIATES, P.C.
P.O. Box 4328
Westport, MA 02790
(855) 223-9080
george@leontirelaw.com

*Counsel for Plaintiff*


May 2, 2022

# TABLE OF CONTENTS

**Page(s)**

Introduction ............................................................................................................................. 1

Key Facts ................................................................................................................................. 2

Argument ................................................................................................................................. 5

    I.    Brandeis's Motion for Summary Judgment Should be Denied Because Brandeis is Not Entitled to Judgment as a Matter of Law .............................................................................. 5

        A.    Waiver of Procedural Arguments is Not Established Law in this Jurisdiction and the Court should Decline Brandeis's Invitation to Establish New Legal Principles ..................... 5

        B.    Brandeis Failed to Meet Its Burden to Demonstrate that Doe Will be Unable to Prove His Claims and Therefore Summary Judgment Must Be Denied ............................................ 7

        A.    The Four - Month Investigation & Investigative Report ............................... 9

        B.    Decision-Making Panel ............................................................................. 14

        C.    Sanctions ................................................................................................... 16

        D.    Appeal, University Appeals Board and Notice of Outcome of Appeal ....................... 17

Conclusion ............................................................................................................................ 20

# TABLE OF AUTHORITIES

**Federal Cases**

*Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721 (1st Cir. 1983) ............................................................ 7

*Dinu v. President and Fellows of Harvard College*, 56 F.Supp.2d. 129 (D. Mass. 1999) ............ 7

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D. Mass. 2016) .................................................. 7, 8

*Doe v. Stonehill College, Inc.*, No. 20-CV-10468-LTS, 2021 WL 706228 (D. Mass. Feb. 23, 2021) (slip opinion) ................................................................................................................. 8

*Doe v. Trs. of Boston Coll.*, 942 F.3d 527 (1st Cir. 2019) ............................................................ 7

*Havlik v. Johnson & Wales*, 509 F.3d 25 (1st Cir. 2007) ............................................................. 7

*Mangla v. Brown Univ.*, 135 F.3d 80 (1st Cir. 1998) ................................................................... 7

*Sonoiki v. Harvard Univ.*, No. 19-CV-12172, 2020 WL 3416516 (D. Mass. June 22, 2020) (slip opinion) ............................................................................................................................. 8

*Tigrett v. Rector & Visitors of Univ. of Va.*, 97 F. Supp. 2d 752 (W.D. Va. 2000) ...................... 6

*Walker v. President & Fellows of Harv. Coll.*, 840 F.3d 57 (1st Cir. 2016) ................................ 7

*Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646 (M.D. Tenn. 2018) ............................................... 6

**State Cases**

*Berkowitz v. Pres. & Fellows of Harvard Coll.*, 789 Mass. App. Ct. 262 (2003) ........................ 6

*Coveney v. President & Trs. of the Coll. of the Holy Cross*, 288 Mass. 16, 445 N.E.2d 136 (1983) ....................................................................................................................................... 8

*Driscoll v. Board of Trs. of Milton Acad.*, 70 Mass. App. Ct. 285, 873 N.E.2d 1177 (2007) ........ 8

*O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686 (1996) ................................................. 6

*Schaer v. Brandeis Univ.*, 432 Mass. 474, 735 N.E.2d 373 (2000) ........................................... 7, 8

**INTRODUCTION**

Plaintiff respectfully submits this memorandum of law in opposition to Defendant's motion for summary judgment and incorporates by reference, Plaintiff's memorandum of law in support of his motion for summary judgment, Plaintiff's his statement of material facts in support of his motion for summary judgment and attached Exhibits 1 through 73, and Plaintiff's Responses to Defendant's Statement of Material Facts.

Brandeis's motion for summary judgment must be denied because Brandeis is not entitled to judgment as a matter of law. Moreover, Brandeis failed to meet its burden to demonstrate that Doe will be unable to establish his claims. Additionally, the record evidence establishes that Brandeis failed to fulfill its contractual obligations and provide a process that was fair and impartial. Doe was entitled to a fair determination of the facts, which required a fair process, not titled to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular outcome. The record evidence establishes that Brandeis did not provide a fair determination of the facts, a fair process, or a fair and neutral fact-finder.

Brandeis should have known there were problems with Brandeis's Office of Equal Opportunity ("OEO") and Brandeis's Title IX staff and administration that indicated their unfitness to oversee Doe's case, and Brandeis should have taken further action. Brandeis's action casts doubt on the accuracy of the disciplinary proceeding outcome and gender bias was a motivating factor behind Brandeis's erroneous finding. The severity of Brandeis's decision to initiate the proceedings and sanction Doe was affected by Doe's gender. Accordingly, this Court should deny Defendant's motion for summary judgment.

**KEY FACTS**

*Roe's Interactions with Brandeis Administration*

Roe was the President of the Brandeis Student Union from April 2019 to September 2020. D's SOF No. 5. In Roe's capacity as Brandeis Student Union President, she met frequently with Brandeis Administration, including specifically to discuss Title IX issues on campus at Brandeis.

In May 2019, after being elected president of the student union, Roe met with the Provost, Lisa Lynch, and told her directly that Title IX at Brandeis needed to be fixed and brought her a list of complaints from students. P's SOF No. 222 (Ex. 73 at 40:11-24, 41:6. (Roe Dep.)). Roe provided feedback to the provost, whom oversaw Lu Ming "Raymond" Ou, Vice Provost of Student Affairs ("Ou"), regarding a litany of concerns concerning Title IX and Roe advocated for students. P's SOF No. 223 (Ex. 73 at 41:12-24, 42:1-24, 43:1-6 (Roe Dep.)).

In May 2019, Roe met with Sonia Jurado ("Jurado"), Director of the Office of Equal Opportunity ("OEO") and during the meeting Roe brought forward student concerns regarding accessibility. *See* **Tab 4**, at 29:3-9.

As President Roe had biweekly meetings with the provost, monthly meetings with the president, weekly meetings with the vice provost of student affairs, monthly meetings with the director of career services, and monthly meetings with the director of finance. P's SOF No. 224 (Ex. 73 at 17:15-24, 18:1-12 (Roe Dep.)).

Roe began meetings with Ou in the Fall of 2019 and they met once a month for the first two months, then biweekly. P's SOF No. 227 (Ex. 73 at 22:12-24, 23:1-15 (Roe Dep.)). During meetings with Ou, Roe discussed how students felt about the OEO because it was relatively new

2

and there was concern among students around Title IX, especially because new federal guidelines were coming into place. P's SOF No. 225 (Ex. 73 at 26:4-15 (Roe Dep.)).

Roe also met with Jurado to training on Title IX issues for the Student Union leadership. Tab 4, at 27-28, 30, 35-39. And on September 30, 2019, Roe filed a different complaint with the OEO, that was not related to Title IX. P's SOF No. 219 (Ex. 73 at 132:7-20 (Roe Dep.).

In November 2019, Roe met with both Ou and Jurado, and discussed the new federal regulations on Title IX, and what they meant, that Ou was unaware students had been concerned about Title IX, and Roe's list of nine student questions about the new Title IX regulations and how they would affect Brandeis, which Roe brought to the meeting. P's SOF Nos. 229 (Ex. 73 at 26:19-24, 27:1-2, 34:12-16. (Roe Dep.)), 230 (Ex. 73 at 27:3-10, 34:12-16 (Roe Dep.)). During the meeting, Roe shared student feedback on how the OEO was being perceived by the student body and Jurado asked Roe how the training session she conducted on Title IX for the student union had gone, asked Roe what improvements she would suggest, and then at the end of the meeting Roe, Jurado, and Ou discussed the new Title IX regulations including what they looked like and how Brandeis would implement those changes. P's SOF Nos. 231 (Ex. 73 at 53:5-24, 54:1-5 (Roe Dep.)), 232 (Ex. 73 at 53:23-24, 54:1-10 (Roe Dep.)). After this meeting, Roe and Jurado continued to have communications regarding student concerns and student complaints. P's SOF No. 234 (Ex. 73 at 66:21-24, 67:1-6 (Roe Dep.)).

In November, 2019, Roe met with the President of Brandeis, Ron Liebowitz, and informed him that students were having concerns about Title IX, including for example that it was unclear to students if an off-campus incident involving Brandeis students would fall under Brandeis's new Title IX regulations. P's SOF No. 233 (Ex. 73 at 27:12-24, 28:1-6, 34:3-4, 34:17-24, 35:1-15 (Roe Dep.)).

*Roe's Complaint*

In December 2019, Jurado and Roe met again, and Roe told Jurado that a male student had sexually assaulted her and asked about the formal resolution process for addressing a complaint, if she decided to bring one. Tab 4, at 28-29, 31. This meeting was more about process and there were no details or names shared about the incident by Roe. Tab 4, at 29:3-9. At that time, Jurado was discussing Roe's concerns, but very generally, and Jurado testified "I don't think she had shared the specifics of the incident or even [the person's] name with me."  Tab 4, at 28:5-14.

In February 2020, Roe initiated her complaint and sent Jurado specific information about the incident and the respondent. Ex. 3, at BRU0001579. On February 13, 2020, Jurado and Amy Condon, OEO Staff ("Condon") met with Roe. P's SOF No. 6. During the meeting, Roe told Jurado and Condon that she was previously sexually assaulted by a graduate student, that her professor reported the sexual assault and that the OEO told her that the investigation would take too long, a year and a half, and the graduate student would have graduated by then, so there was no reason to move the case forward. Ex. 6. Roe told Jurado and Condon that the graduate student was only kicked out of her class and that Roe was given a no contact order. *Id*. Roe told Jurado and Condon that after the experience she felt like she shut down and did not want that to happen this time. *Id.*

During the meeting, Roe reported the alleged sexual assault by Doe, and told Jurado and Condon that Doe said Roe was "gaslighting" him, that Doe did not do anything, and that Doe thought it was a drunk hookup that Doe regretted later. *Id*.  Roe told Jurado and Condon that Doe left with Roe to walk with her home, after hanging out with friends, and Doe allegedly assaulted Roe in her room. *Id*. Roe alleged that Doe kissed her and performed oral sex on her. *Id.*

4

On February 27, 2020, Jurado met with Doe, then emailed Doe copies of the Notice of Complaint and Non-Retaliation Acknowledgement including links to the Policy Against Discrimination, Harassment and Sexual Misconduct, Formal Resolution Process Flowchart, and Rights and Responsibilities ("Policy"), and informed Doe that Jurado assigned Condon as the investigator. *Id.*

## ARGUMENT

I. **Brandeis's Motion for Summary Judgment Should be Denied Because Brandeis is Not Entitled to Judgment as a Matter of Law**

Brandeis's motion for summary judgment must be denied because Brandeis relies on law not adopted in this jurisdiction and has failed to meet its burden to demonstrate that Doe will be unable to establish his claims.

A. **Waiver of Procedural Arguments is Not Established Law in this Jurisdiction and the Court should Decline Brandeis's Invitation to Establish New Legal Principles**

In its motion for summary judgment, Brandeis attempts to complicate a straightforward area of law, which has a well-established legal test in this Circuit, by relying on legal principles applied to legally distinct state law claims and Federal Districts outside of our Circuit. Plaintiff was unable to locate any Massachusetts state case or District of Massachusetts federal case applying such principle in the context of this litigation.

Repeatedly, Brandeis argues that "[a]ny procedural argument is waived if Doe did not raise the issue during the conduct process." (Def. Mem. at 11) and uses this principle to argue that this Court should find Doe waived allegations related to notice of the charges and the scope of the investigation conducted by Brandeis, including Brandeis unfairly limiting the scope of the investigation, Brandeis refusing to explore Roe's character for truthfulness after Doe provided

information that Roe made false allegations against other Brandeis students, Brandeis's investigator failing to include in her credibility assessments information about the inconsistency in Roe's statements, and Brandeis's investigator declining to interview witnesses with potentially relevant information.

In making such arguments, Brandeis relies on *Berkowitz v. Pres. & Fellows of Harvard Coll.*, 789 Mass. App. Ct. 262, 275 (2003), *Tigrett v. Rector & Visitors of Univ. of Va.*, 97 F. Supp. 2d 752 (W.D. Va. 2000), and *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 694 (M.D. Tenn. 2018), and attempts to have this court apply principles of employment law, including contractual rights arising out of a personnel manual in a corporate setting and exhaustion of grievance procedures, to Doe's claims.

In *Berkowitz*, an associate professor, brought action against the university, alleging breach of contract and common law duty by the university, arising from the university's denial of tenure to him. In *Berkowitz*, the court relied on established principles of employment law developed in *O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 695 (1996), wherein the Supreme Judicial Court required a plaintiff employee to exhaust internal grievance procedures before resorting to the courts. The logic behind the court applying the principle was that "[w]here employment rights are contractual, and the contract establishes an internal grievance procedure for resolving disputes, the procedure ought to be followed." *Berkowitz*, at 275. It is in this context, the associate professor's failure to include a procedural argument (pertaining to his short-list claims) in the pre-suit university grievance process barred this aspect of his contract claims. *Id.* The court discussed three reasons for holding the associate professor to the exhaustion requirement, including that exhaustion of internal grievances (1) is part of the contractual bargain and defines the rights themselves, (2) allows the contracting parties to educate each other as to

their respective conceptions of the meaning of the contract, and (3) allows the contracting parties to work out their differences and preserves scarce judicial resources. *Id.*

Brandeis tempts this court to apply apples to oranges, as under the Student Handbook relevant here, there is no contractual term which requires that a student proceed through a grievance process with the university prior to bringing an action in court. *See*, Ex. 1; Ex. 2. Indeed, nowhere in Brandeis's memorandum of law does it set forth the contractual term which requires students, to exhaust an internal grievance procedure, such as those included in employee manuals, before seeking relief in the courts. *See e.g.,* Def. Mem. This court should refuse Brandeis's invitation to set forth a new legal principle in the context of this litigation.

### B. Brandeis Failed to Meet Its Burden to Demonstrate that Doe Will be Unable to Prove His Claims and Therefore Summary Judgment Must Be Denied

In Massachusetts, student-college relationships are contractual in nature and the terms of that contractual relationship can be derived from student policy manuals. *See e.g., Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 593 (D. Mass. 2016) (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998)); *Havlik v. Johnson & Wales*, 509 F.3d 25, 34 (1st Cir. 2007); *Dinu v. President and Fellows of Harvard College*, 56 F.Supp.2d. 129, 130 (D. Mass. 1999). There are two tests relevant to Doe's breach of contract claim pursuant to Massachusetts breach of contract law: (1) reasonable expectations and (2) basic fairness. *Doe v. Trs. of Boston Coll.*, 942 F.3d 527, 533 (1st Cir. 2019).

The first test looks at the terms of the contract between the college and student and asks "whether the reasonable expectations of the parties have been met." *Schaer v. Brandeis Univ.*, 432 Mass. 474, 735 N.E.2d 373, 378 (2000); *Walker v. President & Fellows of Harv. Coll.*, 840 F.3d 57, 61 (1st Cir. 2016); *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 724 (1st Cir. 1983). The reasonable expectation standard asks what meaning the party making the manifestation under the

contract, the university, should reasonably expect the other party, the student, to give it. *Schaer*, 735 N.E.2d at 378.

The second test is whether the procedures followed were "conducted with basic fairness." *Id* at 380; *Driscoll v. Board of Trs. of Milton Acad.*, 70 Mass. App. Ct. 285, 873 N.E.2d 1177 (2007) (considering whether a school's decision was arbitrary and capricious under the umbrella of "basic fairness."). The inquiry is "uncertain and elastic" but requires the court to assess whether Brandeis provided "some minimum level of fair play" to the student during the disciplinary process. *Doe v. Brandeis*, 177 F. Supp. 3d at 572 ("In addition to reviewing the allegations of breach of contract, '[w]e . . . examine the hearing to ensure it was conducted with basic fairness'"); *see also Coveney v. President & Trs. of the Coll. of the Holy Cross*, 288 Mass. 16, 445 N.E.2d 136, 138-139 (1983) ("A private university, college, or school may not arbitrarily or capriciously dismiss a student." (citation omitted)). "Put simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion." *Doe v. Brandeis*, 177 F.Supp. at 567.

"The implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law, applied in the context of school disciplinary proceedings the inquiry is "essentially identical to the analysis under the breach of contract claim and the standard applied to the basic fairness of the proceedings." *See e.g., Doe v. Stonehill College, Inc.*, No. 20-CV-10468-LTS, 2021 WL 706228, at 14 (D. Mass. Feb. 23, 2021) (slip opinion); *Sonoiki v. Harvard Univ.*, No. 19-CV-12172, 2020 WL 3416516, at *15 (D. Mass. June 22, 2020) (slip opinion).

The relevant contracts at issue are Brandeis's "Rights and Responsibilities 2019-2020" and Brandeis's Sexual Misconduct Policy "Policy." Ex. 1, Ex. 2. As follows are specific provisions of the policy and record evidence of what occurred that demonstrate that Doe will be

8

able to establish that Brandeis breached its contract, breached the covenant of good faith and fair dealing, negligently failed to supervise its OEO / Title IX staff and administration, and violated Title IX.

### A.  The Four - Month Investigation & Investigative Report

The Policy does not state (or inform students) that the Director of the OEO has equivalent discretion to the Investigator or that the Director of the OEO will oversee investigations being conducted by the Investigator. See e.g., Ex. 2. (BRU0002545). Moreover, the Policy does not inform students that the Director of the OEO will review, edit, alter, or participate in the drafting or transmission of the Investigative Report. *See* Ex. 2 at 002563. Nor does the Policy state that Brandeis committees or Brandeis General Counsel will review, edit, alter, or participate in the drafting or transmission of the Investigative Report. *See e.g.*, Ex. 2. (BRU0002545). Despite that, the record evidence establishes the following things occurred.

From the start, Jurado guided the Investigation. For example, on March 3, 2020, she told Condon that "Doe might be one that, meeting with him will actually streamline things (not sure what he will admit)." Ex. 10, at BRU0000596. By this point, Jurado had already met with Doe on February 27, 2020, to assign Condon as the Investigator. Ex. 7 (BRU0000589). In that meeting, Doe had informed Jurado that his sexual encounter with Roe was consensual, and the Plaintiff had suffered significant mental health issues since his sexual encounter with Roe. Tab 1 ¶ 156-157.  Moreover, throughout the entirely of the investigation, Jurado and Condon frequently discussed the status investigation of Roe v. Doe, including witnesses, documents, and planned interviews. P's SOF Nos. 32, 57.

Condon began the investigation, and in March 2020, she conducted interviews of Witness 1 and Witness 2 and received text messages from Witness 2 by email.  P's SOF No. 21. During

these interviews, Condon was directly informed again that Doe felt gaslighted; Witness 1 told

Condon that Doe told Witness 2 and Student B, he felt "gaslighted"; apologized for something he

did not do; may have had mixed signals from Roe being friendly with him; may have given him

mixed messages; they reconciled and Roe was ok; when it happened, Doe thought he had

consent; Doe thought Roe forgave him, and that Doe felt like it went back and forth and it was

hard for him. *Id* at No. 25. Witness 1 told Condon that when Roe talked about it initially, it was

different than when she talked about it recently; that now Roe is saying that Roe told Doe no all

along the way, that Roe purposefully stayed out of Roe's room; that Roe did not want Doe to

walk Roe back to Roe's room; and she did not mean anything suggestive by it. *Id* at No. 26.

Witness 1 told Condon that Roe initially said she was drunk, but then Roe said she wasn't, and

that Witness 1 did not recall Roe being that drunk. *Id* at No. 27.

Also, in March, Witness 2 told Condon that Roe told him that Doe described to him, that

it was a "drunken hook up" because they both drank that night; and that right after the incident

Doe was more withdrawn, quiet, and that Witness 2 saw a lot less of him around campus than he

would. *Id* at Nos. 29-30. Condon choose to take notes of these facts from both interviews, but

they were not expressly included in the credibility assessment of Roe, nor were they taken into

consideration for the credibility assessment of Doe.

Then, in April 2020, Condon conducted interviews of Doe twice, had planned to

interview Student A though they did not appear for their scheduled interview, and received text

messages from Doe by email. *Id* at No. 36. Doe expressed to Condon that he had consent from

Roe at all times, that Roe had bitten him (and Student B had seen the marks), and that after Roe

and Doe hooked up that Roe was upset and said "I can't believe I'm the girl that hooks up with a

guy's best friend after they break up." Ex. 13, at BRU0000136-143. Doe told Condon that he

spoke with Roe soon after and tried to tell Roe that she initiated their sexual relations and that he had repeatedly asked if it was ok, but that Roe simply would not hear it and shut him down and also blamed Doe for taking advantage of her. *Id.* Doe explained to Condon that eventually he had believed what Roe said was right because Roe was adamantly insisting, and that whenever Doe tried to bring up the fact that he asked and she initiated, Roe told him it didn't matter, that she was right. *Id.* Doe told Condon that he believed her so much so he started self-harming, punching walls until his knuckles bled and pulling his thumbs out of his sockets, and he was really upset with himself, felt guilty, and thought he was a terrible person. *Id.*

Doe told Condon that during break after this occurred, he had suicidal ideation and then started drinking heavily to avoid talking or thinking about it. *Id.* Condon denies that Doe informed her of self-harm and suicidal ideation; however, Doe testified regarding what he told Condon, as follows: "That's not entirely accurate. Part of that is accurate in that I told her I had not engaged in any self-harming behavior. That is accurate. I also did tell her that the in-person meeting with Jurado, receiving the physical documents, and at various points in the process starting in 2020 that I had had some suicidal ideation." Tab 2, 128:17-24.  Doe further testified "[...] I remember the night that I received the physical documents from Jurado I felt that my life was over. I thought about what it would be like if I was to – if I was to die. I talked about it with my friends. I talked about how – I told Condon that I told Student B and Witness 2 that the night she gave me the documents I felt that I had nothing to live for, I felt this would be the end of my life. I was crying. I was having suicidal thoughts. At various other points when I would sort of like deny and be taken aback by the reality of what was happening of what I was going through, I never did any suicidal actions, but I was thinking, about it a lot. I told Condon, and I feel it isn't fair what didn't get into the report, but I remember I did tell her that I thought about if I was to

go to sleep and not wake up, that I wished I could go to sleep and not wake up, and the only thing that would be bad about it is that my family would miss me, and things like that." Tab 2, 129:11-24, 130:1-7. Furthermore, when asked if Doe ever told Condon he was suicidal during the investigation, Doe testified "yes, I did." Tab 2, 127:23-24; 128:1.Doe struggled with his mental health throughout the adjudication of Roe v. Doe, and contacted the counseling center. **Tab 2**, at 119:20-23.

Doe told Condon that after January 2019 he put a lot of effort into making sure he did not see her on campus, that whenever he saw her on campus he would experience a panic attack, that there were a bunch of instances where Roe was present and so Doe just walked out. Ex. 13, at BRU0000136-143. Doe told Condon that Student A told Doe that Roe has done this with other people; that Student A said Roe did this with three other guys; and that Student A told Doe that he was being gaslighted. *Id.* Condon took note of the information, but determined that it was not relevant because it was too vague – at the time Condon made that assessment she had never actually met with Student A or even spoken with Student A to determine his actual level of personal knowledge – rather she made the determination based off of Doe's information he provided to Condon as part of the investigation.

Then, in May 2020, Condon conducted interviews of Roe and Doe. P's SOF No. 58. In June 2020, Condon stated to Doe that she was in the process of writing the report and would keep Doe updated on progress. *Id* at No. 62. In July 2020, Condon conducted another interview with Roe to show Roe unredacted text messages Doe had provided that would be attached to the Investigative Report. *Id* at No. 64. During the investigation, Condon declined to interview Student B on the basis Student B had the same information as Witness 2. Condon made this determination of Student B's knowledge, without even talking to Student B; and disregarded

what Doe told him, including that Student B saw the marks Roe left on him. Ex. 13, at BRU0000139-141.

On July 1, 2020, Condon sent her Investigative Report to Jurado "for her review" and stated "[p]lease let me know if you have edits/comments." Ex. 21, at BRU0001211. On July 6, 2020, Jurado transmitted to Condon a red-line version of the Investigative Report. Ex. 21, at BRU0000173-0000184. Jurado's red-line edits to Condon's Investigative Report, included the removal of content and the addition of content to the Investigative Report. *See* Ex. 21 at BRU0000173-184. (For example, Jurado added the bold and italicized items in the factual findings section, witness observation sub-section, as follows: "Roe asked Doe if he was 'walking her back,' because that is 'typically what would *have* happen [sic],' but 'not that Roe was inviting him back' *for any sexual purpose*." Jurado moved the following, from the first sentence of "Doe's Later Statements/Conversations" to the end of the section: "*Doe stated that he realizes there is a 'disconnect' between some of his earlier statements around the time of the incident and what he is saying now to the investigator.*" Jurado's edits also assigned the numerical designation as four issues for the hearing panel. *See* Ex. 21 at BRU0000183-184. Exhibit 21 is a color version of Jurado's red-line edits that shows her edits of the Investigative Report.

Thereafter, on July 9, 2020, Condon sent Jurado a revised version of the Investigative Report. Ex. 21, at BRU0001251. In response, Jurado told Condon to "[g]o ahead and send it to [General Counsel] Steve (maybe wait until Monday since he is looking at policy stuff)." Ex. 21, at BRU0001250. Condon replied she would send it Monday and CC Jurado. *Id*.

On July 28, 2020, Jurado sent Condon an email that "[t]he committee would like to get me the next draft to them by the end of the day today. I would need to include any comments you

have to that draft. If you can get it to me today, that would be great. If not, don't worry about it (its fine)." Ex. 21, at BRU0001257.

The following day, on July 29, 2020, Condon sent Jurado her "final draft" and included language (entirely redacted) with the question "Let me know if you want me to add that." Ex. 21, at BRU0001350.  In response, Jurado stated: "I do not think that statement adds anything to the credibility findings. I would let it be." Ex. 21, at BRU0001349. Here, Jurado specifically instructed Condon to "let it be" regarding an additional (and unknown in content) statement in the credibility findings that Condon sought to add. Ex. 21, at BRU0001349-1350.

Later the same day, Condon showed Roe the text messages Doe had provided and Condon informed Roe that "[Condon] hoped to send this out to [Roe and Doe] tomorrow, and they [would] each have 5 days to comment." Ex. 20, at BRU0000150. During this meeting, Roe told Condon she knew that Jurado had sent her a bunch of emails she needed to respond to. Ex. 21, at BRU0001346. Additionally, during the meeting, Roe asked Condon if Roe could have Condon's opinion on what would happen, and after Condon declined Roe asked if she could have the opinion after the case was decided. Ex. 20. Roe asked Condon who in the DOSO would see the Investigative Report, which Condon then asked of Jurado, and Jurado's response was that DOSO would see the Investigative Report, it was not for the whole office, just those involved in sanctioning, and that it would be "handled with discretion." Ex. 21, at BRU0001346.

Brandeis failed to fulfill the obligations it put forth in its Policy.

## B.  Decision-Making Panel

The Policy provides that "[o]nce the Investigation has closed, the Investigator will submit the Investigative Report, supporting documentation referenced in the report and the addendum, if any, to a Decision-Making Panel of three people." *See* Ex. 2 at 002563. Moreover, the policy

provides that "[t]he Decision-Making Panel will base its finding solely on the information presented in the Investigative Report, supporting documentation referenced in the report and the addendum, if any." Ex. 2 at BRU0002564. Additionally, the Policy does not state (or inform students) that the Director of the OEO will edit, revise, or alter the Decision-Making Panel's written decision. *See* Ex. 2 (BRU0002545). Despite that, the record evidence establishes the following things occurred.

On August 12, the Roe v. Doe matter went to the Decision-Making Panel, including members: Corey Bright ("Bright"), Jody Hoffer Gittell ("Hoffer-Gittell"), and Eli Jacobson ("Jacobson"). P's SOF Nos. 90, 93. Jacobson, Bright, and Hoffer-Gittell completed their deliberations and sent their findings to Jurado. *Id* at Nos. 101-102.

After deliberations were complete and the panel transmitted its findings, Jurado made revisions to the panel's findings, Jurado added "Doe agreed that everything happened the way that Roe described it when they spoke a few days later, and Doe agreed that he would admit that it was non-consensual if anyone asked," to each of the four questions and sent it to the panel members for their consideration. Ex. 31 (BRU0001552); Ex. 32 (BRU0001504-1508); Ex. 35 (BRU0001530); Ex. 36 (BRU0001537, 1544, 1512). Thereafter, Jurado stated: "[i]n reviewing these again, I think there is one more finding that needs to be added. I believe you made this finding, but just did not include it in the write up" and added "The Panel found the statements made by AG closer to the incident more credible than the statements he made later."; Ex. 33 (BRU0002003-2004); Ex. 34 (BRU0001527).

The panel rejected Jurado's added "finding" (*see* Ex. 34 (BRU0001527) and Jurado then provided further suggestion for the panel's finding ("The Panel found the inconsistencies in Doe's statements about the incident made his account less credible than Roe's account. Based on

that [...]") (*see* Ex. 35 (BRU0001530) which two of the panel members then agreed to add (*see* Ex. 36 (BRU0001537).

Brandeis argues that the panel, through a majority, found that there were inconsistencies in Doe's statements about the incident and that Doe's account was less credible than Roe's but this is not true as the Panel did not make such finding during its deliberations, the Panel agreed to the additional finding that Jurado added. P's SOF Nos. 102-110; Ex. 31; Ex. 32; Ex. 33; Ex. 34; Ex. 35; Ex. 36

Brandeis failed to fulfill the obligations it put forth in its Policy.

### C.  Sanctions

The Policy states that "[t]he Decision-Making Panel will issue a written decision of their findings which will be submitted to the Director of the Office of Equal Opportunity" and if the student is found responsible for a violation, the matter will be referred to the Dean of Students Office ("DOSO") who will assign the appropriate sanctions or remedies. *Id.*  The policy provides that "[i[f the responding party is a student and is found Responsible for a violation of the University policy, the matter will be referred to the Dean of Students Office who will assign the appropriate sanctions or remedies. Ex. 2 at BRU0002564. The Policy does not state (or inform students) that the Director of the OEO will participate in, contribute to, or provide input in the sanctions process.  Ex. 2 (BRU00002545). Despite that, the record evidence establishes these the following things occurred.

On August 24, 2020, at 4:03PM, Jurado transmitted to Alex Rossett ("Rossett") Assistant Dean of Student Rights & Community Standards, the finding of the Decision-Making Panel, and then was involved throughout the sanctioning process speaking to Rossett, Monique Gnanaratnam ("Gnanaratnam") Associate Dean of Students, Jamele Adams ("Adams") Dean of

Students, Stephanie Grimes ("Grimes") Assistant Dean of Students and Lu Ling "Raymond" Ou ("Ou"). P's SOF Nos. 111-144. Sanctioning is the responsibility of DOSO, the Dean of Students Office, though Jurado was involved in suggesting levels of sanctions, discussing other cases to see how they fell on the spectrum, drafting letters, attending meetings, and giving feedback on how DOSO should function including who should handle these cases. *Id*. Gnanaratnam was the lead, but Rossett, Ou and Jurado remained involved throughout the sanctioning decision process, and the group used Doe as a means to get the process settled. *Id*.

For example, Jurado told Ou that she thought the sanction was appropriate, there was one interaction and no intercourse, and Roe v. Doe was a case where a finding of no responsibility would have been appropriate too (very close), and that Jurado thought anything stronger would lead to automatic dismissal for any finding of sexual assault which with suspension it leaves room for a more severe case (like intercourse with force), and that it was for DOSO (Dean of Students Office) to decide. Ex. 42, at BRU0002113, 2116, 2117, 2120-2121. Additionally, while participating in sanctions discussions, Jurado told Ou that they also needed to keep in mind that probation was given to another student for sexual touching, also a form a sexual assault under the Policy. Ex. 42 (BRU0002116).

Brandeis failed to fulfill the obligations of its Policy.

### D.  Appeal, University Appeals Board and Notice of Outcome of Appeal

The Policy states that "an appeal must be submitted in writing to the OEO within five (5) business days of the receipt of the written final outcome" and "[i]f an appeal is not received within five (5) business days, the outcome will be considered final and the Formal Resolution Process will be permanently closed." Ex. 2 at 2564-65. The Policy does not state (or inform

students) that the Director of the OEO has the discretion or authority to alter the appeals

deadline. *See* Ex. 2 at 2564-65.

The Policy does not state (or inform students) that the Director of the OEO will edit,

revise, or alter the University Appeals Board's finding. *See* Ex. 2 at BRU0002565-66. The Policy

does not inform students that the Director of the OEO will draft the Notice of Outcome of

Appeal letter or that the Director of the OEO will oversee the DOSO regarding the Notice of

Outcome of Appeal and the transmission of the letter to the parties. Ex. 2, at BRU0002565-2566.

Despite that, the record evidence establishes the following things occurred.

On September 25, 2020, at 6:25PM, Doe submitted his appeal under Procedural Error and

New Evidence to Jurado. P's SOF No. 159. Doe's Procedural Error Appeal stated that Doe

believed there was procedural error "because of a potential mishandling of the Investigative

Report," Doe had learned that Witness 1 said that Roe's stories changed over time to villainize

Doe more, that Witness 1 said that in Roe's stories the extent of the sexual interaction changed

over time, that the information was not reflected in the Investigative Report, and had it been

documented properly the Panel would have been able to find Doe more credible and that he

believed the panel ruled against him because he appeared less credible. *Id* at No. 160; Ex. 49

(BRU0002297-2299). Doe attached New Evidence which was text messages between Doe and

Student A (who was not interviewed). *Id* at No. 161.

On October 2, 2020, Jurado dismissed Doe's procedural error appeal and told Doe that

though the policy describes a goal for the completion of the process, there is no required

timeframe, and so the length of time the resolution took is not procedural error, and that the

characterization of evidence from a witness in the investigation is not a proper basis for appeal.

P's SOF No. 168. Doe asked Jurado how the failure to include very pertinent witness testimony

was not procedural error and told Jurado that it seemed to him not only was the characterization of evidence mishandled but evidence itself was misplaced. *Id* at No. 169. Jurado told Doe that statements by the witness he referenced were included and Doe's concerns of how the statements were characterized is a factual dispute and not a basis for appeal. *Id* at. 171. Jurado also told Doe that he did not request access to the report, (No. 172) but Doe had asked Gnanaratnam to review the whole case investigation (No. 147). On October 13, 2020, Jurado told Condon she suspected that Condon would have to speak with Student A as part of the appeal. *Id* at No. 176.

On October 19, 2020, Jurado transmitted to Mani, Matt, and Abdou, the appeal documents, available through Box, the Sexual Misconduct Policy, and information about the appeal. *Id* at 187. Mani said the panel had questions why Student A, was not a witness in the initial report and Jurado responded that Student A did not respond to any outreach. *Id* at 190. Mani stated that credibility was important, and that the reason why Doe's statements conflicted would be information that would be helpful to know. *Id* at 191. Matt stated that credibility was a major issue between the two parties and agreed that the investigator qualified Doe's general credibility by stating Doe admitted that his statements to the investigator conflict with statements he made after the incident to Roe verbally and in writing in January 2019 text messages. *Id* at No. 195.

On October 23, 2020, at 11:30AM, after the UAB panel's deliberations were complete the panel sent Jurado their drafted statement regarding the outcome of their deliberations and they left the first sentence blank for the standard sentence to be added to their decision. P's SOF Nos.198. Jurado made revisions to the panel's findings, noted in "red" and Jurado's revisions substantively changed the panel's finding. P's SOF Nos. 199-200. Then, on October 27, 2020, Jurado created notice of outcome of appeal letter she created for Roe v. Doe, that notated

"DOSO REP SIGNS" at the signature line and it included the UAB findings that Jurado had revised. P's SOF Nos. 201-202.  On October 29, 2020, Gnanaratnam sent Doe the notice of outcome of appeal and it included the UAB findings that Jurado had revised. P's SOF Nos. 207-208.

## CONCLUSION

As described herein and in Plaintiff's Motion for Summary Judgment, Brandeis has breached its contractual duty, violated the covenant of good faith and fair dealing, negligently supervised its OEO / Title IX staff and administration and violated Title IX. Brandeis cannot possibly expect students to reasonably understand the Title IX process if it undertakes conduct and actions that are not described or provided for in the Policy. Moreover, Brandeis's breached its express and implied contract with Plaintiff (Count I); violated the covenant of good faith and fair dealing (Count II); breached its duty to Plaintiff to select and supervise competent, trained, and unbiased staff and administration to be involved in the disciplinary process (Count III); and violated Title IX of the Education Amendments of 1972 ("Title IX") (Count IV).

Respectfully submitted,

JOHN DOE,
By his attorney,

Date: <u>May 2, 2022</u>

<u>/s/ George J. Leontire</u>
George J. Leontire (BBO # 294270)
LEONTIRE & ASSOCIATES, P.C.
PO Box 4328
Westport, MA 02790
(855) 223-9080
george@leontirelaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) as follows, on May 2, 2022:

Daryl J. Lapp
Elizabeth H. Kelly
Locke Lord LLP
111 Huntington Avenue
Boston, MA 02199
Daryl.Lapp@lockelord.com
Liz.Kelly@lockelord.com

_____/s/ George J. Leontire_____
George J. Leontire, Esq.

21