**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————

JOHN DOE,                    )
                             )
            Plaintiff,       )
                             )
                             )   Civil Action No. 20-CV-12162-AK
v.                           )
                             )
BRANDEIS UNIVERSITY,         )
                             )
            Defendant.       )
———————————————————

<u>**MEMORANDUM AND ORDER ON**</u>
<u>**CROSS MOTIONS FOR SUMMARY JUDGMENT**</u>

**A. KELLEY, D.J.**

This is a Title IX action in which a former Brandeis University ("Brandeis") student seeks monetary and injunctive relief against the university, alleging that it unlawfully adjudicated a sexual assault allegation filed against him.  In addition to his Title IX claim, the plaintiff—who is proceeding under the pseudonym John Doe ("Doe") [see Dkt. 7]—brings Massachusetts law claims for breach of contract, breach of the covenant of good faith and fair dealing, and negligence.  The parties have cross-moved for summary on all counts.  For the following reasons, Doe's motion for summary judgment will be **DENIED**, and Brandeis' motion will be **DENIED** as to Counts 1 and 5[1] and **GRANTED** as to Counts 2, 3, and 4.

**I.     BACKGROUND**

In evaluating these cross-motions for summary judgment, the Court relies on the statements of material facts and the attached exhibits the parties have submitted.  The Court

---

[1] Count 5 is a demand for injunctive relief and not an independent theory of liability.  Brandeis' motion for summary judgment on this claim is denied because this matter will proceed to trial on a substantive claim, Count 1, that may support an award of injunctive relief.

accepts as true each alleged material fact to the extent it has not been disputed by the opposing party, and considers contested each material fact that one or both parties has disputed.

A.      **Brandeis' Sexual Misconduct Policy**

Brandeis is a private university in Massachusetts.  [Dkt. 46 ("Def. SMF") ¶ 1].  Doe is a former student who enrolled at Brandeis in Spring 2018.  [Def. SMF ¶ 2].  At all times relevant to this action, Brandeis published a Student Handbook that incorporated the university's Sexual Misconduct Policy ("the Policy").  [Dkt. 48-2, ("Policy")].  Brandeis displayed the Policy on its website at all times, and retained the right to revise it at any time.

The Policy prohibits various forms of sexual assault, including non-consensual sexual contact, forced sexual contact, non-consensual sexual intercourse, and forced sexual intercourse. [Policy at 4–6].  It defines "consent" as  an affirmative, voluntary, knowing, and continuous agreement to engage in a specific form of sexual activity" that "must be obtained before engaging in any sexual activity," "must be received for each individual sexual act," and " may be withdrawn at any time."  [Id. at 8].

The Policy further establishes a resolution process as "the internal University disciplinary procedure that is available to student … to address violations of this Policy."  [Id. at 12].  When Brandeis receives notice of a possible violation of the Policy, the Office of Equal Opportunity ("OEO") "will attempt to communicate with the person who experienced the alleged conduct regarding that incident" and "discuss the available options for addressing the conduct."  [Id.] The person who experienced the alleged violative conduct has the option to initiate either an informal or formal resolution process.  [Id.]  When this person chooses to initiate the resolution process, their report becomes a complaint.  [Id.]  There is no time limit following an alleged violation of the policy for a person to submit a complaint, and the policy establishes a "goal …

2

to complete the Resolution Process within 90 days from the initiation of the complaint." [Id. at 13]. However, the policy anticipates that "more or less time may be required to complete the process" and provides that the parties will be "kept informed, in writing, at least every 30 days, regarding the progress of the Resolution Process." [Id.]

The formal resolution process, which Brandeis undertook against Doe, requires the initiating party to speak with OEO about their complaint. [Id. at 15]. The initiating party must provide a statement including the name of the responding party, the date and location of the incident, and any witnesses who may have information. [Id.] The initiating party should also identify any relevant documents. [Id.] After the complaint is initiated, Brandeis will provide the responding party with "a Written Notice of Complaint outlining the allegations raised and providing information about the Formal Resolution Process." [Id. at 16]. The responding party will then have the opportunity to meet with OEO to review the Notice of Complaint and discuss the process. [Id.] The responding party has an opportunity at this point to accept responsibility for the conduct outlined in the complaint; if he or she does, the matter is referred to the Dean of Students Office for sanctioning. [Id.] If the responding party does not accept responsibility, he or she has the option to provide a written or oral statement to OEO outlining their response to the complaint, and may identify additional witnesses and documents. [Id.]

Assuming the responding party does not accept responsibility, the process proceeds to an investigation. [Id.] The Director of OEO assigns the complaint to one or more investigators who have been "specially trained to address issues of discrimination, harassment and sexual misconduct." [Id. at 17]. The investigator's responsibility is to conduct "a prompt, equitable, fair, thorough and impartial investigation into the allegations raised." [Id.] The parties bear the obligation to make themselves available to the investigator, to provide true and complete

information, to comply with instructions from university officials, and to "inform the Investigator about what information they believe is relevant to the complaint and do their best to preserve any information they may have in their possession." [Id.]  The investigator reviews the parties' statements and all documents the parties identify as relevant, interviews the parties and witnesses, and may consult with expert witnesses at their discretion. [Id. at 17–18].

Upon conclusion of the investigation, the investigator prepares a report summarizing relevant facts. [Id. at 19].  The investigator is empowered, at this stage, to draw conclusions as to the credibility of the parties, witnesses, and documents. [Id.]  The parties are each given an opportunity to review the investigative report and any referenced documentation, and to provide comments. [Id.]  If the parties provide comments, the investigator may conduct further investigation and prepare a written addendum, which the parties may again review, but without further opportunity to comment. [Id.]  The investigation phase closes once the parties have had an opportunity to review the addendum. [Id.]

The investigator submits the completed investigative report to a Decision-Making Panel ("DMP") of three university employees "trained in the resolution of issues of discrimination, harassment and sexual misconduct." [Id.]  The Director of OEO, or her designee, has the sole discretion to appoint members of the DMP. [Id.]  OEO must communicate the names of the panel members to the parties during their review of the investigative report, and the parties must immediately alert OEO if they believe there to be any possibility of a conflict of interest. [Id. at 19–20].  The Director of OEO, or her designee, has the sole discretion to replace a DMP member, and once the DMP receives the investigative report, the parties may no longer raise conflict of interest concerns. [Id. at 20].  The DMP may consult with the Director of OEO or her

designee regarding questions about the process, and may also submit questions to the investigator.  [Id.]

The DMP must find the responding party "Responsible" or "Not Responsible" for violating the Policy by a majority vote, based on its review of the investigative report and supporting documentation.  [Id.]  The panel applies a "preponderance of the evidence standard – that is, whether the facts presented in the Investigative Report support a finding that it is more likely than not that Brandeis University policy was violated."  [Id.]  The DMP issues a written decision of its findings that is submitted to the Director of OEO.  [Id.]  If the responding party is a student and is found responsible, the matter is referred to the Dean of Students Office for imposition of sanctions.[2]  [Id.]  Sanctions may include, but are not limited to, denial of privileges, disciplinary warning, disciplinary probation, suspension, dismissal and any other sanction noted in the Rights and Responsibilities handbook."  [Id.]  The parties are simultaneously notified in writing of the final outcome; this notice may or may not disclose the assigned sanction.  [Id.]

Each party is entitled to appeal the notice of final outcome, unless he or she did not particulate in the investigation.  [Id.]  The appeal must be submitted to OEO in writing within 5 days of the parties' receipt of the notice of final outcome.  [Id.]  The only grounds upon which a party may appeal are procedural error and new information, and the appellant must specify which grounds he or she is appealing on.  [Id. at 21].  A procedural error appeal alleges that "(i) the procedural requirements of the Formal Resolution Process were not followed and (ii) that deviation from the process had an adverse impact on the outcome of the complaint against the appellant."  [Id.]  A new information appeal alleges that information that "could have impacted

---

[2] The Dean of Students Office's sanctions process is not covered by the Sexual Misconduct Policy.

the outcome of the complaint" became available after the issuance of the outcome, and requires

the appellant to present the information, "show why it was unavailable prior to the final outcome;

and show that the new information could have altered the outcome of the complaint." [Id.]  The

appellee may respond to the appellant's assertions in writing within 5 days.  [Id.]  The appeal is

adjudicated by a University Appeals Board (UAB) of three university employees "trained in the

resolution of issues of discrimination, harassment and sexual misconduct." [Id.]  The UAB is

chosen at the sole discretion of the Director of OEO or her designee, and the parties are

responsible for identifying any potential conflicts of interest before the appeal is submitted.  [Id.]

The UAB reviews the complaint, investigative report, supporting documentation, the notice of

final outcome, and the appeal submissions.  [Id.]  It may either dismiss or grant the appeal; if an

appeal is granted, the matter is referred back to the Dean of Students Office "to uphold or modify

the final outcome on the complaint."  [Id.]

      The policy does not permit a hearing at any stage of the proceedings, whether before the

investigator, the DMP, the UAB, or the Dean of Students Office.  Likewise, although the parties

are each afforded an opportunity to examine the investigative report and its supporting

documentation, there is no right of cross-examination of any party or witness at any stage of the

proceedings.

### B.    Proceedings Against John Doe

      On the night of December 7 or 14, 2018, Doe was socializing and drinking alcohol along

with Jane Roe[3] ("Roe") and other students in Witness 1's[4] room in a Brandeis residence hall.

---

[3] The individual who accused Doe of sexual assault is referred to as Jane Roe throughout this Order and these proceedings.

[4] This opinion refers pseudonymously to individuals who gave witness statements during Brandeis' investigation of the allegations against Doe as "Witness," and distinguishes them by number.  The Court's use of the term "Witness" does not reflect a finding that any of these individuals did, or did not, "witness" misconduct.  The question of whether Doe committed sexual misconduct is not before the Court.

[Dkt. 48 ("Pl. SMF") ¶ 12; Def. SMF ¶¶ 45–47].  The specific details of what happened on this evening are in dispute, but the parties agree on the below facts.

After leaving Witness 1's room, Doe walked Roe home, and sexual activity between Doe and Roe occurred in Roe's room ("the Incident").  [Def. SMF ¶¶ 48–52].  Roe has alleged that she did not consent to any of the sexual activity that occurred, that Doe did not ask for permission to engage in any of the sexual activity, that she said "no" to Doe, that she bit Doe in an effort to get him to stop, and that when the sexual activity continued, she disassociated from the experience and started crying.  [Def. SMF ¶ 53].  Doe has maintained that Roe initiated or otherwise expressed consent to the sexual activity.  [Def. SMF ¶ 54].   After the Incident, Doe apologized.  [Def. SMF ¶ 55–56].  Doe has explained that he apologized because he believed Roe was upset after she "hooked up" with Doe shortly after exiting a relationship with Doe's friend.  [Def. SMF ¶ 54].

A day or two after the Incident, Doe and Roe spoke in person and Roe accused Doe of taking advantage of her, asserting that the sexual activity was nonconsensual.  [Def. SMF ¶¶ 57–58].  According to Doe, Roe convinced him the Incident occurred as she alleged, and his memory was "overwritten," such that he went along with what Roe said.  [Def. SMF ¶ 60].  Doe apologized to Roe and offered to turn himself in to the Brandeis Title IX office.  [Def. SMF ¶ 61].  Roe has maintained that she and Doe agreed that if anyone asked about the Incident, Doe would admit the sexual activity was not consensual, though Doe does not recall this agreement.  [Def. SMF at ¶¶ 63–64].  A few months later, in a text conversation with Roe, Doe admitted that he told other students "[Roe] didn't want to do anything" and "I [Doe] know what I did and I know it was wrong."  [Def. SMF ¶ 73].  On January 30, 2019, Doe messaged another student discussing Roe's accusations against him, and Doe claimed he was "gaslit" and could not

"believe I went along with the stuff she said."  [Def. SMF ¶¶  75–76].  On February 8, 2019, Doe

texted Roe "I didn't lie or cover shit up. I know damn well what I did, and I carry the guilt with

me every day."  [Def. SMF ¶ 77].

On February 3, 2020 (approximately 14 months after the Incident), Roe initiated an

internal complaint with the university's administration by emailing Sonia Jurado ("Jurado"), an

attorney who served as the Director of OEO and the university's Title IX Coordinator.  [Pl. SMF

¶ 1; Def. SMF ¶¶ 6, 8].  OEO handled all complaints of sexual misconduct at Brandeis as well as

other complaints of discrimination and harassment.  [Def. SMF ¶ 7; Pl. SMF ¶ 1].  During the

academic year 2019–20, Brandeis applied the Policy as detailed supra to complaints of sexual

misconduct.  [Def. SMF ¶ 11].

At the time Roe emailed her internal complaint, Jurado had already met with Roe

regarding unrelated matters.  [Def. SMF ¶ 80].  From April 2019 to September 2020, Roe was

the president of the student union at Brandeis.  [Pl. SMF ¶ 221; Def. SMF ¶ 5].  As part of that

role, Roe provided feedback to the Provost regarding concerns with Title IX.  [Pl. SMF ¶ 223].

Roe had biweekly meetings with the Provost, monthly meetings with the President, monthly

meetings with the director of career services, and monthly meetings with the director of finance.

[Pl. SMF ¶ 224].  Roe also had weekly meetings with the Vice Provost of Student Affairs,

Raymond Ou ("Ou").  [Id.]  During meetings with Ou, Roe discussed how students felt about

OEO as it was relatively new and the concerns among students regarding Title IX.  [Pl. SMF

¶ 225].  The conversations between Ou and Roe mostly concerned figuring out how to

communicate what OEO did for the student body.  [Pl. SMF ¶ 226].  In November 2019, Ou,

Jurado, Roe, and Roe's chief of staff had met to discuss the new federal Title IX regulations.  [Pl.

SMF ¶ 228].  Following this meeting, Roe and Jurado continued to communicate regarding

student concerns and complaints.  [Pl. SMF ¶ 234].  Jurado also emailed Roe and other student leaders to get feedback on events and initiatives.  [Pl. SMF ¶ 235].  Roe also met in November 2019 with the university's President, and informed him that students had concerns about Title IX.[5]  [Pl. SMF ¶ 223].

On February 7, 2020, Jurado appointed Amy Condon ("Condon"), the university's Deputy Title IX Coordinator, as the investigator for this matter, and forwarded Roe's email to her.  [Pl. SMF ¶¶ 2–3].  Condon had no prior connection or familiarity with Roe and had no interactions with Roe outside of the investigation.  [Def. SMF ¶¶ 84–86].  During the investigation, Condon became aware that Roe was the Student Union President, but all parties maintain this had no effect on her work as the investigator in the case.  [Def. SMF ¶ 87].  On February 13, 2020, Roe met with Jurado and Condon.  [Pl. SMF ¶ 6; Def. SMF ¶ 85].[6]  While speaking with Jurado and Condon, Roe said that she had previously been sexually assaulted by a graduate student at the beginning of her sophomore year in September 2018, about three months before the Incident.  [Pl. SMF ¶ 7].  During Roe's interview, she stated that the university had not pursued her complaint regarding this prior assault because the investigation could not be completed by the time the respondent graduated.  [Pl. SMF ¶¶ 8–9].  However, the university did issue a "no contact" order against the respondent graduate student, and Roe was offered the chance to move rooms.  [Id.]  Roe told Jurado and Condon that after the assault in September 2018, she felt like she shut down and did not want that to happen this time.  [Pl. SMF ¶ 11].

---

[5] In addition to these interactions with OEO and senior Brandeis administrators, Roe had filed an unrelated non-Title IX matter with OEO on September 30, 2019.  [Pl. SMF at ¶219].  On April 17, 2020, during the investigation of Roe's complaint against Doe, Condon sent an email asking Roe to talk to Jurado regarding an update on the unrelated issue with OEO.  [Pl. SMF at ¶220].
[6] It is disputed whether Roe met with Jurado and Condon individually or together.  [Dkt. 53 ¶ 6].

Regarding the Incident, Roe told Jurado and Condon that after Doe walked her home, Doe sexually assaulted her in her room.  [Pl. SMF ¶ 12].  Roe stated that she told Doe outside his room that she did not want to do anything with anyone right now and that she was "not mentally ready for that."  [Pl. SMF ¶ 13].  Roe stated that when Doe started to kiss her, she "shut down" and "could not process it" and she "disassociated."  [Pl. SMF ¶ 15].  Roe also stated that she was aware Doe told his roommate, Witness 2, that Roe was "gaslighting" him, that he did not do anything to Roe, and that he thought it was a drunk hookup he later regretted.  [Pl. SMF ¶ 10].

On February 27, 2020, Jurado met with Doe to inform him of the complaint and provided him a Notice of Complaint along with other relevant documents.  [Pl. SMF ¶ 18; Def. SMF ¶ 91].  In March 2020, Condon conducted interviews of Witness 1 and Witness 2, and received copies of text messages from Witness 2 via email.  [Pl. SMF ¶ 21].  During her interview, Witness 1 told Condon that she would have found it surprising that Doe would make advances toward Roe because "they were friends and Roe was seeing Student B."[7]  [Pl. SMF ¶ 22].  Witness 1 also stated that Roe and Doe had each told her that the other person initiated the sexual activity, that Roe's sorority had decided to kick Roe out, that Roe was not in an emotionally good place, and Roe had gone through a break-up.  [Pl. SMF ¶ 22].  Witness 1 also told Condon that Roe did not tell Witness 1 what specifically happened during the Incident until a couple months later, and that Witness 1 later spoke with Roe about the Incident several times.  Roe had described the Incident to Witness 1 as "a blur," and right before a semester break, Roe had had a panic attack.  [Pl. SMF ¶ 23].  Witness 1 told Condon that Witness 1 had spoken with Doe about the Incident several times, and that he felt guilty.  [Pl. SMF ¶ 24].  Witness 1 also told Condon that Doe had told Witness 2 and Student B that he felt "gaslighted," had apologized for

---

[7] The individual who dated Roe prior to the Incident is referred to as Student B in this Order.

something he did not do, that he may have interpreted "mixed signals" from Roe being friendly toward him, that he had reconciled with Roe, that he thought he had Roe's consent at the time of the Incident, that he thought Roe forgave him, and that he "felt like it went back and forth" and it was hard for him.  [Pl. SMF ¶ 25].  Witness 1 stated to Condon that Roe had not asked Doe to walk her home that night, but also had not explicitly told him he was *not* invited back to her room, and that Roe initially had said she was drunk, but later said she was not, and that Witness 1 did not recall Roe seeming "that drunk" on that evening.  [Pl. SMF ¶ 27].

On July 1, 2020, Condon finalized an Investigative Report concerning the Incident and transmitted it to Jurado for her review.  [Pl. SMF ¶ 67].  On July 6, 2020, Jurado replied to Condon with edits and comments on the Investigative Report.  [Pl. SMF ¶ 68].  Jurado told Condon that she had made some formatting changes, that Condon had quoted witnesses extensively, and that Jurado felt the report "could be tightened up a bit."  [Pl. SMF ¶ 68].  On July 9, 2020, Condon sent Jurado a revised report, which Jurado approved.  [Pl. SMF ¶ 69–71]. On July 29, 2020, Condon informed Jurado that before she sent the final Investigative Report to the involved parties, she wanted to speak with Roe one more time to show Roe text message exchanges between Doe and some of Doe's friends who did not attend Brandeis.  [Pl. SMF ¶ 75]. Condon also asked Jurado about adding specific language to the report's credibility finding (which has been withheld from the record under the attorney-client privilege).  [Pl. SMF ¶ 75]. Jurado replied that she did not think Roe would respond, since Roe had "checked out," and the office needed to move forward with the matter regardless of Roe's responsiveness.  [Pl. SMF ¶ 76].  Jurado also told Condon that she wanted to try to schedule an OEO panel meeting before August 14, 2020, and that she did not think the specific statement on credibility that Condon had suggested would add anything to the report's credibility finding.  [Pl. SMF ¶ 78].  Condon met

with Roe later in July 2020, and Roe posed questions about what would happen if Doe was found responsible.  [Pl. SMF ¶¶ 79–80].  Condon told Roe that the case would go to the Dean of Students Office for discipline if Doe was found responsible.  [Id.].  Roe further asked how much information would be shared, and Condon replied she did not know, but would ask Jurado.  [Pl. SMF ¶ 80].  Jurado replied that only OSO and those involved in any sanctioning decision would see the report, and it would be handled with discretion.  [Pl. SMF ¶ 81].

Condon sent the investigative report and attachments to Doe and Roe.  [Pl. SMF ¶ 82]. On July 30, 2020, Roe provided comments on the investigative report and forwarded them to Jurado.  [Pl. SMF ¶ 84].  Doe did not reply to Condon before August 7.  [Pl. SMF ¶ 86].  On August 7, 2020, Jurado told Condon to send Jurado, Roe, and Doe the final report by August 10, and to tell Roe and Doe that the matter had been referred to Jurado and a "Decision-Making Panel."  [Pl. SMF ¶ 87].  After her follow-up meeting with Roe, Condon made several changes from the draft report to the final report, including adding comments from Roe that Doe was never coming to walk Roe to her room; that they did not get together with friends after the Incident; that Roe avoided Doe after the Incident and told him she wanted nothing to do with him; that Roe had said to Doe, "I don't want to do anything tonight"; that Roe and Doe had only met once following the Incident; that Roe avoided Doe for a month after the Incident; and they did not interact frequently at all.  [Pl. SMF ¶ 88].  Condon sent the amended final report with these edits to Jurado on August 10, 2020.  [Pl. SMF ¶ 88].

While Jurado and Condon were coordinating revisions to the draft report, Jurado had sent an email on July 6, 2020, soliciting potential members of a Decision-Making Panel ("DMP") to review Roe's complaint and providing each potential member with the names of the parties to determine if any conflicts existed. [Pl. SMF ¶¶ 90–91].  In the following days, each person

ultimately selected for the DMP responded that they did not have any conflicts with the identified students.  [Pl. SMF ¶ 92].  The DMP met and consulted with Jurado on multiple occasions.  [Pl. SMF ¶ 95].  The panel members drafted a document which included each panel member's votes.  Two panel members found Roe more credible than Doe, and one panel member found both parties equally credible.  [Pl. SMF ¶¶ 98, 101].  On August 18, 2020, after the panel completed its deliberations and transmitted a draft decision, Jurado suggested edits to the panel's findings.  [Pl. SMF ¶¶ 101–02].  All three members agreed to Jurado's revisions.  [Pl. SMF ¶ 103].  Jurado made additional revisions regarding the role of the inconsistencies in Doe's statements in the majority's determination that his account was less credible than Roe's.  [Pl. SMF ¶¶ 105–08].  After some back-and-forth emails with the panelists, the two panelists in the majority agreed to the edits.  [Pl. SMF ¶¶ 106–10].  The DMP issued a decision finding Doe responsible for violating the Policy.

Jurado communicated the DMP's finding to the Dean of Students Office for review. [Def. SMF ¶ 160].  Monique Gnanaratnam, the Associate Dean of Students, led the office's review of the investigative report.  [Def. SMF ¶ 162].  Based on the DMP's findings, the Dean of Students Office suspended Doe for two academic terms, until May 23, 2021, and upon reinstatement, Doe was ineligible to hold any leadership roles or represent Brandeis in any official capacity.  [Def. SMF ¶ 163].  In determining the length of a student suspension, Brandeis considers the date on which the complaining party is scheduled to graduate; Roe's scheduled date of graduation was May 23, 2021, the date on which Doe's suspension ended.  [Def. SMF ¶ 163].  This method of calculating a suspension's length provided that, had Doe been found responsible only of some of the accusations against him while being found not responsible on

others, the sanction would have been the same as if he had been found responsible on all counts. [Def. SMF ¶ 164].

Ou, the Vice Provost of Student Affairs, is the senior Brandeis administrator tasked with reviewing the finals drafts of sanctioning letters and related documents.  [Def. SMF ¶ 167]. After reviewing the documents in Doe's case, Ou wrote that the sanctions felt light to him, and asked the Dean of Students Office if it would share its rationale for the sanctions.  [Pl. SMF ¶ 126; Def. SMF ¶ 168].  Ou was satisfied with the office's response, and on September 16, 2020, Gnanaratnam communicated the findings and sanctioning decision to Doe and notified him of his right to appeal.  [Def. SMF ¶¶ 168–69].

Doe appealed on the grounds of procedural error and new evidence.  [Def. SMF ¶¶ 170–71].  On procedural grounds, Doe argued that the case was not completed in a timely manner, and that the Investigative Report failed to record that Witness 1 had informed Condon that Roe's story changed over time to make Doe look worse.  [Def. SMF ¶ 172].  Doe argued that, had the panel seen this statement, it would have corroborated Doe's version of events and made Doe seem more credible.  [Def. SMF ¶ 172; Pl. SMF ¶ 160].  Jurado rejected these claims of procedural error because the Policy does not require investigations be completed within a particular timeframe, and because Doe's complaint about how the investigator summarized Witness 1's testimony was not procedural in nature.  [Def. SMF ¶ 173].  Doe also cited new evidence, which consisted of Facebook messages between Doe and "Student A" on January 30, 2019.  Doe argued that these messages would have demonstrated that his framing of the Incident as Roe "gaslight[ing]" him was consistent across time, and thus would make Doe seem more credible.  [Def. SMF at ¶ 175].  Jurado redacted portions of this Facebook conversation before sending the appeal to the University Appeals Board ("UAB") because she interpreted some of

the statements in the conversation as referencing Roe's sexual history and thus improperly trying to introduce irrelevant character evidence.  [Def. SMF ¶¶ 177–78].

Jurado screened the UAB members for potential conflicts and concluded there were no conflicts.  [Def. SMF at ¶184].  One member of the UAB knew that Roe was the Student Union President, but this member had no other knowledge about Roe and his interaction with her was limited to a brief email exchange about unrelated matters.  [Def. SMF ¶ 185].  Doe raised no objection to the composition of the UAB.  [Def. SMF ¶ 186].  The board deliberated and sent findings to Jurado, who suggested changes to the decision.  [Pl. SMF ¶ 199].  On October 29, Gnanaratnam sent Doe the notice of outcome of his appeal which informed him his appeal was denied.  [Pl. SMF at ¶ 207].  Doe completed his suspension and returned to Brandeis.  [Def. SMF ¶ 198].

### C.      Procedural History

Doe filed the instant complaint for monetary and injunctive relief against Brandeis on December 4, 2020.  [Dkt. 1].  The parties filed the instant cross-motions for summary judgment in April 2022.  [Dkts. 44, 47].  Oral argument was presented on July 21, 2022, and the Court took the matter under advisement.

## II.   LEGAL STANDARD

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citing Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law.  Paul v. Murphy, 948 F.3d 42, 49 (1st Cir. 2020).  The Court

must determine (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence"; and (3) whether a fact that is genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law." Scott v. Sulzer Carbomedics, Inc., 141 F. Supp. 2d 154, 170 (D. Mass. 2001). Courts must draw all reasonable inferences in the non-moving party's favor, and "[t]he nonmoving party may 'defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists.'" Paul, 948 F.3d at 49 (citation omitted). On issues where the non-moving party bears the ultimate burden of proof, the non-moving party "must present definite, competent evidence to rebut the motion." Mesnick, 950 F.2d at 822.

## III.   DISCUSSION

### A.   Count 1: Breach of Contract

"A student's relationship to his university is based in contract." Havlik v. Johnson & Wales Univ., 509 F.3d 25, 24 (1st Cir. 2007). As Brandeis is located in Massachusetts, the contractual relationship between Doe and Brandeis is governed by Massachusetts law. Doe v. Stonehill Coll. ("Stonehill"), 55 F.4th 302, 316 (1st Cir. 2022). Massachusetts recognizes "two distinct theories of breach of contract" that a student may assert against a university: the "reasonable expectations" theory and the "basic fairness" theory, id. at 316–17, each of which Doe asserts here.

Doe alleges that the terms of his contractual relationship with Brandeis were set, in part, by the Student Handbook, which incorporates by reference the Policy. As courts have routinely recognized that student handbooks and the documents they incorporate may form actionable contracts, see Schaer v. Brandeis Univ., 735 N.E.2d 373, 378 (Mass. 2000), and Brandeis does

not dispute that its Student Handbook created a contract between itself and Doe, the Court treats the Student Handbook and its incorporated documents as contractual terms binding on Doe and Brandeis.  See Doe v. Amherst Coll. ("Amherst"), 238 F. Supp. 3d 195, 215 (D. Mass. 2017).

### 1.    Reasonable Expectations

The reasonable expectations theory requires a university to adhere to its stated standards and procedures.  Courts consider the university's manifestations toward its students, and ask "what meaning … the university[] should reasonably expect the other party to give [them.]" Stonehill, 55 F.4th at 316 (quoting Schaer, 735 N.E.2d at 378).  A university may breach a student's reasonable expectation "even if the precise expectation is not stated explicitly in the contract's language."  Id. (quoting Sonoiki v. Harvard Univ., 37 F.4th 691, 709 (1st Cir. 2022)). The "appropriate inquiry is 'whether the student's expectation, viewed objectively alongside the express terms of the contract, is based on the student's fair interpretation of the contract's provisions.'"  Id. (citation omitted).  The student must assert facts establishing that the university failed to meet his or her reasonable expectations, and must also show injury resulting from the contractual breach.  Id.

Doe alleges that Brandeis failed to adhere to its Student Handbook and the Policy because Jurado, as Director of OEO: (1) guided and communicated with the investigator throughout the investigation; (2) edited the investigative report before it was sent to Roe or Doe; (3) edited the DMP's decision after it finished deliberations; and (4) inappropriately involved herself in the sanctions process.  The Court considers these allegations individually and collectively to determine whether a triable issue of fact exists on whether Brandeis handled the disciplinary process in accordance with Doe's reasonable expectations.

First, Doe charges Jurado with excessive involvement with investigator Condon, during the course of the investigation.  According to the Policy, the Director's only responsibility during the investigation phase is to assign one or more investigators to the complaint, "who will be responsible for gathering information regarding the allegations raised." [Policy at 17].  The Policy gives the Director no additional duties until after the investigation has closed.  During the resolution phase, the Director's next role is to appoint the three-member DMP.  [See id. at 19–20].  Moreover, the Policy strongly implies that the Director has no role in the drafting or transmission of the investigative report.  It vests the investigator with the authority to find facts and draw conclusions as to the credibility of parties, witnesses, and documents, and grants the investigator the discretion to conduct additional investigation based on the comments of the parties.  [Id. at 19].  The parties—complainant and respondent—are the only persons the Policy directs the investigator to circulate the report to, and solicit comments from, before the investigator transmits the report to the DMP.  [Id.]

The undisputed facts suggest that Jurado took a more active role in the preparation of the investigative report than that which the Policy prescribes, including: the investigator, Condon, discussed specifics of the investigation, including documents and interview, with Jurado throughout the pendency of the investigation, [PL. SMF ¶ 56]; Condon transmitted two preliminary drafts of the report for to Jurado for her review and feedback, [id. ¶¶ 67, 69–70]; Jurado provided edits and comments on this draft, including suggestions on quoting witnesses and feedback that the draft "could be tightened up a bit," [id. ¶ 68]; Jurado approved a revised version of the report, [id. ¶ 69–71]; Condon asked Jurado about adding specific language to the report's credibility finding, and Jurado provided a substantive opinion on the value of this language [id. ¶¶ 75, 78]; Jurado gave Condon advice on whether to solicit further input from

Roe, [id. ¶ 76]; and Jurado received directly from Roe her comments on the report directly,

rather Condon, [id. ¶ 84].  These facts indicate that, contrary to the Policy's silence on the

Director's role in the investigation, Jurado assumed a supervisory, or at least consultatory, role in

the preparation of the report, and had direct and substantive contact with the complaining party

during the investigation.

Doe likewise argues that Jurado excessively involved herself in the DMP's process.  The

policy charges the Director with selecting the members of the DMP, soliciting and responding to

the parties' concerns about potential conflicts of interest among the members, consulting with the

DMP "about any questions they may have about the process or the resolution of the complaint,"

and receiving the DMP's written decision.  [Policy at 19–20].  Although the policy is silent on

who is responsible for referring the DMP's decision to the Dean of Students Office if the

responding party is found Responsible, the Court can infer that this also falls within the

Director's purview.

Again, the undisputed facts suggest Jurado assumed a substantially greater role in the

DMP process than the Policy assigns to the Director.  Jurado edited a document the panel

members had prepared describing each member's vote, [Pl. SMF ¶ 101]; Jurado likewise

suggested revisions to the panel's first draft of its written decision, which the panel members

unanimously accepted [id. ¶¶ 102–03]; and, in a second round of revisions, Jurado drafted a

substantive sentence, "[t]he panel found the inconsistencies in Doe's statements about the

incident made his account less credible than Roe's account," which the two panel members in the

majority voted to include in the final version of the decision, [id. ¶¶ 108–10].  The parties dispute

whether Jurado added additional substantive language about Doe's credibility,[8] and whether she

---

[8] Doe alleges that Jurado added the sentence "Doe agreed that everything happened the way that Roe described it
when they spoke a few days later, and Doe agreed that he would admit that it was non-consensual if anyone asked"

affirmatively suggested "one more finding that needs to be added," [see Dkt. 51 ¶ 104].  Even setting aside these disputed facts, it appears that Jurado actively involved herself in the drafting of the DMP's decision and drafted at least one substantive sentence of it.  The Policy, conversely, assigns the drafting of the decision exclusively to the DMP itself.

Finally, Doe argues that Jurado played an excessive role in the sanctions process.  The Policy does not provide a detailed process for assignment of sanctions; it merely states that "the matter will be referred to the Dean of Students Office who will assign the appropriate sanctions or remedies."  [Policy at 20].  The undisputed facts suggest Jurado worked actively with the Dean of Students Office in formulating a sanction for Doe, including discussing comparable cases, [Pl. SMF ¶ 114]; suggesting how the findings in Doe's case should be classified, [id. ¶ 115]; and providing a direct opinion to the Vice Provost of Student Affairs (the administrator ultimately responsible for implementing the sanction) on the appropriateness of the sanction and the correctness of the DMP's finding of responsibility, [id. ¶ 132].

In total, a triable issue of fact exists around whether the scope Jurado's involvement in the investigation and adjudication of Doe's case fell outside the reasonable expectations the Policy created.[9]  A reasonable jury may, as Brandeis urges, conclude that Jurado's role in the proceedings—although beyond those explicitly assigned to the Director of OEO by the policy—fell within the scope of the duties a reasonable student would expect an administrator in Jurado's position would undertake during a sexual assault investigation.  See Stonehill, 55 F.4th at 316. The Policy does not expressly preclude the Director from participation in the investigation, the

---

during her first round of revisions to the report.  Brandeis alleges that Jurado merely asked the members of the DMP if this language applied to all of their findings.  [Dkt. 51 ¶ 102].  This is a triable dispute.

[9] In Doe's opposition to Brandeis' motion, he raises a similar argument concerning Jurado's involvement in the appellate process, including her substantive revisions to the UAB's written findings.  This likewise contributes to the triable issue concerning Jurado's role.

drafting of the investigative report, the drafting of the DMP's decision, or the assignment of sanctions.  Moreover, a reasonable student could expect that an individual designated as the university's Title IX coordinator would assume an integral role in investigating any allegations of sexual assault on campus, even if not formally designated to do so by the university's policies. Further, a jury could well determine that no prejudice accrued to Doe as a result of Jurado's participation in the proceedings.

Conversely, a reasonable jury could find that the Policy's careful assignment of roles to various independent actors and boards—the Director, the investigator, the three members of the DMP, the three members of the UAB, and the Dean of Students Office—was a deliberate creation of a system of checks and balances that prevented any single official from exerting undue influence over the formal resolution process.  By the letter of the Policy, OEO and the Director play a powerful role in the process: the office is the initial point of contact for the complaining party and is tasked with informing him or her of all available options for addressing the alleged misconduct, including the informal and formal resolution processes and legal remedies outside the university.  Likewise, the office makes initial contact with the responding party, and provides him or her with information about the resolution process and the option to accept or contest responsibility.  OEO is thus the only entity in this process that informs and counsels, rather than merely interviews, the involved parties.  Accordingly, it is reasonable to infer that the Director may have information about the parties that exists outside of the adjudicative record, and may have formed opinions on the basis of these facts not in the record. It is thus reasonable to infer that the Policy's assignment of adjudicative functions to persons other than the Director was a deliberate step to separate the Director's role from the adjudicatory function.

Further, the Director has the sole authority to select each of the seven persons with adjudicatory authority: the investigator, the three members of the DMP, and the three members of the UAB.  The Director is also tasked with addressing any questions the DMP has about the process or the resolution of the complaint.  Again, it is reasonable to infer that the Policy was purposeful in not granting the Director the authority to draft, edit, or provide off-the-record comments on any of the written work these persons are responsible for producing.

A jury may thus reasonably conclude the Policy's limitation on the role of the Director created a reasonable expectation among students that a system of checks and balances existed to prevent any participant in the resolution process from exerting undue influence over adjudication.  Further, it could conclude that Jurado's unauthorized involvement throughout the process upset this system to such a degree that Doe's process did not meet his reasonable expectations.  It could likewise find that Jurado's involvement contributed to Doe's injury, as Jurado suggested language adverse to a finding that Doe was credible.[10]  See Stonehill, 55 F.4th at 316 (holding that a student must assert facts establishing that the university failed to meet his or her reasonable expectations, and must also show injury resulting from the contractual breach).

Brandeis' attempt to close the door on this theory of liability through analogies to two similar cases is unpersuasive, as each case's holding reinforces the Court's conclusion that a triable issue of fact exists surrounding Jurado's role.  The university first cites Doe v. Trustees of Boston College, 892 F.3d 67 (1st Cir. 2018), in which the First Circuit vacated the district court's grant of summary judgment to a university on a similar set of facts, and remanded for trial on a reasonable expectations claim.  One of the circuit's grounds for reversal was the district court's inappropriate conclusion that the Dean of Students and Senior Associate Dean of Students had

---

[10] Doe likewise asserts that Roe's familiarity, through unrelated matters, with members of the adjudicatory process biased the process against him; this is likewise a triable question.

*not*, as a matter of law, interfered with an adjudicatory board's private deliberations.  Id. at 85.  There, the Associate Dean had transmitted to the board a statement from the Dean discouraging a "no finding" result during the period between the board's two deliberative sessions.  Id.  at 85–86.  The parties agreed that this extraneous comment reached the appointed chairperson of the board before the second deliberative session.  Id. at 86.

The First Circuit held that a student could reasonably read the operative policy's language stating that "the Board will meet in private to determine whether the accused is responsible or not" to mean that outside influences would be excluded from the Board's deliberations.  Id.  Accordingly, whether the administrators' communication to the board "inappropriately interfered with the Board's decision" was a "material fact with regard to the [] breach of contract claim" that precluded a grant of summary judgment.  Id.  Although Doe does not allege, and the record does not suggest, that Jurado transmitted extraneous statements of opinion to the board, the Court considers her degree of involvement at all stages of the adjudicatory process—from the investigation to the imposition of sanctions and appeal—to create an analogously triable issue as to whether Brandeis' process failed to adhere to Doe's reasonable expectations.

Likewise, this district's recent decision in Doe v. Williams College ("Williams"), 530 F. Supp. 3d 92 (D. Mass. 2021), is of no help to Brandeis.  The court there denied summary judgment to Williams on the question of whether an administrator "improperly influenced the hearing panel's decision" through his "involvement with drafting of the portion of the findings letter."  Id. at 122.  Although Brandeis attempts to parse distinctions between the facts at bar by arguing that Jurado exerted less influence over the DMP than the administrator in Williams had, summary judgment is no more appropriate here than it was there, as a legitimate question

remains as to the degree to which Jurado's involvement exceeded the reasonable expectations set by the Policy.

Because the facts may reasonably support a verdict for either party on the reasonable expectations theory of liability, summary judgment will not enter for either party.

### 2.   Basic Fairness

The basic fairness theory prohibits a university from arbitrarily or capriciously disciplining a student, or doing so in bad faith.  See Stonehill, 55 F.4th at 317 (citing Driscoll v. Board of Trs. of Milton Acad., 873 N.E.2d 1177, 1187 (Mass. App. Ct. 2007)).  In addition to any explicit promises of fairness a university makes in its contract with a student, Massachusetts law recognizes an "independent duty to conduct disciplinary procedures with basic fairness."  Id. (quoting Boston College, 892 F.3d at 87).

The First Circuit has strongly suggested that the Court's finding of a triable procedural issue on the reasonable expectations claim should preclude any grant of summary judgment on the basic fairness claim.  See id. at 331.  Where a university has made a commitment to an "impartial, prompt, *fair*, and equitable investigative process," a plaintiff may prevail on a basic fairness claim where he "adequately alleged procedural irregularities that may have resulted in prejudice to his defense and, hence, affected the outcome of the misconduct inquiry."  Id. (emphasis in original).  A finding of "prejudicial investigative flaws" is irreconcilable with a contractual commitment to provide a "fair" process.  See id.; see also Boston College, 892 F.3d at 87–88 (reversing district court's grant of summary judgment for university on basic fairness claim after finding a triable question on reasonable expectations claim); Williams, 530 F. Supp. 3d at 123 (denying college's motion for summary judgment on basic fairness claim where

"evidence that [an administrator] improperly influenced the hearing panel's decision raise[d] questions about whether the College conducted a fair adjudication").

The Policy states that Brandeis "strives to provide a resolution process that is prompt, equitable, *fair*, thorough, and impartial towards all parties."  [Policy at 13 (emphasis added)]. As discussed in the context of the reasonable expectations claim above, a triable question of fact exists on whether procedural irregularities surrounding Jurado's role resulted in prejudice to Doe's defense and affected the outcome of the inquiry.  See Stonehill, 55 F.4th at 31. Accordingly, summary judgment will not enter for either party on the basic fairness theory of liability.

### B.      Count 2: Breach of Implied Covenant of Good Faith and Fair Dealing

The contractual duty of basic fairness is the "student disciplinary adjudications' version of claiming a breach of the implied covenant of good faith and fair dealing."  Sonoiki, 37 F.4th at 716.  Unless a student asserts meaningfully distinct grounds for claims of basic fairness and breach of the implied covenant of good faith and fair dealing, courts treat the claims as duplicative.  See Stonehill, 55 F.4th at 337–38; Sonoiki, 37 F.4th at 716.

Here, Doe has asserted no grounds for relief on this count independent of those asserted in support of his breach of contract claim.  Accordingly, the Court will grant summary judgment to Brandeis on this duplicative claim.

### C.      Count 3: Negligent Retention and Supervision

The familiar Massachusetts standard for negligence requires that a plaintiff allege that "the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage."  Jupin v. Kask, 849 N.E.2d 829, 834–35 (Mass. 2006).  Here, Doe specifically alleges

that Brandeis was negligent in selecting and supervising the employees who participated in the disciplinary process.  This claim fits within the framework of negligent retention and supervision, which requires the plaintiff to "show that employer became aware or should have become aware of problems with an employee that indicated his unfitness, and the employer failed to take further action such as investigating, discharge or reassignment."  Stonehill, 55 F.4th at 338 (alterations omitted) (quoting Helfman v. Northeastern Univ., 149 N.E.3d 758, 775 (Mass. 2020)).

A plaintiff's status as a student, whose ordinary remedy against his university is at contract, does not necessarily preclude him from asserting a claim of negligent retention or supervision.  Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 613–14 (D. Mass. 2016); but see Williams, 530 F. Supp. 3d at 123 (holding that breach of contract and negligent supervision claims presented "a distinction without a difference").  Here, even if the breach of contract claim does not preclude the negligent retention and supervision claim, summary judgment for Brandeis is appropriate, as Doe cannot point to facts in the record sufficient to sustain a finding that there were "problems" with employees indicating unfitness, or that Brandeis was or should have been aware of these problems.  See Stonehill, 55 F.4th at 338 (granting motion to dismiss similar claim on similar paucity of evidence).  The facts that Doe relies upon in his briefing on this claim state a cause of action for breach of contract, not for negligence, and any remedy he has lies there.

### D.      Count 4: Title IX

Title IX is seminal civil rights legislation which provides that "no person ... shall, on the basis of sex ... be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Individual plaintiffs may enforce the

provisions of Title IX "through an implied private right of action."  Gebser v. Lago Vista Indep.

Sch. Dist., 524 U.S. 274, 281 (1998).  As a university receiving federal financial assistance,

Brandeis is subject to Title IX.  "A claim of sex bias in the enforcement or design of a college's

sexual misconduct policy may state a claim under Title IX."  Stonehill, 55 F.4th at 331.

 Doe pursues two recognized theories of Title IX liability: "selective enforcement" and

"erroneous outcome."[11]  Id. at 332.  A selective enforcement claim requires the plaintiff to

"demonstrate that 'the severity of the penalty and/or the decision to initiate the proceeding was

affected by the student's gender.'"  Id. at 332 (citation omitted).  An erroneous outcome claim

requires the plaintiff to "allege facts casting some articulable doubt on the accuracy of the

outcome of the disciplinary proceeding, and indicating that gender bias was a motivating factor."

Id. (citation and alterations omitted).

 Doe fails, however, to meet the threshold requirement with respect to either claim of

producing evidence that Brandeis' decision-making was motivated by his gender.  A Title IX

plaintiff must establish "a causal connection between the outcome of his disciplinary proceedings

and gender bias."  Id. at 333–34 (quoting Boston College, 892 F.3d at 91).  Procedural errors

may be relevant in identifying gender discrimination, but "are not inevitably a sign of sex bias";

rather, they may be a result of "ineptitude, inexperience, and sex-neutral pro-complainant bias."

Id. at 334 (quoting Doe v. Samford Univ., 20 F.4th 675, 692 (11th Cir. 2022)).

 In his briefing, Doe identifies only one ground upon which a factfinder could conclude

that his gender played a role in Brandeis' adjudicatory proceedings.  In July 2020, after the

completion of the investigation and shortly before the investigative report was transmitted to the

---

[11] Some authorities define "selective enforcement" and "erroneous outcome" as component parts of a single theory, "differential treatment," see Amherst, 238 F. Supp. 3d at 221, but the First Circuit evaluated them as independent theories in Stonehill, its most recent opinion on this matter, 55 F.4th at 332–33.

DMP, an Assistant Director of Academic Advising communicated to Jurado that Doe had reported that he had been sexually assaulted on campus in February 2020.  [Pl. SMF ¶¶ 209–13]. Jurado and Condon discussed the matter, and agreed not to contact Doe about it until after he completed review of the investigative report, to "keep the two things separate."  [Id. ¶¶ 213–17]. Jurado contacted Doe to discuss options for addressing the conduct he reported shortly after this time.  [Id. ¶ 218].  These facts, as a matter of law, cannot establish a causal connection between the outcome of Doe's proceedings and gender bias.  Stonehill, 55 F.4th at 333–34.  The circumstances of Doe's and Roe's reports of sexual assault are neither similar nor related:  OEO learned of Doe's report of a sexual assault through a mandatory reporter outside of the office, while Roe directly filed a complaint with the office and requested to initiate formal resolution proceedings.  On these limited facts, Doe's argument that Jurado's and Condon's reaction suggested that they treated reports of sexual assault with less urgency when the reporter was male is far too tenuous to support any finding of liability on Title IX.

Accordingly, the Court will grant summary judgment to Brandeis on this claim.[12]

## IV.    CONCLUSION

For the foregoing reasons, Doe's motion for summary judgment is **DENIED**.  Brandeis' motion for summary judgment is **GRANTED** as to Counts 2, 3, and 4 and **DENIED** as to Counts 1 and 5.  A jury trial will be scheduled on Counts 1 and 5.

Dated: February 8, 2023                                  /s/ Angel Kelley
                                                         Hon. Angel Kelley
                                                         United States District Judge

---

[12] The termination of the federal claim, which is the basis for the Court's supplemental jurisdiction over Doe's state-law claims against this non-diverse defendant, "does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion."  Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256–57 (1st Cir. 1996).  Upon considering "concerns of comity, judicial economy, convenience, fairness, and the like," id., the Court concludes that the interests of justice are most appropriately served by its continued exercise of supplemental jurisdiction over Counts 1 and 5, so that it may complete its adjudication of these claims that the parties have litigated for over two years.